# Exhibit

# A

CAUSE NO. _____

| | | |
|---|---|---|
| PRCHOU LLC, D/B/A PREMIER | § | IN THE DISTRICT COURT OF |
| REGIONAL CONSTRUCTION HOUSTON, | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| METROPOLITAN TRANSIT AUTHORITY | § | |
| OF HARRIS COUNTY | § | |
| *Defendants.* | § | ____ JUDICIAL DISTRICT |

## PLAINTIFF'S VERIFIED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff PRCHOU LLC, D/B/A Premier Regional Construction Houston ("PRC"), brings this lawsuit complaining of Metropolitan Transit Authority of Harris County ("METRO") ONLY for Breach of Contract under TEX. LOC. GOV'T CODE ANN. § 271.

### I.
### DISCOVERY LEVEL

1.      Pursuant to Rule 190 of Texas Rules of Civil Procedure, Plaintiff intends to conduct discovery under a Level 2 Discovery Control Plan as defined in Rule 190.3.

### II.
### PURSUANT TO RULE 47 OF TEX. R. CIV. P.

2.      Plaintiff seeks monetary relief over $1,000,000 and injunctive relief. Furthermore, Plaintiff demands for Judgment for all other reliefs to which Plaintiff is justly entitled.

### III.
### JURISDICTION AND VENUE

3.      This Honorable Court has jurisdiction because METRO's governmental immunity from liability and immunity from suit have been waived.

4.      Governmental immunity encompasses two principles: (1) immunity from suit (barring a lawsuit unless the legislature expressly gives its consent to suit) and (2) immunity from liability. *Travis County v. Pelzel & Assoc*s.,77 S.W.3d 246, 248 (Tex. 2002).

5.      First, when a governmental entity contracts with a private party, as METRO has done here, it is liable in its contracts as if it were a private party. *See Gen. Servs. Comm n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001). It is undisputed that METRO executed a written contract for services at issue in this case with Plaintiff. Thus METRO has waived its governmental immunity to liability.  TEX. LOC. GOV'T CODE ANN. § 271.151.

6.      Secondly, pursuant to Section 271.152 of the Tex. Loc. Gov't Code Ann, METRO also waived immunity to suit. This section provides:

> A local government entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity **to suit** for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE ANN. § 271.152. *See* Act of May 23, 2005, 79th Leg., R.S., ch. 604, § 3, 2005 Tex. Gen. Laws 1548, 1549 (September 1, 2005 effective date), *reprinted* following TEX. LOC. GOV'T CODE ANN. § 271.152.

7.      Specifically, METRO is a local governmental entity; it is authorized to enter into the contract at issue, which has the essential terms of the agreement for providing services to the local governmental entity that is properly executed on behalf of the local governmental entity; and it is in fact entered into a written contract subject to the subchapter.

8.      In addition, the damages for which Plaintiff brings suit exceed the minimum jurisdictional limits of the Court.

9.      Venue is proper in Harris County, Texas, as Defendant METRO maintains its principal offices in Harris County, under Texas Local Government Code, Section 271.152-153.

## IV.
## INTRODUCTION

10.     Ms. Mukadas D. Kurban is a hardworking businesswoman, a dutiful wife of a reputable oncologist in the Texas Medical Center, and a loving, caring mother of two wonderful young ladies, who look up to her not only as a role model, but a determined woman who has never allowed herself to be bullied—especially in the business arena.  Most importantly, Ms. Kurban is a proud U.S. citizen who loves this country with all her heart and soul.

11.     Ms. Kurban founded, owned, and operated the Houston construction company, PRCHOU LLC, which has provided services for METRO since 2019 with three successful million-dollar contracts, listed in PRC's History on page 4.

12.     In 2022, Ms. Kurban's company, PRC, was awarded a service contract with METRO. Unfortunately, METRO blatantly breached its contract.  Why? Because they wanted to terminate the contract to give it to a different contractor, Total Contracting Limited, their "pre-arranged bidder." Shortly after the Contract was wrongfully terminated on May 5, 2023, METRO did not bother to respond although PRC requested in writing to appeal the termination decision on May 8, May 15, June 16, and June 29 of 2023.

13.     METRO purportedly pretended to advertise for bids for this project on June 21, 2023. On September 21, 2023, METRO subsequently awarded it to their "pre-arranged bidder," Total Contracting Limited, for $16,492,788.35.

14.     To bring down PRC after making complaints to METRO, METRO delayed and failed to pay PRC for **(1)** the balance due and owed for work done by PRC under the contract (as it was amended), including the amount owed as compensation for the increased cost to perform the work as a direct result of METRO's delays or acceleration; **(2)** the amount owed for change orders and additional work the contractor is directed to perform by METRO in connection with

the contract; and interest and the **(c)** actual damages suffered by Plaintiff.[1] After many attempts requesting to resolve the dispute with METRO and the other Defendants failed, Ms. Kurban decided to fight against the bureaucratic municipal system. Her resilience has made all Houston businesswomen proud!

## V.
## REQUEST FOR DISCLOSURE

15.     Pursuant to Rule 194.2 of the Texas Rules of Civil Procedure (effective since 2021), Plaintiff requests that Defendants disclose, within thirty (30) days after METRO files its Answer, the information and material described in Rule 194.2 of the Texas Rules of Civil Procedure.

## VI.
## PARTIES

16.     PRCHOU LLC, D/B/A Premier Regional Construction Houston ("PRC"), is a Houston company existing under the laws of the State of Texas with its principal place of business in Houston, Harris County, Texas.

17.     Defendant Metropolitan Transit Authority of Harris County ("METRO") is a government entity and may be served with citation by serving its President and Chief Executive Officer, or authorized Official at 1900 Main Street, 3rd Floor, Houston, Texas 77002.

---

[1] Tex. Loc. Gov't Code Ann § 271.153 - Limitations on Adjudication Awards provides: (a) Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;(3) reasonable and necessary attorney's fees that are equitable and just; and (4) interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.(c) Actual damages, specific performance, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by Section 271.151(2)(B).Tex. Loc. Gov't. Code § 271.153. Amended by Acts 2013, 83rd Leg. - Regular Session, ch. 1138,Sec. 3, eff. 6/14/2013.Amended By Acts 2011, 82nd Leg., R.S., Ch. 226, Sec. 1, eff. 9/1/2011.Amended By Acts 2009, 81st Leg., R.S., Ch. 1266, Sec. 8, eff. 6/19/2009.Added by Acts 2005, 79th Leg., Ch. 604, Sec. 1, eff. 9/1/2005.

## VII.
## THE SUCCESSFUL HISTORY OF THE PRIOR CONTRACTUAL RELATIONSHIP BETWEEN METRO AND PRC

18.     Since 2019, PRC was awarded and successfully completed three METRO construction contracts, each worth over $1 million to $2 million:

1.     Construction of Bike Path And Sidewalk (Improvements) Along Red Line (2019).
METRO Contract No. 7319000092. Contract amount: $2,252,902.50: Completed Successfully because there was no Gary Lehman in the picture.

2.     Leeland Bike Lane Construction (2020).
METRO Contract No. 7020000054. Contract amount: $1,413,818.06: Completed Successfully because there was no Gary Lehman in the picture.

3.     Traffic Signal Mast Arms Upgrade, 12 Downtown Locations (2021).
METRO Contract No. 7021000058. Contract amount: $1,392,352.00: Completed Successfully because there was no Gary Lehman in the picture.

(PRC finished this Project far ahead of schedule for less than the contract amount.)

## VIII.
## TIMELINE AND EVENTS OF THE PROJECT

### A. CHRONOLOGY.

19.     In 2022, METRO hosted a public bid for a new project known as 56 BOOST. After bidding $11.5 million, PRC was given written notice of contract award from METRO for the job. (**Exhibit 1**: METRO Contract with Plaintiff with specific terms - No. 7022000111 - 56 Airline/Montrose BOOST Construction Contract).  METRO issued a separate Notice to Proceed (NTP) Letter that requested the work be finished within 24 months from the effective date noted in the NTP.

April 7, 2022:          PRC received notice of contract award from METRO.

May 19, 2022:          PRC received the first Work Authorization for services for Segment #2 of Route 56 - between Cavalcade and Tidwell. Without the City of Houston having an approved set of plans, per contract, PRC could not obtain Permits. This factual evidence shows that the Procurement Department

OEBO is a mess, and obstructed the project work due to METRO mismanagement.

May 23, 2022: After a month and 16 days, Notice to Proceed was issued by METRO, causing delay damages to PRC.

June 1, 2022: PRC received the second Work Authorization for services for Segment #3.

August 4, 2022: After delivering the bond document, PRC was informed by Michael Diettel and Michael Kyme, who is the METRO Contract Officer for this specific job, that the document was lost while in the possession of the Procurement Department. The document was then found the following day. (This factual evidence again demonstrates one of many instances in which the METRO has shown irresponsible mismanagement and lack of professionalism when working with PRC.)

September 15, 2022: PRC filed a formal complaint against both Philip Cavazos, METRO Project Manager, and Gary Lehman who worked for Third-Party Arcadis (both of whom are Project Managers ("PMs") for the project).

METRO then breached the contract.

September 27, 2022: PRC submitted the P6 schedule (Payment Application 6) to METRO.

October 19, 2022: PRC submitted the same P6 schedule to METRO via its agent Gary Lehman of Arcadis again.

*[At this point, despite METRO's nonpayment, PRC continued to fulfill its side of the contract agreement by continuing work on the job site.]*

December 7, 2022: Around this time, there were many dangerous incidents concerning the safety of PRC's workers. Due to the location of the job site, workers were subjected to theft, threats, and intimidation by criminals in the area and harassed by strangers with machetes. PRC informed METRO numerous times regarding these incidents and requested police protection to aid the workers' safety. However, METRO proceeded to ignore these claims and did not respond to the requests made by PRC.

[PRC continued working in good faith on the job site to complete the project.]

January, 2023: PRC did not receive the full payment amount that was promised by METRO for Payment Application 6 (which was submitted in January of 2023, but was not paid in full).

| | |
|---|---|
| February, 2023: | PRC also did not receive the full payment amount that was promised by METRO for Payment Application 7 (that was submitted in February of 2023, but was not paid in full). |
| | [PRC finished the work in March and was owed and underpaid.] |
| February 20, 2023: | The original awarded contract with METRO was for $11.5M. However, PRC repeatedly requested a 20% increase due to COVID-19, inflation, and multiple supply chain issues. These requests were acknowledged by METRO. |
| April 5, 2023: | PRC submitted two separate Payment Application invoices in the amount of $202,126.25 due and owed for Segment 2 and Segment 3 to METRO; however, PRC was not paid for either of them. |
| | [During April of 2023, PRC continued to work even though they did not receive payment for the two invoices.] |
| April 27, 2023: | **PRC was granted extensions of both Work Authorizations to complete both Segments 2 and 3 by December 31, 2023.** |
| April 28, 2023: | *See* METRO's Email attached to PRC's May 15 Response. |
| April 29, 2023: | *See* PRC's Email Reply to METRO. |
| May 1, 2023: | *See* Danielle Smith's Email from METRO at 1:55 p.m. |
| May 1, 2023: | *See* PRC's Email Reply to METRO at 2:04 p.m. |
| **May 5, 2023:** | PRC again submitted two more separate Payment Application invoices owed and due for Segment 2 and Segment 3 to METRO. However, once again, PRC was not paid for either of them [making a total of four unpaid invoices of **$50,884.38; $54,219.21; $70,436.26 and $22,411.19** respectively]. |
| | At this point in the project, as a small and minority business, PRC exhausted all of its resources, its line of credit, and company cash flow to support the project. After many attempts to receive payments for the work that was done, PRC notified METRO that if METRO did not pay the outstanding invoices, PRC would have no choice but to pause the project. |
| | METRO's nonpayment forced PRC to pause the project at the beginning of May of 2023. PRC then repeatedly requested multiple meetings with the METRO Procurement Department to address the four invoices that were not paid. |

Furthermore, PRC underwent significant hardship during this time, including having heavy machinery being stolen (loss of $168,000.00), 12 break-ins (which were reported to the Houston Police Department and the Metro Project Manager), the theft of working tools (loss of $24,000.00), 16 different replacements for the front and back windows of the workers' cars as a result of ongoing theft, and two electronic arrow boards that were shot down at the job site (loss of $11,800.00). The total amount for these actual damages is $203,800.00.

May 5, 2023:     Without warning, METRO Small Business and Procurement wrongfully sent PRC an Email at 2:58 p.m. giving the Notice of Termination – Contract No. 7022000111 – Boost 56 Airline/Montrose.  (*See* **Exhibit 2**.)

The Allegations made by METRO were false.

*This was a shock for PRC, because PRC did not have any say in this matter. Instead of communicating with PRC to resolve the dispute, METRO abruptly terminated the contract. Instead of resolving this issue, the termination was decided one-sidedly.  METRO also made false claims in the letter, without giving PRC the opportunity to address and correct the errors all made by METRO that were not PRC's fault.*

May 8, 2023:     PRC sent METRO its first response, offering mutual resolution, citing the week of May 8-12 as a complete "weather week due to heavy rainfall expected" and requesting payment so PRC can complete Segment 2 and 3. In the May 8, 2023 response, PRC stated as follows:

*"If payment is made, PRC can continue traffic control and site work for as soon May 15, 2023. The week of May 8-12 <u>is a complete weather week due to heavy rainfall expected.</u> If it is the mission for METRO Small Business to support certified Small Business, we ask METRO Small Business to reconsider its decision given (without a proper due and appeals process afforded) to an SBE/DBE firm and allow us to complete Segment 2 and 3."* (*See* **Exhibit 3**: PRC's May 8, 2023 Response offering Resolution.)

May 15, 2023:    PRC sent its response and Appeal Request to the METRO Contract Disputes Appeals Committee, Contract Officer Michael Diettel, but again never received any response from these persons or the Contract Disputes Appeals Committee of METRO. (*See* **Exhibit 4**: PRC's May 15, 2023 Response and request for Appeal.)

*PRC continued to request an appeal of the decision pursuant to the contract, and was met with no response from METRO or urgency to the claim. Unfortunately, the company suffered multiple losses in terms of*

*termination of numerous employees and ultimately being forced to close down the company. The irresponsible actions on METRO's part have severely affected all parties involved.*

June 16, 2023: PRC sent a formal letter to Michael Diettel, Contracting Officer, but again METRO never responded. Sections 9, 35, and 36 of the contract were violated in refusing to give PRC opportunity to dispute METRO's stated grounds for termination, not providing evidence in support thereof, and refusing to give PRC an evidentiary hearing to present its case in accordance with Section IX, Paragraph 9 of the Contract.

June 21, 2023: **METRO purportedly advertised this project and on September 21, 2023, subsequently awarded it for $16,492,788.35 to a different contractor, Total Contracting Limited, their "pre-arranged bidder."**

June 29, 2023: PRC sent another formal letter to Michael Diettel, Contracting Officer, including an Email sent at 4:57 p.m. to Michael Diettel and Charles Holmes at METRO requesting an appeal. METRO did not respond.

To this day, PRC still has not received a response from METRO regarding the appeals it submitted on May 8, May 15, June 16, and June 29, 2023. However, METRO did make a demand of performance upon PRC's surety without providing PRC the required appeal. This caused additional damages to PRC. **(***See*** Exhibit 5** including the correspondence below.)

20. *TO THIS DAY, METRO HAS REMAINED SILENT.*

**B. On June 29, 2023, Connor Best of Munsch Hardt Law Firm, Attorney for PRC, sent a Letter demanding an appeal to Michael Diettel, METRO Contract Disputes Appeals Committee, but METRO did not answer.**

Re: PRCHOU, LLC's Appeal pursuant to Section IX(9) of METRO'S Termination of Contract No. 7022000111 BOOST 54 AIRLINE/MONTROSE

June 29, 2023

Via Certified Mail/RRR 9314769904300109537664 and Email (Michael.Diettel@ridemetro.org)

METRO Contract Disputes Appeals Committee c/o Michael Diettel Contracting Officer 1900 Main Street Houston, Texas 77002

Re: PRCHOU, LLC's Appeal pursuant to Section IX(9) of
METRO'S Termination of Contract No. 7022000111 BOOST 54
AIRLINE/MONTROSE

Dear Mr. Diettel:

*I am writing this letter in accordance with my previous
letter, dated June 16, 2023, to which I have not received any
response. Per my previous letter, PRC disputes METRO's
termination of the Contract, and submitted two responses
appealing METRO's termination of the Contract and requesting a
hearing to contest the termination on May 8, 2023 and May 15,
2023. In its appeal to the METRO Contract Disputes Appeals
Committee on May 15, 2023. PRC disputed METRO's stated
grounds for termination, provided evidence in support thereof, and
requested an evidentiary hearing to present its case in accordance
with Section IX, Paragraph 9 of the Contract.*

*PRC still has not received any response from METRO
regarding the appeals it submitted in May, nor its June 16, 2023
letter requesting METRO comply with its Contract. METRO's
failure to provide an appeal is a breach of the Contract and waives
ay requirement of PRC to submit to the evidentiary hearing.
Furthermore, METRO's wrongful demands of performance to
PRC's surety without providing PRC the required appeal may
cause damages to PRC for which METRO will be liable and
constitutes a failure to mitigate damages by METRO. Please
confirm in writing that METRO will be providing an evidentiary
hearing, as required by the Contract, by July 5, 2023.*

*By the copy below, I am providing a copy of this
correspondence to the performance bond surety on the project at
issue, Travelers Casualty and Surety Company of America.*

*PRC reserves all rights and remedies granted to it pursuant
to the Contract, at law and equity, and the requests contained in
this letter shall not be construed as a waiver of any of PRC's rights
and/or remedies. In addition, METRO's wrongful termination and
breach of the Contract has caused PRC to incur damages and
attorney's fees, which are recoverable pursuant to Chapter 38 of
the Texas Civil Practice and Remedies Code.*

*Furthermore, PRC requests METRO preserve and retain
all documents, electronically stored information (ESI), and
physical evidence related to the Contract, in accordance with
Texas and Federal law.*

*I look forward to hearing from you.*

*Regards,*

Connor Best
Attorney at Law

cc: Charles Holmes
Supervisor, Contracts Specialist
Metropolitan Transit Authority of Harris County
1900 Main Street
Houston, TX 77002
Charles.Holmes@ridemetro.org

Travelers Casualty and Surety Company of America c/o
Elizabeth Roman
EJROMAN@travelers.com"

21.     **To this day, METRO remains silent; thus, litigation has ensued.**

## IX.
## BREACH OF CONTRACT CLAIM AGAINST METRO

22.     Based on the above facts, METRO breached the contract that it had with PRC; and METRO failed to keep and fulfill the promises that formed all or part of the agreement with PRC.  METRO breached the contract with Plaintiff by failing to pay the amount due and owed for work that Plaintiff had performed so that Plaintiff could continue completing the job.

23.     METRO further breached the contract by violating Sections 9, 35, 36, and many other sections, in refusing to allow PRC to dispute METRO's stated grounds for termination, providing evidence in support thereof, and refusing to give PRC an evidentiary hearing to present its case in accordance with Section IX, Paragraph 9 of the Contract.

24.     To this day, PRC still has not received any response from METRO regarding the appeals that it submitted on May 8, May 15, June 16, and June 29, 2023, requesting METRO comply with its Contract.  METRO's failure to provide an appeal is a breach of the Contract in itself and waives any requirement of PRC to submit to the evidentiary hearing.  Furthermore,

METRO's wrongful demands of performance to PRC's surety without providing PRC the required appeal may cause damages to PRC for which METRO will be liable and constitutes a failure to mitigate damages by METRO.

## X.
## SPECIFIC PERFORMANCE

25.     In the alternative, Section 271.153(c) provides: Actual damages, **specific performance**, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by Section 271.151(2)(B).

26.     The petition and application for specific performance should demonstrate that:

(1)     There was an enforceable contract;

(2)     Plaintiff tendered performance, or tendered performance was excused by Defendant's breach or repudiation of the contract;

(3)     Defendant repudiated the contract, breached the contract, or otherwise failed to perform Defendant's obligations under the contract; and

(4)     Plaintiff is ready, willing, and able to perform at the time the contract was to have closed.

27.     In the instant case, there was an enforceable contract, PRC tendered performance, or tendered performance was excused by METRO's breach or repudiation of the contract; and METRO's repudiated the contract, breached the contract, or otherwise failed to perform.

28.     As such, PRC is seeking Specific Performance and requesting the Court to hold an emergency hearing ordering METRO to perform its obligations under Sections 9 and 35.

## XI.
## REQUEST FOR EMERGENCY HEARING FOR SPECIFIC PERFORMANCE.

29.     PRC respectfully requests the Court to grant it an emergency hearing for specific performance.

## XII.
## DAMAGES AGAINST METRO

30.     As a direct and proximate result of Defendants' breaches, Plaintiffs suffered unliquidated damages that fall within the jurisdictional limits of this Court.

31.     Pursuant to Section 271.153 (a) and the rulings of the Texas Supreme Court, Plaintiff respectfully requests the following damages to be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate Plaintiff.

32.     Section 271.153 provides:

(a) Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed of owner-caused delays or acceleration;
(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;
(3) reasonable and necessary attorney's fees that are equitable and just; and
(4) interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.
                                        *****
(c) Actual damages, **specific performance**, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by Section 271.151(2)(B).

33.     "Section 271.153 does not add immunity that Section 271.152 takes away; Section 271.152 uses Section 271.153 to further define to what extent immunity has been waived." *Zachry Const. Corp. v. Port of Houston Auth. of Harris County,* 449 S.W.3d 98, 106 and 114 (Tex. 2014).

34.     "Under Section 271.153(a)(1), the 'amount of money awarded . . . for breach of contract' includes 'the balance due and owed . . . under the contract' as amended, 'including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays." *Port of Houston Auth. of Harris County*, 449 S.W.3d at 114. The Texas Supreme Court further held: "If so, as we conclude, the second part of the immunity issue is whether the delay damages Zachry seeks are permitted by the Act, so that the Port's immunity from suit is waived. We conclude they are." *Id.*

35.     According to the Texas Supreme Court,[2] the phrase, "balance due and owed/owing" is not defined in the Act, and the Legislature has not used it except in three other statutes waiving governmental immunity, where it is also undefined: the State Contract Claims Act[3], the County Contract Claims Act,[4] and the State Agency Contract Claims Act.[5] The Texas

---

[2] *Zachry Const. Corp. v. Port of Houston Auth. of Harris County,* 449 S.W.3d 98, 106 and 114 (Tex. 2014).

[3] The Supreme Court included and discussed TEX. GOV 'T CODE § 2260.003(a). This Code stated:  ("The total amount of money recoverable on a claim for breach of contract under this chapter may not . . . exceed an amount equal to the sum of: (1) *the balance due and owing on the contract price*; (2) *the amount or fair market value of orders or requests for additional work made by a unit of state government to the extent that the orders or requests for additional work were actually performed*; and (3) *any delay or labor-related expense incurred by the contractor as a result of an action of or a failure to act by the unit of state government or a party acting under the supervision or control of the unit of state government*.").

[4] The Supreme Court included and discussed TEX. LOC. GOV'T CODE § 262.007(b). This Code provides: ("The total amount of money recoverable from a county on a claim for breach of the contract is limited to the following: (1) the balance due and owed by the county under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration; (2) the amount owed for change orders or additional work required to carry out the contract; (3) reasonable and necessary attorney's fees that are equitable and just; and (4) interest as allowed by law.").

[5] The Supreme Court included and discussed TEX. CIV. PRAC. & REM. CODE § 114.004(a). This Code provides: ("The total amount of money awarded in an adjudication brought against a state agency for breach of an express provision of a contract subject to this chapter is limited to the following:(1) the balance due and owed by the state agency under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration if the contract expressly provides for that compensation; (2) the amount owed for written change orders; (3) reasonable and necessary attorney's fees based on an hourly rate that are equitable and just if the contract expressly provides that recovery of attorney's fees is available to all parties to the contract; and (4) interest at the rate specified by the contract or, if a rate is not specified, the rate for postjudgment interest under Section 304.003(c), Finance Code, but not to exceed 10 percent.").

Supreme Court further held that the word **"due" simply means "owing or payable" and "owing"** **means "unpaid."** [6]

36.     The Court further held that a "balance due and owed . . . under the contract" is simply **the amount of damages for breach of contract payable and unpaid.** The Court further held that direct damages for breach is "the necessary and usual result of the defendant's wrongful act." **and that were "contemplated at the time [the parties] made the contract that such damages would be a probable result of the breach."**

37.     Furthermore, Section 271.153(a)(1) also allows the inclusion of "any amount owed as compensation for . . . owner-caused delays." [7]

38.     The Court clearly said in this landmark decision: "While the Legislature clearly intended to limit the recovery of consequential damages on contract claims permitted by the Act,[8] nothing in the Act suggests that the Legislature intended to create a unique and somehow limited standard for measuring direct damages for breach of contract.  Generally, a contractor has a right to delay damages for breach of contract. The parties are free to modify or exclude it by agreement, but unless they do, the right provided by law is as much a part of the contract as the rights the contract expressly creates." *Zachry Const. Corp. v. Port of Houston Auth. of Harris County,* 449 S.W.3d 98, 106 and 114 (Tex. 2014).

---

[6] *See* Black's Law Dictionary 609 (10th Ed. 2014).

[7] *Housing Auth. of Dallas v. Hubbell*, 325 S.W.2d 880, 884-885, 890-891 (Tex. Civ. App.—Dallas 1959, writ ref'd n.r.e.) (holding NO DELAY DAMAGES clause did not bar delay damages found to have been caused by owner arbitrarily and capriciously—defined as "willful and unreasoning action without due consideration and in disregard of the facts, circumstances, and the rights of other parties involved"—even though NO DELAY DAMAGES clause barred delay damages "from any cause"); *U.S. ex rel. Wallace v. Flintco*, 143 F.3d 955, 964-965 (5th Cir. 1998) (holding NO DELAY DAMAGES clause did not preclude recovery of delay damages caused by owner's active interference with the contractor's performance, without considering impact of NDFD language); *see generally* P. V. Smith, Annotation, *Right of Building or Construction Contractor to Recover Damages Resulting from Delay Caused by Default of Contractor*, 115 A.L.R. 65 (1938).

[8] "Consequential damages are those damages that result naturally, from the defendant's wrongful acts." *Basic Capital Mgmt. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex. 2011); *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 144 (Tex. 2012). Delay damages are consequential damages.

39.     As such, Plaintiff seeks damages against METRO for:

a.     Actual damages including the amount due and owed under contract, delay damages; specifically, all damages allowed under Section 271.153 and by the Texas Supreme Court interpreting Section 271.153.[9]

b.     Specifically, all damages due to Defendants' delays and nonpayment in performance of the contract; due to METRO's breach.

> "We hold that Zachry's claim for delay damages is not barred by immunity or by the no-damages-for-delay provision of the contract." (*Port of Houston Authority* of Harris County, Texas, 449 S.W.3d 98, at 106 and 114.)

c.     All damage resulted from the changing of orders.

d.     All reasonable expenses incurred by Plaintiff, including court costs and reasonable and necessary Attorney's fees; and

e.     Pre-judgment and post-judgment interest.

40.     As to Herman Gary Lehman IV and Arcadis, Pierre Merhi, and Total Contracting Limited, Plaintiff seek damages for actual damages and exemplary damages which are two times the actual damages.

41.     The Defendants are jointly and severally liable for the actual damages.

## XIII.
## ATTORNEY'S FEES

42.     Plaintiff is entitled to recover reasonable and necessary Attorney's fees under Texas Civil Practice & Rem. Code, Section 38.001, and under Sections 271.153(a)(3). It was necessary for Plaintiff to hire the undersigned Attorneys to file this lawsuit. Upon judgment, Plaintiff respectfully requests an award of Attorney's fees and costs.

---

[9] *Zachry Const. Corp. v. Port of Houston Auth. of Harris County,* 449 S.W.3d 98, 106 and 114 (Tex. 2014).

## XIV.
## JURY DEMAND

43.     Plaintiff demands a Trial by Jury and submits the appropriate fee.

## XV.
## CONDITIONS PRECEDENT

44.     All conditions precedent has been performed or have occurred as required by

Texas Rule of Civil Procedure 54.

## PRAYER

45.     For the above reasons, Plaintiff prays for judgment against Defendants, with

interest on the judgment at the legal rate, pre-judgment interest, costs of court, and for such other

further relief, both in law and equity, to which Plaintiff may show itself justly entitled.


Respectfully submitted,

**The Kelley Law Firm**
**By: */s/ Lloyd E. Kelley*_____
**Lloyd E. Kelley**
Texas Bar No. 11203180
kelley@lloydekelley.com
2726 Bissonnet, Suite 240, PMB 12
Houston, Texas 77005
(281) 492-7766 (main)
(281) 652-5973 (fax)
**LEAD COUNSEL FOR PLAINTIFF**

**CAGLE & ASSOCIATES**
By: */s/ R. Jack Cagle*_____
**R. JACK CAGLE**
**State Bar No. 03591850**
The Texas Justice Center
4900 Fournace Place, Suite #200
Bellaire, Texas 77401
(713) 927-0720 Telephone
**CO-COUNSEL FOR PLAINTIFF**

**THE TAMMY TRAN LAW FIRM**
By: */s/ Minh-Tam Tran*
**MINH-TAM TRAN**
Texas State Bar No. 20186400
ttran@tt-lawfirm.com
4900 Fournace Place, 4th Floor
Bellaire, Texas 77401
Telephone: (832) 372-4403
**ATTORNEY-IN-CHARGE FOR**
**PLAINTIFF**

## VERIFICATION

STATE OF TEXAS        §
COUNTY OF HARRIS    §

Before me, a notary public, on this day, personally appeared **Mukadas D. Kurban**, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are true and correct and within personal knowledge.

Mukadas D. Kurban

**SWORN TO AND SUBSCRIBED BEFORE ME**, the undersigned authority, on the **28th day of February 2024**, to certify which witness my hand and seal of office.

VINH-HUY VINCENT LAM
Notary ID #133396323
My Commission Expires
October 15, 2025

NOTARY PUBLIC IN AND
FOR THE STATE OF TEXAS

# Exhibit 1

## METRO Contract with PRC with specific terms

## No. 702200111
## 56 Airline/Montrose BOOST Construction Contract

## Award Notice: April 7, 2022



**Mission Statement**

*"Provide safe, clean, reliable, accessible and friendly public transportation services to our region."*

**Board of Directors**

Sanjay Ramabhadran (Ram)
*Chair*

Jim Robinson
*First Vice-Chair*

Don Elder, Jr.
*Second Vice-Chair*

Troi Taylor
*Secretary*

Lex Frieden

Bob Fry

Christopher G. Hollins

Terry Morales

**President & Chief Executive Officer**

Thomas C. Lambert



Date: April 7, 2022
Mukadas D. Kurban
CEO
PRCHOU, LLC.
3411 Richmond Ave., Suite 610
Houston, Texas 77046

**SUBJECT:  Notice of Contract Award**
**METRO Contract No.  7022000111 – 56 Airline/Montrose BOOST Construction**
**Contract**

Dear Ms. Mukadas D. Kurban:

This letter is your written notification of award for base Contract No. 7022000111, copy attached for your files.

METRO will issue a separate Notice-to-Proceed (NTP) letter to you.  We request that the Work be prosecuted fully in twenty-four (24) months from the effective date noted in the NTP, unless otherwise extended or terminated by METRO in accordance with the terms and conditions of this Contract.  You are reminded that the amount of this contract shall not exceed Eleven Million, Five-Hundred-Thousand and 00/100 Dollars ($11,500,000.00), unless changed in writing by an authorized METRO Representative.

**As applicable, you are requested to provide the following information to me from the date of this letter:**

- o   **Payment and performance bonds within fourteen (14) calendar days;**
- o   **All subcontractor agreements, containing flow-down language within fifteen (15) calendar days.**

Subcontractor agreements will be subject to approval by METRO's Office of Small Business. All information will become part of the contract files.

METRO uses an online system, Docutrax, to automate and streamline the process of insurance certificate collection and management. We will forward your COI to Docutrax upon receipt. Docutrax will contact you directly by email, from email address MetroCOI@docutrax.com, when the COI is due to expire or when any other deficiency affecting your compliance with METRO's insurance coverage requirements is identified. Please notify your insurance agent/broker of any deficiencies. If you have questions, please feel free to contact Docutrax directly at MetroCOI@docutrax.com or 1-855-747-5866.

**Please be sure that every invoice you submit under this contract is presented to METRO with a completed Contractor's Release form, Exhibit C to this contract, as required in Section V of this contract, Article 2, paragraph C5.**

As work under this contract progresses, please contact me at (713) 652-8018 or md66@ridemetro.org if you have any questions concerning contractual matters. For questions or issues concerning specific work requirements, please contact the Project Manager assigned to this contract, Casey McKay, at (713) 321-9449 or Casey.McKay@ridemetro.org.

Sincerely,

*Michael Diettel*

Michael Diettel
Contracting Officer

cc:  Philip Brenner: Office of Management & Budget; Casey McKay: Project Manager; Kamesha Guidry: Office of Small Business; Joyce Alabi: Davis Bacon Specialist; Darrell Dartez: Risk Management; Contract File No. 7022000111

---



# CONTRACT NO. 7022000111

## BY AND BETWEEN

## THE METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS

## AND

## PRCHOU, LLC.
### 3411 Richmond Ave., Ste 610
### Houston, TX 77046

## FOR

## 56 BOOST CONSTRUCTION CONTRACT

## FEDERAL FUNDING

IFB No. 4022000021                                                    Contract No. 7022000111

# TABLE OF CONTENTS

**SECTION II - FORMS FOR BIDDING/AWARD** .................................................................................... 1
1    SOLICITATION, BID AND AWARD FORM .................................................................................. 1
2    OFFER/ACCEPTANCE/AWARD SIGNATURE PAGE ................................................................ 2
3    BID/CONTRACT AMOUNT, ITEMS AND PRICES ...................................................................... 3

**SECTION III - DELIVERIES OR PERFORMANCE ARTICLES** ...................................................... 10
1    DEFINITIONS ............................................................................................................................. 10
2    LIQUIDATED DAMAGES ........................................................................................................... 10
3    PERFORMANCE AND PAYMENT BONDS ............................................................................... 10
4    ADDITIONAL BOND SECURITY ............................................................................................... 11
5    PERIOD OF PERFORMANCE ................................................................................................... 11
6    SCHEDULES ............................................................................................................................. 11
7    TEXAS ETHICS COMMISSION (TEC) ELECTRONIC FILING .................................................. 11
8    WORK TO BE PERFORMED ..................................................................................................... 11
9    WORK AUTHORIZATIONS ....................................................................................................... 11

**SECTION IV - INSPECTION AND ACCEPTANCE ARTICLES** ..................................................... 13
1    INSPECTION OF CONSTRUCTION .......................................................................................... 13

**SECTION V - CONTRACT ADMINISTRATION DATA ARTICLES** ................................................ 14
1    COMPENSATION ....................................................................................................................... 14
2    INVOICING AND PAYMENT ...................................................................................................... 14
3    ADMINISTRATIVE CONTROL OF CORRESPONDENCE ......................................................... 16
4    CONTRACTOR REPRESENTATIVE ......................................................................................... 16
5    MINUTES OF MEETINGS .......................................................................................................... 16
6    NOTICES ................................................................................................................................... 16

**SECTION VI - INSURANCE ARTICLES** ....................................................................................... 17
1    CONTRACTOR'S INSURANCE ................................................................................................. 17
2    INDEMNIFICATION AGREEMENT ............................................................................................ 18

**SECTION VII - SMALL BUSINESS PROGRAM ARTICLES FOR CONTRACTS WITH SMALL BUSINESS GOALS** .................... 19

**SECTION VIII - SPECIAL TERMS AND CONDITIONS ARTICLES** .............................................. 20
1    CONFIDENTIALITY AND NONDISCLOSURE ........................................................................... 20
2    CONTRACTOR'S EMPLOYEES ................................................................................................ 20
3    GOVERNMENT CODE 2258, PREVAILING WAGE RATES ...................................................... 21
4    NO DAMAGES FOR DELAYS ................................................................................................... 21
5    USE OF LOW SULFUR DIESEL ................................................................................................ 21

**SECTION IX - GENERAL TERMS AND CONDITIONS ARTICLES** .............................................. 22
1    ACCESS REQUIREMENTS FOR INDIVIDUALS WITH DISABILITIES ...................................... 22
2    ASSIGNMENT ........................................................................................................................... 22
3    CHANGES ................................................................................................................................. 22
4    CLEANING UP ........................................................................................................................... 23
5    COMPOSITION OF CONTRACTOR .......................................................................................... 23
6    CONTRACT ORDER OF PRECEDENCE ................................................................................... 23
7    COVENANT AGAINST CONTINGENT FEES ............................................................................ 23
8    DIFFERING SITE CONDITIONS ................................................................................................ 23
9    DISPUTES ................................................................................................................................. 23
10   DISSEMINATION OF CONTRACT INFORMATION ................................................................... 24
11   EQUAL OPPORTUNITY FOR VEVRAA PROTECTED VETERANS ........................................... 24
12   ETHICAL CONDUCT ................................................................................................................. 26
13   EXTRAS .................................................................................................................................... 26
14   FORCE MAJEURE ..................................................................................................................... 26
15   INDEPENDENT CONTRACTOR ............................................................................................... 26
16   INTERPRETATION, JURISDICTION AND VENUE .................................................................... 26
17   LAYOUT OF WORK .................................................................................................................. 26
18   MATERIAL AND WORKMANSHIP ............................................................................................. 27
19   METRO-FURNISHED DOCUMENTS ......................................................................................... 27
20   METRO-FURNISHED PROPERTY ............................................................................................ 27
21   OPERATIONS AND STORAGE AREAS .................................................................................... 28
22   OTHER CONTRACTS ................................................................................................................ 28
23   PATENT INDEMNITY ................................................................................................................ 28
24   PERFORMANCE OF WORK BY THE CONTRACTOR .............................................................. 28
25   PERMITS AND RESPONSIBILITIES ......................................................................................... 28
26   PRICING ADJUSTMENTS ......................................................................................................... 28

27    PROTECTION OF EXISTING VEGETATION, STRUCTURES, UTILITIES AND IMPROVEMENTS ...............29
28    SAFETY ...............................................................................................................................29
29    SEVERABILITY .....................................................................................................................30
30    SITE INVESTIGATIONS AND CONDITIONS AFFECTING THE WORK..........................................30
31    SPECIFICATIONS AND DRAWINGS ........................................................................................30
32    SUBCONTRACTORS .............................................................................................................31
33    SUPERINTENDENCE BY CONTRACTOR ..................................................................................32
34    SUSPENSION OF WORK ........................................................................................................32
35    TERMINATION FOR CONVENIENCE OF METRO ......................................................................32
36    TERMINATION FOR DEFAULT ................................................................................................34
37    TESTING OF MATERIALS .......................................................................................................35
38    USE AND POSSESSION PRIOR TO COMPLETION ....................................................................35
39    USE OF METRO'S NAME IN CONTRACTOR ADVERTISING OR PUBLIC RELATIONS ...................35
40    USE OF SPECIFICATIONS, DRAWINGS AND NOTES ................................................................35
41    VARIATIONS IN ESTIMATED QUANTITY ..................................................................................35
42    WAIVERS ............................................................................................................................35
43    WARRANTY OF CONSTRUCTION ...........................................................................................36

**SECTION X - FEDERAL REQUIREMENTS ARTICLES** ...............................................................**37**

1     ACCESS TO RECORDS .........................................................................................................37
**2     APPENDIX II TO PART 200** ...................................................................................................**37**
3     CARGO PREFERENCE–USE OF UNITED STATES-FLAG VESSELS ..............................................39
4     CONTRACT WORK HOURS - SAFTETY STANDARDS – OVERTIME COMPENSATION .....................40
5     CONTRACTOR NON-DISCRIMINATION .....................................................................................40
6     DAVIS-BACON AND COPELAND ANTI-KICKBACK ACTS ............................................................40
7     DEBARMENT AND SUSPENSION .............................................................................................44
8     DRUG AND ALCOHOL TESTING ..............................................................................................44
9     ENVIRONMENTAL REQUIREMENTS ........................................................................................45
10.   FEDERAL CHANGES .............................................................................................................45
11    FLY AMERICA .....................................................................................................................45
12    FRAUD AND FALSE OR FRAUDULENT STATEMENTS AND RELATED ACTS .................................45
13    INCORPORATION OF FEDERAL TRANSIT ADMINISTRATION (FTA) TERMS .................................46
14    METRO NON-DISCRIMINATION ...............................................................................................46
15    NO OBLIGATION BY THE FEDERAL GOVERNMENT ..................................................................46
16    OFFICIALS NOT TO BENEFIT .................................................................................................46
17    PROJECT SIGNS ..................................................................................................................46
18    RECYCLED PRODUCTS .........................................................................................................47
19    RESTRICTIONS ON LOBBYING ...............................................................................................47
20    SEISMIC SAFETY .................................................................................................................47
21    VALUE ENGINEERING ...........................................................................................................47

**22    BUY AMERICA** ...................................................................................................................**49**

23    ENTIRE AGREEMENT ...........................................................................................................49

**SECTION XI - EXHIBITS** ............................................................................................................**50**

1     EXHIBIT A   SCOPE OF SERVICES .........................................................................................50
2     EXHIBIT B   WORK AUTHORIZATION FORM ............................................................................53
3     EXHIBIT C   CONTRACTOR'S RELEASE ..................................................................................54
4     EXHIBIT D   CONSTRUCTION SUBMITTAL ..............................................................................55
5     EXHIBIT E   FEDERAL HIGHWAY CONSTRUCTION WAGE RATES ..............................................56
6     EXHIBIT F   CERTIFICATION OF RESTRICTIONS ON LOBBYING ...............................................57
7     EXHIBIT G   DEBARMENT AND SUSPENSION FORM ................................................................58
8     EXHIBIT H   CODE OF ETHICS OF THE METROPOLITAN TRANSIT AUTHORITY ..........................59
9     EXHIBIT I    SMALL BUSINESS FORMS ..................................................................................60
        Form 1    CONTRACTOR UTLIZATION PLAN FORM .................................................................60
        Form 2    BUSINESS ASSURANCE STATEMENT .....................................................................66
        Form 3    SUBCONTRACTOR/SUPPLIER LETTER OF INTENT ...................................................68
10    EXHIBIT J   PERSONAL PROTECTIVE EQUIPMENT .................................................................71
11    EXHIBIT K   BUY AMERICA CERTIFICATE ...............................................................................74

IFB No. 4022000021                                                   Contract No. 7022000111

**SECTION II - FORMS FOR BIDDING/AWARD**

**1  SOLICITATION, BID AND AWARD FORM**

**METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY TEXAS**

**INVITATION FOR BIDS**

========================================================================

Requisition No.: 1121002455    IFB No.: 40220021    Date of IFB: December 07, 2021    Contract No.: 7022000111

Description of Project: **56 BOOST CONSTRUCTION CONTRACT**

========================================================================

In compliance with the above referenced Invitation for Bids, the undersigned hereby proposes to furnish all of the resources necessary to complete the above referenced project for the total price listed in the 'Solicitation/Contract Amount, Items and Prices' Article herein and in accordance with the Contract documents.

Any resulting contract will consist of this form and Sections II through XI of the original solicitation.

The undersigned agrees that this offer will remain valid for a period of one hundred twenty (120) calendar days after the date of receipt of bids.

Upon written acceptance of this offer, executed by METRO and mailed or otherwise furnished within the one hundred twenty (120)-day offer validity period, the Bidder/Contractor will, within fourteen (14) calendar days (unless a longer period is allowed) after receipt of award documents, provide required certification of insurance, bonds and other documentation as may be required.

The resulting Contract sets forth the entire agreement between the parties with respect to the subject matter thereof, and supersedes and replaces all proposals, negotiations, representations, and implied obligations. The obligations, liabilities and remedies set forth herein are exclusive and shall operate as limitations on any action brought in connection with this Contract, including an action in tort. The resulting Contract is binding upon and shall inure to the benefit of the parties hereto and their successors and permitted assigns, but shall not inure to the benefit of any third party or other person.

**CAUTION - Bids shall not be qualified by exceptions to the bidding conditions.**

========================================================================

(TO BE COMPLETED BY BIDDER)

BIDDER NAME AND ADDRESS (Full Name of Firm, Corporation, Partnership, Joint Venturer):

**PRCHOU, LLC.**

BUSINESS NAME (Type or print)

**3411 Richmond Ave. Ste. 610**

ADDRESS (Type or print)                         **(281) 846-5125**

**Houston, TX 77046**           PHONE: ( ) _____    FAX NO: ( ) _____

CITY, STATE, ZIP CODE (Type or print)

                             EMAIL: **dansi@premiergrouptx.com**

BY: (Sign in ink)

**Mukadas D. Kurban**          **CEO**                   **(832) 858-1239**

NAME (Type or print)               TITLE (Type or print)    PHONE: ( ) _____

DATE: **1/10/22**

========================================================================

DIRECTIONS FOR SUBMITTING BIDS:

**All bid responses to this solicitation must be submitted electronically through METRO's Bonfire hub at:**
**https://ridemetro.bonfirehub.com There is no cost to Contractors to register to submit bids on METRO's Bonfire hub.**

========================================================================

IFB No. 4022000021                                                           Contract No. 7022000111

**2          OFFER/ACCEPTANCE/AWARD SIGNATURE PAGE**

OFFER

(TO BE COMPLETED AND SIGNED BY BIDDER/CONTRACTOR)

SIGNATURE OF BIDDER/CONTRACTOR:                      ATTEST:

BY: _____                          BY: _____
(MUST BE SIGNED BY AUTHORIZED PERSON)

NAME: Mukadas D. Kurban                              NAME: _____
(Type or Print)                                      (Type or Print)

TITLE: CEO                                           TITLE: _____

DATE: 1/10/22

Note:   1)   If Joint Venture, each party shall provide the above information and sign the offer.
        2)   Bidder/Contractor's signature constitutes acceptance of a Contract that may result from this solicitation.

===============================================================================

ACCEPTANCE AND AWARD
(TO BE COMPLETED AND SIGNED BY METRO)

Contract No. **7022000111**

METRO and the Contractor have executed this Contract and it shall be effective on the 5th day of April_____, 20 22.

**METROPOLITAN TRANSIT AUTHORITY
OF HARRIS COUNTY**

Executed for and on behalf of the Metropolitan Transit
Authority pursuant to Resolution No. 2022-27 of the
Board of Directors on the 24th day of March, 2022, and
on file in the office of the Assistant Secretary of the
Authority.

BY: _____                          APPROVED:
Name: Michael Kyme
Title: Chief Procurement Officer
                                                     Name:   Debbie Sechler
                                                     Title:   Executive Vice President, Administration

                                                     Name:   Arthur C. Smiley III
                                                     Title:   Chief Financial Officer

                                                     APPROVED AS TO FORM:

                                                     Name:   Cydonii Fairfax
                                                     Title:   Executive Vice President & General Counsel

                                                     ATTEST:

                                                     Title:   Assistant Secretary          Date

2

IFB No. 4022000021

Contract No. 7022000111

## 3   BID/CONTRACT AMOUNT, ITEMS AND PRICES

The Contractor shall furnish all supervision, labor, materials, tools, supplies, equipment, transportation, bonds, insurance, including taxes, overhead and profit to perform all operations necessary for the **56 BOOST Construction Contract** as outlined in the contract issued, in accordance with the specifications, drawings the terms and conditions of the proposed contract for the firm fixed unit prices shown below.

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| **Section A - General Items** | | | | | | | |
| Success: All values provided | #1-1 | Performance and Payment Bonds | -- | LS | 1 | $ 300,000.00 | $ 300,000.00 |
| Success: All values provided | #1-2 | Mobilization | 01505 | LS | 1 | $ 398,670.75 | $ 398,670.75 |
| Success: All values provided | #1-3 | Project Identification Sign | 01504 | EA | 14 | $ 1,100.00 | $ 15,400.00 |
| **Section B - Demolition** | | | | | | | |
| Success: All values provided | #2-1 | Remove Raised Medians, Including Curbs | 02050 | SY | 694 | $ 18.00 | $ 12,492.00 |
| Success: All values provided | #2-2 | Remove Concrete Sidewalk and Ramp | 02050 | SY | 49059 | $ 19.00 | $ 932,121.00 |
| Success: All values provided | #2-3 | Remove Curb (Concrete, Wood, Other) | 02050 | LF | 28892 | $ 1.75 | $ 50,561.00 |
| Success: All values provided | #2-4 | Remove Concrete Retaining Wall | 02050 | LF | 1348 | $ 6.00 | $ 8,088.00 |
| Success: All values provided | #2-5 | Remove Concrete Gutter | 02050 | LF | 1716 | $ 11.00 | $ 18,876.00 |
| Success: All values provided | #2-6 | Remove Concrete Driveway | 02050 | SY | 10220 | $ 22.50 | $ 229,950.00 |
| Success: All values provided | #2-7 | Remove Concrete Pavement | 02050 | SY | 3760 | $ 24.75 | $ 93,060.00 |
| Success: All values provided | #2-8 | Remove Asphalt | 02050 | SF | 29804 | $ 2.00 | $ 59,608.00 |
| Success: All values provided | #2-9 | Remove Edging (Metal, Stone, Bricks, Others) | 02050 | LF | 417 | $ 3.00 | $ 1,251.00 |
| Success: All values provided | #2-10 | Remove Storm Sewer Inlet | 02050 | EA | 16 | $ 550.00 | $ 8,800.00 |
| Success: All values provided | #2-11 | Remove Existing Bus Stop Signs, Traffic Signs, Posts, Post Bases and Foundations | 02050 | EA | 104 | $ 110.00 | $ 11,440.00 |
| Success: All values provided | #2-12 | Remove Masonry Pavers | 02050 | SF | 2190 | $ 2.25 | $ 4,927.50 |
| Success: All values provided | #2-13 | Remove Gravel (All Types) | 02050 | SF | 232 | $ 5.00 | $ 1,160.00 |
| Success: All values provided | #2-14 | Remove and Reuse Masonry Pavers (Includes 3" Cement Stabilized Subgrade) | 02050 | SF | 278 | $ 25.00 | $ 6,950.00 |
| Success: All values provided | #2-15 | Remove/Relocate R.O.W. Obstructions (Bollards Metal/Wood, Pay Phone, Stand Pipe, Guy Wire, Pedestal, Marker, Gas Test Station, and Others) | 02050 | EA | 69 | $ 350.00 | $ 24,150.00 |
| Success: All values provided | #2-16 | Remove and Replace Fire Hydrant | 02050 | EA | 5 | $ 7,500.00 | $ 37,500.00 |
| Success: All values provided | #2-17 | Relocate Bus Stop Sign and Traffic Sign | 02050 | EA | 226 | $ 378.00 | $ 85,428.00 |
| Success: All values provided | #2-18 | Relocate Mailbox, Newspaper Stand | 02050 | EA | 13 | $ 700.00 | $ 9,800.00 |

3

IFB No. 4022000021                                                                 Contract No. 7022000111

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #2-19 | Adjust Handhole, Water Meter, Water Valve and Other Surface Features to Final Grade | 02086 | LS | 1 | $ 37,500.00 | $ 37,500.00 |
| Success: All values provided | #2-20 | Remove Plastic Water Meter and Replace with Concrete Water Meter | 02086 | EA | 233 | $ 350.00 | $ 81,550.00 |
| Success: All values provided | #2-21 | Adjust Irrigation Lines and Sprinkler Heads | 02086 | LS | 1 | $ 62,500.00 | $ 62,500.00 |
| Success: All values provided | #2-22 | Adjust Manhole/Junction Box to Final Grade | 02086 | EA | 234 | $ 350.00 | $ 81,900.00 |
| Success: All values provided | #2-23 | Blast Cleaning Pavement Markings | 02762 | LS | 1 | $ 55,000.00 | $ 55,000.00 |

## Section C Traffic Control

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #3-1 | Traffic Control | 01555 | LS | 1 | $ 225,000.00 | $ 225,000.00 |

## Section D - Sitework

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #4-1 | Excavation | 02315 | CY | 781 | $ 40.00 | $ 31,240.00 |
| Success: All values provided | #4-2 | Tack Coats (0.15 GAL/SY) | 02743 | GAL | 696 | $ 185.00 | $ 128,575.00 |
| Success: All values provided | #4-3 | Hot Mix Asphalt Concrete (Match Exist Thickness) | 02741 | SY | 4857 | $ 36.00 | $ 174,852.00 |
| Success: All values provided | #4-4 | 10" Portland Cement Stabilized Subgrade | 02338 | SY | 5612 | $ 25.00 | $ 140,300.00 |
| Success: All values provided | #4-5 | 6" Portland Cement Stabilized Subgrade | 02338 | SY | 10041 | $ 18.00 | $ 180,738.00 |
| Success: All values provided | #4-6 | Reinforced Concrete Pavement - High Early Strength (Match Exist Thickness) | 02751 | SY | 5462 | $ 87.00 | $ 475,194.00 |
| Success: All values provided | #4-7 | Concrete Gutter | 02771 | LF | 2261 | $ 15.00 | $ 33,915.00 |
| Success: All values provided | #4-8 | Concrete Driveway | 02754 | SF | 85247 | $ 7.00 | $ 596,729.00 |
| Success: All values provided | #4-9 | New Shelter Foundation-9" Concrete Pad | 02775 | SF | 3480 | $ 11.00 | $ 38,280.00 |
| Success: All values provided | #4-10 | New Shelter Foundation-13" Concrete Pad | 02775 | SF | 13469 | $ 13.00 | $ 175,097.00 |
| Success: All values provided | #4-11 | Concrete Sidewalk/Pedestrian Ramps | 02775 | SF | 563335 | $ 4.35 | $ 2,450,507.25 |
| Success: All values provided | #4-12 | Concrete Curb (6 inch) | 02771 | LF | 45223 | $ 4.00 | $ 180,892.00 |
| Success: All values provided | #4-13 | Concrete Curb (9-inch) | 02771 | LF | 7439 | $ 6.00 | $ 44,634.00 |
| Success: All values provided | #4-14 | Colored Concrete Median (Black) | 02772 | SY | 242 | $ 40.00 | $ 9,680.00 |
| Success: All values provided | #4-15 | Concrete Retaining Wall - Up to 24" High | 02771 | LF | 11226 | $ 15.00 | $ 168,390.00 |
| Success: All values provided | #4-16 | BB Storm Sewer Inlet (Complete in Place) | 02632 | EA | 25 | $ 2,200.00 | $ 55,000.00 |
| Success: All values provided | #4-17 | Floating Bus Stops | 02772 | EA | 9 | $ 30,000.00 | $ 270,000.00 |

4

IFB No. 4022000021                                    Contract No. 7022000111

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #4-18 | Detectable Warning Surface (DWS) Fiberglass/Composite (No Bricks) | 02775 | SF | 7300 | $ 15.00 | $ 109,500.00 |
| Success: All values provided | #4-19 | 4" PVC Schedule 40 Pipe | 02631 | LF | 40 | $ 35.00 | $ 1,400.00 |
| Success: All values provided | #4-20 | Guard Post (4" Bollards) | 12870 | EA | 74 | $ 350.00 | $ 25,900.00 |
| Success: All values provided | #4-21 | Decomposed Granite (Match Exist Thickness) | 02775 | SF | 590 | $ 5.00 | $ 2,950.00 |
| Success: All values provided | #4-22 | Polymer Concrete Truncated Domes (For BOOST Bus Stops) | 02776 | SF | 10242 | $ 13.00 | $ 133,146.00 |
| Success: All values provided | #4-23 | Electric Junction Box Assembly | -- | EA | 33 | $ 1,770.00 | $ 58,410.00 |
| Success: All values provided | #4-24 | 2" Underground Electrical Conduit (Open Trench or Bored) | -- | LF | 5007 | $ 25.00 | $ 125,175.00 |
| Success: All values provided | #4-25 | 4" Underground Electrical Conduit (Open Trench or Bored) | -- | LF | 842 | $ 48.00 | $ 40,416.00 |
| Success: All values provided | #4-26 | 1" Diameter Electrical Conduit EMT (Fastened to Bus Shelter) | -- | LF | 640 | $ 20.00 | $ 12,800.00 |
| Success: All values provided | #4-27 | No. 10 THHN CU (Copper) | -- | LF | 14474 | $ 1.58 | $ 22,788.55 |
| Success: All values provided | #4-28 | No. 12 THHN Wire | -- | LF | 780 | $ 1.65 | $ 1,287.00 |
| Success: All values provided | #4-29 | No. 12 THHN Ground Wire | -- | LF | 375 | $ 2.00 | $ 750.00 |
| Success: All values provided | #4-30 | Stand-Off Bracket | -- | EA | 6 | $ 240.00 | $ 1,440.00 |
| Success: All values provided | #4-31 | Weatherhead | -- | EA | 23 | $ 300.00 | $ 6,900.00 |
| Success: All values provided | #4-32 | 50 W LED Light Fixture | -- | EA | 24 | $ 1,309.00 | $ 31,416.00 |
| Success: All values provided | #4-33 | Electric Disconnect 30 AMP/250 Volt with Photocell | -- | EA | 24 | $ 1,609.00 | $ 38,616.00 |
| Success: All values provided | #4-34 | No. 8 CU Ground Assembly | -- | EA | 24 | $ 900.00 | $ 21,600.00 |

### Section E - SWPPP

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #5-1 | SWPPP (Including IPB, Filter Fabric Fence) & NPDES General Permit | 01570 | LS | 1 | $ 35,000.00 | $ 35,000.00 |

### Section F - Landscaping

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #6-1 | Sodding | 02922 | SY | 49500 | $ 9.00 | $ 445,500.00 |
| Success: All values provided | #6-2 | Tree Protection (including Fencing, Limb Pruning, Root Pruning, Zero Curb Cut, Tree Stump Removal, and Tree Removal per COH Urban Forestry Requirements) | 01562 | LS | 1 | $ 55,000.00 | $ 55,000.00 |
| Success: All values provided | #6-3 | 2.5" Live Oak | 02915 | EA | 37 | $ 1,100.00 | $ 40,700.00 |

IFB No. 4022000021                                                            Contract No. 7022000111

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #6-4 | 3" Live Oak | 02915 | EA | 10 | $ 1,100.00 | $ 11,000.00 |
| Success: All values provided | #6-5 | 2.5" Montezuma Cypress | 02915 | EA | 9 | $ 1,750.00 | $ 15,750.00 |
| Success: All values provided | #6-6 | 4" Pecan | 02915 | EA | 3 | $ 2,000.00 | $ 6,000.00 |
| Success: All values provided | #6-7 | 4" Live Oak | 02915 | EA | 20 | $ 1,250.00 | $ 25,000.00 |

## Section G - Pavement Markings & Signage

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #7-1 | Ground Mounted Sign and Post Assembly | 01554 | EA | 294 | $ 516.00 | $ 151,704.00 |
| Success: All values provided | #7-2 | Ground Mounted Sign and Post Assembly with Solar Powered Flashing Beacon Assembly | 01554 | EA | 4 | $ 8,040.00 | $ 32,160.00 |
| Success: All values provided | #7-3 | Small Traffic Sign | 01554 | EA | 205 | $ 275.00 | $ 56,375.00 |
| Success: All values provided | #7-4 | Thermoplastic Pavement Mrkg, ON CURB, Solid, YELLOW | 02767 | LF | 2061 | $ 3.40 | $ 7,007.40 |
| Success: All values provided | #7-5 | Thermoplastic Pavement Mrkg, 4" Wide, Broken, WHITE | 02767 | LF | 2479 | $ 1.15 | $ 2,850.85 |
| Success: All values provided | #7-6 | Thermoplastic Pavement Mrkg, 4" Wide, Solid, YELLOW | 02767 | LF | 21363 | $ 1.15 | $ 24,567.45 |
| Success: All values provided | #7-7 | Thermoplastic Pavement Mrkg, 4" Wide, Broken, YELLOW | 02767 | LF | 3315 | $ 1.15 | $ 3,812.25 |
| Success: All values provided | #7-8 | Thermoplastic Pavement Mrkg, 8" Wide, Solid, WHITE | 02767 | LF | 25391 | $ 1.75 | $ 44,434.25 |
| Success: All values provided | #7-9 | Thermoplastic Pavement Mrkg, 8" Wide, Solid, YELLOW | 02767 | LF | 26 | $ 2.25 | $ 58.50 |
| Success: All values provided | #7-10 | Thermoplastic Pavement Mrkg, 12" Wide, Solid, WHITE | 02767 | LF | 25783 | $ 5.25 | $ 135,360.75 |
| Success: All values provided | #7-11 | Thermoplastic Pavement Mrkg, 12" Wide, Solid YELLOW | 02767 | LF | 1012 | $ 5.50 | $ 5,566.00 |
| Success: All values provided | #7-12 | Thermoplastic Pavement Mrkg, 24" Wide, Solid, YELLOW | 02767 | LF | 1389 | $ 10.50 | $ 14,584.50 |
| Success: All values provided | #7-13 | Thermoplastic Pavement Mrkg, 24" Wide, Solid, WHITE | 02767 | LF | 8262 | $ 10.50 | $ 86,751.00 |
| Success: All values provided | #7-14 | Thermoplastic Pavement Mrkg, 6" Wide, Cat Track | 02767 | LF | 3008 | $ 2.25 | $ 6,768.00 |
| Success: All values provided | #7-15 | Thermoplastic Pavement Mrkg, BICYCLE GREEN | 02767 | SF | 2047 | $ 20.50 | $ 41,963.50 |
| Success: All values provided | #7-16 | Thermoplastic Pavement Mrkg Symbol, ARROW | 02767 | EA | 75 | $ 263.00 | $ 19,725.00 |
| Success: All values provided | #7-17 | Thermoplastic Pavement Mrkg Symbol, ONLY | 02767 | EA | 9 | $ 300.00 | $ 2,700.00 |

IFB No. 4022000021                                                                       Contract No. 7022000111

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #7-18 | Thermoplastic Pavement Mrkg Symbol, BICYCLE | 02767 | EA | 99 | $ 130.00 | $ 12,870.00 |
| Success: All values provided | #7-19 | Thermoplastic Pavement Mrkg Symbol, BICYCLE ARROW | 02767 | EA | 97 | $ 130.00 | $ 12,610.00 |
| Success: All values provided | #7-20 | Thermoplastic Pavement Mrkg Symbol, SHARROW | 02767 | EA | 13 | $ 413.00 | $ 5,369.00 |
| Success: All values provided | #7-21 | Thermoplastic Pavement Mrkg Symbol, PED XING | 02767 | EA | 72 | $ 570.00 | $ 41,040.00 |
| Success: All values provided | #7-22 | K71 Flexible Traffic Post | 02764 | EA | 192 | $ 350.00 | $ 67,200.00 |
| Success: All values provided | #7-23 | TY II C-R Marker | 02764 | EA | 320 | $ 10.00 | $ 3,200.00 |
| Success: All values provided | #7-24 | Precast Concrete Bikeway Curb | 02764 | EA | 475 | $ 95.00 | $ 45,125.00 |
| Success: All values provided | #7-25 | Surface-Mounted Flexible Post Delineator | 02764 | EA | 136 | $ 375.00 | $ 51,000.00 |
| Success: All values provided | #7-26 | Armadillos | 02764 | EA | 632 | $ 220.00 | $ 139,040.00 |

**Section H – TRAFFIC SIGNALS**

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #8-1 | Remove Existing Signal Pole and Foundation | 02050 | EA | 6 | $ 2,000.00 | $ 12,000.00 |
| Success: All values provided | #8-2 | Remove Existing Ped Pole and Foundation | 02050 | EA | 2 | $ 1,200.00 | $ 2,400.00 |
| Success: All values provided | #8-3 | 35-FT Mast Arm Pole Assembly With Foundation | 02582 | EA | 3 | $ 21,480.00 | $ 64,440.00 |
| Success: All values provided | #8-4 | 40-FT Mast Arm Pole Assembly With Foundation | 02582 | EA | 4 | $ 24,000.00 | $ 96,000.00 |
| Success: All values provided | #8-5 | 45-FT Mast Arm Pole Assembly With Foundation | 02582 | EA | 3 | $ 26,040.00 | $ 78,120.00 |
| Success: All values provided | #8-6 | 50-FT Mast Arm Pole Assembly With Foundation | 02582 | EA | 2 | $ 30,000.00 | $ 60,000.00 |
| Success: All values provided | #8-7 | 250W HPS Street Lighting Luminaire | 02590 | EA | 12 | $ 1,200.00 | $ 14,400.00 |
| Success: All values provided | #8-8 | Overhead Street Name Traffic Sign | 01554 | EA | 12 | $ 525.00 | $ 6,300.00 |
| Success: All values provided | #8-9 | Remove and Salvage Existing Traffic Signal Equipment | 02050 | EA | 2 | $ 4,800.00 | $ 9,600.00 |
| Success: All values provided | #8-10 | Sign,"LEFT TURN YIELD ON GREEN" R10-12 (30" X 36") | 01554 | EA | 14 | $ 600.00 | $ 8,400.00 |
| Success: All values provided | #8-11 | Sign,"LEFT TURN YIELD ON FLASHING YELLOW ARROW", R10-17T (30" X 30") | 01554 | EA | 10 | $ 525.00 | $ 5,250.00 |
| Success: All values provided | #8-12 | Sign,"LEFT ON GREEN ARROW ONLY", R10-5 (30" X 36") | 01554 | EA | 4 | $ 600.00 | $ 2,400.00 |
| Success: All values provided | #8-13 | Accessible Pedestrian Push Button Pole With Foundation | 16750 | EA | 12 | $ 3,850.00 | $ 46,200.00 |

7

IFB No. 4022000021                                                                                   Contract No. 7022000111

| Status | # | Description | SPEC #. | Unit | Quantity Required | Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #8-14 | Controller Cabinet Foundation with Apron (MODEL 340) (TYPE 2170L) | 16750 | EA | 3 | $ 5,000.00 | $ 15,000.00 |
| Success: All values provided | #8-15 | Electrical Service Pedestal Assembly - 70AMP ("SQUARE D" Breakers Included) | 02893 | EA | 3 | $ 9,500.00 | $ 28,500.00 |
| Success: All values provided | #8-16 | Type "A" Pull Box with Apron, Gravel and Ground Rod | 16710 | EA | 44 | $ 1,400.00 | $ 61,600.00 |
| Success: All values provided | #8-17 | Type "B" Pull Box with Apron, Gravel and Ground Rod | 16710 | EA | 12 | $ 1,700.00 | $ 20,400.00 |
| Success: All values provided | #8-18 | Type "C" Pull Box with Apron, Gravel and Ground Rod | 16710 | EA | 3 | $ 3,300.00 | $ 9,900.00 |
| Success: All values provided | #8-19 | Conduit, 1-IN SCH 80 PVC Trench | 16711 | LF | 470 | $ 40.00 | $ 18,800.00 |
| Success: All values provided | #8-20 | Conduit, 2-IN SCH 80 PVC Trench | 16711 | LF | 3750 | $ 27.00 | $ 101,250.00 |
| Success: All values provided | #8-21 | Conduit, 3-IN PVC | 16711 | LF | 125 | $ 47.00 | $ 5,875.00 |
| Success: All values provided | #8-22 | Conduit, 4-INCH SCH 80 PVC Bore | 16711 | LF | 1560 | $ 46.00 | $ 71,760.00 |
| Success: All values provided | #8-23 | Conduit, 4-INCH SCH 80 PVC Trench | 16711 | LF | 160 | $ 52.50 | $ 8,400.00 |
| Success: All values provided | #8-24 | 4-Section Vehicle Signal Head Assembly (<R<Y<Y<G) (Horizontal) (H4LF) | 16715 | EA | 4 | $ 1,800.00 | $ 7,200.00 |
| Success: All values provided | #8-25 | 4-Section Vehicle Signal Head Assembly (<R<Y<Y<G) (VERTICAL) (V4LF) | 16715 | EA | 4 | $ 1,725.00 | $ 6,900.00 |
| Success: All values provided | #8-26 | 3-Section Vehicle Signal Head Assembly (RYG) (HORIZONTAL) (H3) | 16715 | EA | 30 | $ 1,850.00 | $ 40,500.00 |
| Success: All values provided | #8-27 | 3-Section Vehicle Signal Head Assembly (RYG) (VERTICAL) (V3) | 16715 | EA | 6 | $ 1,500.00 | $ 9,000.00 |
| Success: All values provided | #8-28 | 3-Section Vehicle Signal Head Assembly (RYG) (VERTICAL) (V3L) | 16715 | EA | 2 | $ 1,650.00 | $ 3,300.00 |
| Success: All values provided | #8-29 | LED Pedestrian Signal Head Assembly (SYMBOLIC) (COUNTDOWN) | 16716 | EA | 24 | $ 1,050.00 | $ 25,200.00 |
| Success: All values provided | #8-30 | #4 XHHW Service Wire | 16720 | LF | 65 | $ 7.50 | $ 487.50 |
| Success: All values provided | #8-31 | Traffic Signal Cables, 3/C-#14 AWG Solid Cable | 16720 | LF | 2715 | $ 2.70 | $ 7,330.50 |
| Success: All values provided | #8-32 | Traffic Signal Cables, 5/C-#14 AWG Solid Cable | 16720 | LF | 2670 | $ 3.00 | $ 8,010.00 |
| Success: All values provided | #8-33 | Traffic Signal Cables, 7/C-#14 AWG Solid Cable | 16720 | LF | 5300 | $ 4.95 | $ 26,235.00 |
| Success: All values provided | #8-34 | Traffic Signal Cables, Detector Lead-in Cable 2/C #14 AWG IMSA 50-2-1984 | 16720 | LF | 14110 | $ 3.00 | $ 42,330.00 |
| Success: All values provided | #8-35 | Traffic Signal Cables, #8 AWG SOLID, Bare Bond | 16720 | LF | 5015 | $ 3.00 | $ 15,045.00 |

IFB No. 4022000021                                                     Contract No. 7022000111

| Status | # | Description | SPEC # | Unit | Quantity Required | Numeric Unit Price | Total Cost |
|---|---|---|---|---|---|---|---|
| Success: All values provided | #8-36 | Traffic Signal Cables, #8 AWG SOLID, Bare Ground | 16720 | LF | 45 | $3.00 | $135.00 |
| Success: All values provided | #8-37 | Traffic Signal Cables, #12 AWG XHHW, Bare Ground Lighting | 16720 | LF | 1065 | $1.70 | $1,810.50 |
| Success: All values provided | #8-38 | Traffic Signal Cables, #10 AWG XHHW, Photo Cell | 16720 | LF | 1350 | $2.00 | $2,700.00 |
| Success: All values provided | #8-39 | Traffic Signal Cables, #20 3 CC, Pre-Emption (3M MODEL 138) | 16720 | LF | 1200 | $3.00 | $3,600.00 |
| Success: All values provided | #8-40 | Traffic Signal Cables, #14 AWG (IMSA 51-5-1985) | 16720 | LF | 810 | $2.00 | $1,620.00 |
| Success: All values provided | #8-41 | Emergency Vehicle Preemption System | 16724 | EA | 3 | $9,800.00 | $29,400.00 |
| Success: All values provided | #8-42 | Loop Detector Sawcut with Loop Wire | 16727 | LF | 3000 | $14.50 | $43,500.00 |
| Success: All values provided | #8-43 | ITS Controller Cabinet Assembly (MODEL 340) (TYPE 2070L) | 16730 | EA | 3 | $38,000.00 | $114,000.00 |
| Success: All values provided | #8-44 | Uninterruptible Power Supply | 16732 | EA | 3 | $11,250.00 | $33,750.00 |
| Success: All values provided | #8-45 | Accessible Pedestrian Push Button | 16750 | EA | 24 | $1,500.00 | $36,000.00 |
| Success: All values provided | #8-46 | GPS Serial Communication Module | 16765 | EA | 3 | $1,050.00 | $3,150.00 |

## TOTAL NOT-TO-EXCEED AMOUNT FOR ALL SECTIONS: $11,500,000.00

1.  The Contractor shall reflect in the bid price for each Item the cost the Contractor anticipates incurring for the performance of that Item, together with a proportional share of the Contractor's anticipated profit, overhead, and costs to perform work for which no Item is provided.

2.  The quantities appearing herein are estimated and do not commit nor obligate METRO to order the quantities shown. Quantities for which payment will become due, shall be those consumed during performance of the Work as approved and accepted by METRO's authorized representative.

3.  The pre-established amount for bid items 'Mobilization' shall apply to all bidders and shall not be revised.

4.  Payment for 'Payment and Performance Bonds' shall be reimbursable at actual cost, or bid amount, whichever is less, within fifteen days (15) after METRO's receipt of the appropriate bonding certificates and a copy of a paid invoice or other supporting documentation.

## Statement Of Materials and Other Charges

Materials Incorporated into Project:                                     **$4,600,000.00**

All other charges, including bonding, contingency,
insurance, labor and miscellaneous:                                     **$6.900,000.00**

**TOTAL AMOUNT OF ALL WORK:**                                           **$11,500,000.00**

9

IFB No. 4022000021                                                    Contract No. 7022000111

## SECTION III - DELIVERIES OR PERFORMANCE ARTICLES

**1    DEFINITIONS**

A.    'METRO' shall mean Metropolitan Transit Authority of Harris County, Texas.

B.    The term 'President & Chief Executive Officer' means the President & Chief Executive Officer of the Metropolitan Transit Authority and the term 'the duly authorized representative' means any person specifically authorized to act for the President & Chief Executive Officer. These representatives are authorized to obligate METRO by executing this Contract, and any modification thereto.

C.    The term 'Contracting Officer' means the Contract Administrator who has been designated the responsibility, by the METRO Chief Procurement Officer, for overall administration of the contract, excluding the execution of contract modifications.

D.    The term 'METRO Project Manager' means the technical representative who has been designated to act on behalf of METRO in monitoring and assessing the Contractor's services and/or technical performance and progress; inspecting and periodically reporting on such performance and progress during the stated period of performance, and finally certifying as to the acceptability of the contract Work in its entirely or any portion thereof, as required by the contract documents.

E.    The term 'Contract Disputes Appeals Committee' means the METRO administrative body designated by the President & Chief Executive Officer to hear a Contractor's appeal submitted under the 'Disputes' Article of this Contract.

F.    The term 'Work' means all construction, labor, materials, equipment, and contractual requirements as specified, or indicated in the Contract documents, including all alterations, amendments, or extensions thereto made by authorized changes.

G.    The term 'Contractor' shall mean the individual, partnership, corporation, organization, or association contracting with METRO to furnish all materials, goods and work defined herein. As may be used herein, the terms 'Contractor and 'Consultant' are synonymous.

H.    The term 'subcontract' means any agreement including purchase orders (other than one involving an employer employee relationship) entered into between the Contractor and a subcontractor calling for services, labor, equipment, and/or materials required for Contract performance, including any modifications thereto.

I.    The terms 'subcontractor' and 'subcontractor and supplier' mean any individual, partnership, firm, corporation or joint venture that contracts with the Contractor to furnish services, labor, equipment and/or materials under this Contract. As used herein, the terms 'subcontractor' and 'subcontractor and supplier' are synonymous.

**2    LIQUIDATED DAMAGES**

If the Contractor fails to complete the work within the time specified in this Contract, or any extension thereof, the Contractor shall pay to METRO, as liquidated damages, the sum of One-Thousand Twenty Dollars ($1,020.00) for each calendar day of delay until the work is completed and accepted.

The Contractor acknowledges that actual damages likely to result from breach of this section are difficult to estimate on date of this contract and difficult to prove. The parties intend that payment of liquidated damages amount would serve to compensate METRO for any breach by the Contractor of its obligations under this Section and they do not intend for such liquidated damages to serve as punishment for any such breach by the Contractor.

**3    PERFORMANCE AND PAYMENT BONDS**

A.    If the Contract amount, as indicated in the 'Compensation' Article exceeds $100,000.00, the Contractor shall furnish a Performance Bond in an amount equal to one hundred percent (100%) of the Contract amount and if the Contract amount, as indicated in the 'Compensation' Article exceeds $25,000.00, the Contractor shall furnish a Payment Bond in an amount equal to one hundred percent (100%) of the Contract amount.

B.    The surety company providing the bonds must be licensed to do business in the state of Texas. If the amount of the bond, as determined by Paragraph A above, is in excess of 10 percent of the surety company's capital and surplus, as of the date of the last annual statutory financial statement filed with the Texas Board of Insurance, written certification that the surety company has reinsured that portion of the bond amount in excess of 10 percent with one or more reinsurers authorized, accredited or trusted to do business in the state of Texas must be submitted. The Performance and Payment Bonds must be submitted to the Contracting Officer within fourteen (14) calendar days after receipt of a copy of the executed Contract or a Notice of Award. The Notice to Proceed will not be issued until properly executed bonds are received and accepted by the Contracting Officer.

IFB No. 4022000021                                                            Contract No. 7022000111

**4        ADDITIONAL BOND SECURITY**

The Contractor shall promptly furnish additional security required to protect METRO and persons supplying labor or materials under this Contract if:

1.   Any surety on any bond furnished with this Contract becomes unacceptable to METRO;

2.   Any surety fails to furnish reports on its financial condition when required by METRO, or

3.   The Contract price is increased so that the penal sum of any bond becomes inadequate in the opinion of the Contracting Officer.

**5        PERIOD OF PERFORMANCE**

METRO will issue a written Notice to Proceed (NTP) to the Contractor within thirty (30) calendar days after the Contract has been executed and the Contractor has delivered the required certificates, bonds, and forms. Any preliminary work started or materials ordered or purchased before written NTP shall be at the risk and expense of the Contractor. The first day of performance under the Contract shall be the effective date specified in the NTP. The Contractor shall diligently prosecute the Work to completion within two (2) years from the effective date noted in the NTP. This Period of Performance includes allowance for mobilization, holidays, weekend days, inclement weather, and clean-up, therefore, claims for delay based on these elements will not be allowed. The allowance for inclement weather days for this Contract shall be entered on each Work Authorization issued under this Contract.

**6        SCHEDULES**

A.   The Contractor shall prepare and submit to the Contracting Officer copies of the schedule for the Work of this Contract in accordance with the specification requirements. If the Contractor fails to submit a schedule within the time prescribed or if the schedule fails to comply with the specified requirements, the Contracting Officer may withhold approval of progress payments until the Contractor submits the required schedule.

B.   If, in the opinion of the Contracting Officer, the Contractor falls behind the approved schedule, the Contractor shall take steps necessary to improve its progress, including those that may be required by the Contracting Officer, without additional cost to METRO. In this circumstance, the Contracting Officer may require the Contractor to increase the number of shifts, overtime operations, days of work, and/or the amount of construction plant, and to submit for approval any supplementary schedule or schedules in chart form as the Contracting Officer deems necessary to demonstrate how the approved rate of progress will be regained.

C.   Failure of the Contractor to comply with the requirements of the Contracting Officer under this Article shall be grounds for a determination by the Contracting Officer that the Contractor is not prosecuting the Work with sufficient diligence to ensure completion within the time specified in the Contract. Upon making this determination, the Contracting Officer may terminate the Contractor's right to proceed with the Work, or any separable part of it, in accordance with the default terms of this Contract.

**7        TEXAS ETHICS COMMISSION (TEC) ELECTRONIC FILING**

In the event this Contract requires the approval of METRO's Board of Directors, the Contractor shall submit to METRO, after notification that METRO's Board has authorized the Contract and prior to final execution of the Contract, a completed, signed and notarized Form 1295 generated by the Texas Ethics Commission's (the TEC) electronic filing application in accordance with the provisions of Section 2252.908 of the Texas Government Code and the rules promulgated by the TEC (Form 1295). The Contractor hereby confirms and agrees to submit such forms with the TEC through its electronic filing application at: https://www.ethics.state.tx.us/whatsnew/elf_info_form1295.htm

**8        WORK TO BE PERFORMED**

Except as may be specified elsewhere in this Contract, the Contractor shall furnish all necessary labor, materials, tools, supplies, equipment, transportation, supervision, management, and shall perform all operations necessary and required for **56 BOOST CONSTRUCTION CONTRACT.** The Work shall be performed in accordance with Exhibit A, 'Scope of Services' and Exhibit B, Work Authorizations,' made a part hereof.

**9        WORK AUTHORIZATIONS**

A.   Performance of the Services contemplated in this Contract shall be undertaken only upon the issuance of written Work Authorizations by the METRO Contracting Officer. The format for the Work Authorization document itself shall be as indicated in the exhibit ("B") entitled "WORK AUTHORIZATION FORM", except that the Contracting Officer may add such other items of information as he may deem necessary to accurately describe the requirement of that particular Work Authorization.

IFB No. 4022000021                                                    Contract No. 7022000111

B.      Work Authorizations may be amended by the METRO Contracting Officer in the same manner as they are issued.

C.      METRO reserves the right to contract with other sources for the provision of similar services. Provided however, METRO will use best efforts to issue at least one work authorization to Contractor during the term of this Contract.

D.      Work Authorizations issued prior to and in effect at the time of the expiration date of this Contract shall continue to be in effect and performed by the Contractor until such time as all requirements have been met and a written acceptance of the Services performed has been made by METRO's Project Manager. Provided however, no new Work Authorizations shall be issued after the expiration of the Contract term as indicated above.

IFB No. 4022000021                                                                        Contract No. 7022000111

## SECTION IV - INSPECTION AND ACCEPTANCE ARTICLES

**1      INSPECTION OF CONSTRUCTION**

A.      The Contractor shall maintain an adequate inspection system and perform such inspections as will ensure that the Work called for by this Contract conforms to contract requirements. The Contractor shall maintain complete inspection records and make them available to METRO. All work shall be conducted under the general direction of the Contracting Officer and is subject to METRO inspection and test at all places and at all reasonable times before acceptance to ensure strict compliance with the terms of the Contract.

B.      METRO inspections and tests are for the sole benefit of METRO and do not:

   1.    Relieve the Contractor of responsibility for providing adequate quality control measures;

   2.    Relieve the Contractor of responsibility for damage to or loss of the material before acceptance;

   3.    Constitute or imply acceptance; or

   4.    Affect the continuing rights of METRO after acceptance of the complete work under Paragraph H below.

C.      The presence or absence of a METRO inspector does not relieve the Contractor from any Contract requirement, nor is the inspector authorized to change any term or condition of the specification without the Contracting Officer's written authorization.

D.      The Contractor shall promptly furnish, without additional charge, all facilities, labor, and material reasonably needed for performing such safe and convenient inspections and tests as may be required by the Contracting Officer. METRO may charge to the Contractor any additional cost of inspection or test when work is not ready at the time specified by the Contractor for inspection or test, or when prior rejection makes re-inspection or retest necessary. METRO shall perform all inspections and tests in a manner that will not unnecessarily delay the Work. Special, full size, and performance tests shall be performed as described in the Contract.

E.      The Contractor shall, without charge, replace or correct work found by METRO not to conform to Contract requirements, unless in the public interest METRO consents to accept the Work with an appropriate adjustment in Contract price. The Contractor shall promptly segregate and remove rejected material from the premises.

F.      If the Contractor does not promptly replace or correct rejected Work, METRO may:

   1.    By Contract or otherwise, replace or correct the Work and charge the cost to the Contractor; or

   2.    Terminate for default the Contractor's right to proceed.

G.      If, before acceptance of the entire Work, METRO decides to examine already completed Work by removing it or tearing it out, the Contractor, on request, shall promptly furnish all necessary facilities, labor, and material. If the Work is found to be defective or nonconforming in any material respect due to the fault of the Contractor or its subcontractors, the Contractor shall defray the expenses of the examination and of satisfactory reconstruction. However, if the Work is found to meet Contract requirements, the Contracting Officer shall make an equitable adjustment for the additional services involved in the examination and reconstruction, including, if completion of the Work was thereby delayed, an extension of the period of performance time.

H.      When the Contractor considers the Work complete and ready for its intended use, the Contractor shall request the METRO Project Manager to inspect the Work to determine the status of completion. When the METRO Project Manager or Resident Engineer determines the Work to be substantially complete, the METRO Project Manager will issue a Certificate of Substantial Completion with a list of items to be completed or corrected prior to final payment. The Contractor shall process promptly to complete and correct items on the list.

I.      Unless otherwise specified in the Contract, METRO shall accept, as promptly as practicable after completion and inspection, all Work required by the Contractor that portion of the Work the Contracting Officer determines can be accepted separately. Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or METRO's rights under any warranty or guarantee.

IFB No. 4022000021

Contract No. 7022000111

<div align="center">

**SECTION V - CONTRACT ADMINISTRATION DATA ARTICLES**

</div>

**1      COMPENSATION**

A.    The Contractor shall be compensated for the actual quantities of Work performed, at the firm fixed unit prices as provided in Section II, Article 3, 'Bid/Contract Amount, Items & Prices.'

B.    METRO's total obligation for the satisfactory performance of this Contract shall not exceed Eleven Million, Five Hundred Thousand and 00/100 Dollars ($11,500,000.00), less any prompt payment discount earned or set forth in Paragraph C.

C.    Prompt payment discount(s): 0%. In connection with any discount offered for prompt payment, time shall be computed from the date of receipt of a properly prepared invoice by METRO or acceptance of all materials and goods furnished and work performed, whichever is later. For the purposes of computing the discount earned, payment shall be considered to have been made on the date that the payment is mailed or the date which an electronic funds transfer was made.

**2      INVOICING AND PAYMENT**

A.    **On a monthly basis or based on a METRO approved payment milestone schedule**, METRO shall make progress payments in percentages for the Work that has been completed, or at more frequent intervals as determined by the Contracting Officer, on estimates agreed to by METRO's Project Manager and the Contracting Officer. The Contractor's Authorized Representative shall secure the Project Manager's certification that the services for which payment is requested have been performed. This shall be in the form of the Project Manager's signature and date on the invoice. The Contractor shall furnish a breakdown of the total contract price showing the amount of the Work, in such detail as requested, to provide a basis for determining progress payments. In the preparation of estimates of Work accomplished, METRO may authorize payment for material delivered on the site and preparatory work done if the Contractor furnishes satisfactory evidence that it has acquired title to such material and that the material will be used to perform this Contract.

B.    In making these progress payments, METRO will retain five percent (5%) for each progress payment amount until final completion and acceptance of the contract Work from the Contractor. METRO shall retain the five percent (5%) progress payment based on incremental acceptances of portions of the Work. For purposes of this section, contract Work is satisfactorily completed when all the tasks called for in the Contract have been accomplished and documented by METRO. Upon METRO's review and acceptance of the Contract Work, METRO shall pay the retainage payments to the Contractor. The Contractor remains responsible for the project until final acceptance by METRO. Upon identification, and acceptance of satisfactorily completed Contract Work, METRO shall issue prompt payment of the retainage associated with the Contract Work to the Contractor. The Contractor is required to pay all retainage owed to the subcontractors for satisfactory completion of the contract Work within five (5) business days after receipt of retainage payments from METRO. The Contractor will also include in all subcontracts, language obligating the Contractor to make retainage payments to subcontractors within five (5) business days after receipt of payment from METRO.

   If the Contractor has previously been paid for items or services that have later been found deficient, defective or otherwise unacceptable, subsequent invoices may be adjusted accordingly. In such instances, METRO shall provide the Contractor written explanation for such adjustments.

   When the Work is substantially complete, the Contracting Officer may release to the Contractor all or a portion of any retainage amount Contracting Officer considers adequate protection of METRO. The Contractor will be paid in full upon final acceptance of the Work.

C.    METRO shall pay the amount due the Contractor under this Contract after:

   1.   Completion and acceptance of all Work;

   2.   Presentation of a properly prepared invoice;

   3.   For each invoice <u>with a Small Business Participation goal</u>, update METRO's Online Contract Audit screen demonstrating payments to subcontractors and confirmation of receipt of payment by subcontractors;

   4.   Presentation of a completed 'Contractor's Release' form, Exhibit C, with every invoice, thereby releasing all claims against METRO arising by virtue of this Contract, other than claims, in stated amounts that the Contractor has specifically excepted from the operation of the release. A release may also be required of the assignee if the Contractor's claim to amounts payable under this Contract has been assigned. The Contractor shall complete a 'Contractor's Release' form, Exhibit C, or other Contractor's release form acceptable to METRO and submit with every invoice; and

   5.   For each invoice <u>with a Small Business Participation goal</u>, update METRO's online Subcontractor Invoice Report demonstrating subcontractor's invoices for the billing period and upload a copy of the subcontractor's invoice. The Contractor's invoice to METRO should include subcontractors' invoices for the same period of performance.

<div align="center">

14

</div>

IFB No. 4022000021

Contract No. 7022000111

D.      The Contractor shall submit invoices to the following address:

Sr. Director of Accounting/Controller
METROPOLITAN TRANSIT AUTHORITY
1900 Main St., 5th Floor (77002)
P.O. Box 61429
Houston, Texas 77208-1429

E.      Subcontractor and Supplier Payments:

1.      The Contractor shall provide payment to each subcontractor and supplier within five (5) business days after receiving payment from METRO for amounts previously invoiced for work performed or materials furnished under the Contract with a Small Business Participation goal. Subcontract payment provisions shall require payments to subcontractors within five (5) business days after the Contractor received payment from METRO. Interest on late payments is subject to the provisions of Texas Government Code, Title 10, Chapter 2251, regarding payments to subcontractors.

2.      In the event of disputed amounts, within five (5) business days of receiving a disputed invoice, the Contractor shall provide a written response to a subcontractor or supplier, with a copy to the Contracting Officer, specifically addressing any disputed amounts on invoices. The Contractor should resolve all disputed invoices at the earliest time to avoid a delay in the submission of print out of METRO's Online Contract Audit screen with subcontractor payment verification which could delay payment to the Contractor. In the event that the Contractor cannot resolve a subcontractor or supplier disputed invoice, the Contractor shall bring the matter to the attention of the Contracting Officer at the time of submitting the Contractor's invoice for payment. The Contracting Officer will investigate the situation and make a determination whether the Contractor's invoice should be processed for payment without the required contract Audit verification. The Contracting Officer will not mediate the dispute between the Contractor and any subcontractor or supplier in the resolution of disputed invoices.

3.      Each time METRO releases a payment of retainage to the Contractor, the Contractor is then required to report the date and amount of retainage released to its subcontractors, with the next invoice submitted to METRO. If a subcontractor's work has been completed, and no retainage is released to that subcontractor, the Contractor must explain in writing, its reasons for not releasing retainage.

The Contractor's obligation to make prompt payment to its subcontractors, as reflected in Section V, Invoicing and Payment of this Contract applies to the Contractor's release of retainage to its Subcontractors after METRO's release of retainage to the Contractor. Any delay in the Contractor's payment of retainage to a subcontractor must take place for good cause only, and the Contractor must obtain the subcontractor's written consent for the delay. The Contractor must also obtain METRO's prior approval in those circumstances where a subcontractor has completed work but will not be paid any retainage. In addition, a Contractor's unexplained failure to pay retainage to its subcontractors as required in this Section will permit METRO to withhold reimbursement for that subcontractor's work until the Contractor ensures that the subcontractors are promptly paid for the Work they have performed.

F.      METRO's Online Contract Audit on Contracts with Small Business Participation Goals:

1.      Contractors are required to update METRO's Online Contract Audit screen and Subcontractor Invoice Report, and to upload subcontractor invoices.

2.      Failure of the Contractor to update METRO's Online Contract Audit screen, Subcontractor Invoice Report and/or subcontractor's invoices will be cause for the return of the invoice to the Contractor as an improperly prepared invoice.

3.      In the event that no invoice is due for the past month, METRO's Online Contract Audit screen shall nevertheless be updated, showing payment/nonpayment confirmation by the subcontractor/supplier.

G.      METRO is exempt from payment of Federal Excise and Transportation Tax and Texas Limited Sales, Excise and Use Tax. METRO's Federal Excise Tax Number is 76-79-0020K and METRO's State Tax Exempt Number is 1-74-1998278-4. The Contractor's invoices shall not contain assessment of any of these taxes on materials incorporated into the project.

H.      For each invoice with a Small Business Participation goal, payments will be made within fifteen (15) business days after receipt of a properly prepared invoice, which includes METRO's on-line Contract Audit screen and Subcontractor Invoice Report updates and upload of subcontractor invoices. Invoices with no Small Business Participation goal will be made within thirty (30) business days after receipt of a properly prepared invoice. Payments shall be considered made when METRO deposits the Contractor's payment in the mail or the date on which an electronic transfer of funds was made. Interest on payments under this Contract shall accrue and be paid only in accordance with Texas Government Code, Title 10, Chapter 2251, which shall be the Contractor's sole remedy under this Article.

IFB No. 4022000021                                                      Contract No. 7022000111

I.      All material and work covered by payments made shall, at the time of payment, become the sole property of METRO, but this provision shall not be construed as:

    1.    Relieving the Contractor from the sole responsibility for all material, goods and work upon which payments have been made or the restoration of any damaged Work; or as

    2.    Waiving the right of METRO to require the fulfillment of all of the terms of the Contract.

**3      ADMINISTRATIVE CONTROL OF CORRESPONDENCE**

Contract-related correspondence, transmittal letters, etc., issued by each party to this Contract will refer to the Contract number shown on the cover page of this Contract. The correspondence shall be addressed to the appropriate METRO representative set forth elsewhere in this Contract. Should it be addressed to other than the Contracting Officer, a copy shall be provided to the Contracting Officer.

**4      CONTRACTOR REPRESENTATIVE**

A.    Prior to the start of performance, the Contractor shall advise METRO in writing of the primary and alternate representative (including phone number) who will have management responsibility for the total Contract, with the authority to transmit instructions, receive information, receive and act on technical matters and resolve problems of a contractual nature, and represent the Contractor in all matters with regard to the Project. These representatives may be changed by the Contractor from time to time, with the written approval of METRO.

B.    Contractor personnel who will require access to any METRO property on a frequent basis (greater than 20 hours a week), will require a Contractor badge. METRO's Project Manager is responsible for coordinating these badges with METRO's Facilities Maintenance Department. Badges will carry an expiration date of 90 days; if further access is required, METRO's Project Manager must resubmit a Contractor badge request on the Contractor's behalf to the Facilities Maintenance Department with the appropriate levels of approval.

C.    At the termination of this Contract, the Contractor shall return to METRO's Project Manager all METRO issued identification badges and METRO Q Cards for deactivation by METRO's Human Resources Department. The Contractor shall also immediately notify METRO's Project Manager and return such identification badges and METRO Q Cards for those Contractor employees whose services are no longer needed during the course of this Contract. The Contractor will be assessed a $10.00 fee for each identification badge or METRO Q Card that is lost or not returned to METRO.

**5      MINUTES OF MEETINGS**

The Contractor shall provide a record of all conferences, meetings, discussions, verbal directions, telephone conversations, etc., participated in by the Contractor, on matters relative to the Contract and Services thereunder. Each record shall be entitled 'Confirmation Record' and shall fully identify participating personnel, subjects discussed, and any conclusions reached. The Contractor shall, within five (5) calendar days after each activity requiring a 'Confirmation Record,' forward two (2) copies to METRO's Project Manager.

**6      NOTICES**

All notices to either party by the other shall be delivered personally or sent by U.S. registered or certified mail, postage prepaid, addressed to such party at the following respective addresses for each:

        Authority:    Michael L. Diettel
                     Contracting Officer
                     METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS
                     1900 Main St., 8th Floor
                     Houston, Texas  77002

        Contractor:    PRCHOU, LLC.
                     3411 Richmond Ave., Suite 610
                     Houston, TX 77046
                     POC: Mukadas D. Kurban
                     Email: dansi@premiergrouptx.com
                     Phone: 832-858-1239

and shall be deemed given on the date so delivered or so deposited in the mail, unless otherwise provided herein. Either party hereto may change the above address by sending written notice of such change of address to the other in the manner provided for above.

IFB No. 4022000021

Contract No. 7022000111

## SECTION VI - INSURANCE ARTICLES

**1**  **CONTRACTOR'S INSURANCE**

A.  The Contractor shall purchase and maintain in effect during the entire period of this contract, including any maintenance period thereof, insurance of the types and with minimum limits of liability as stated below. Such insurance shall protect Contractor from claims which may arise out of or result from Contractor's operations whether such operations are performed by Contractor or by any subcontractor or by anyone for whose acts any of them may be liable.

**WORKERS' COMPENSATION INSURANCE** providing Statutory Benefits in accordance with the Workers' Compensation Act of the State of Texas and/or any other State or Federal law as may be applicable to the work being performed under this contract. EMPLOYER'S LIABILITY with limits of liability not less than:

| | |
|---|---|
| $1,000,000 | Each Accident |
| $1,000,000 | Each Employee for Disease |
| $1,000,000 | Policy Limit for Disease |

- Policy shall be endorsed with a waiver of subrogation recognizing the waiver of all rights of subrogation or recovery against METRO as stated in paragraph B. below.

**COMMERCIAL GENERAL LIABILITY** utilizing Insurance Services Office Form CG 00 01 or its substantial equivalent providing coverage on an "occurrence" basis, including bodily injury, property damage, and products and completed operations with limits no less than:

| | |
|---|---|
| $3,000,000 | Each Occurrence |
| $3,000,000 | General Aggregate |
| $3,000,000 | Products and Completed Operations Liability Aggregate |

- Policy shall be endorsed to name METRO as Additional Insureds as respects Contractor's **ongoing and completed** operations in performance of this contract.
- Policy shall be endorsed with a waiver of subrogation recognizing the waiver of all rights of subrogation or recovery against METRO as stated in paragraph B. below.
- Such insurance shall be primary and non-contributing with any other valid and collectible insurance or self-insurance available to METRO.

**BUSINESS AUTOMOBILE LIABILITY** utilizing Insurance Services Office Form CA 00 01 or its substantial equivalent including liability coverage for all autos owned, rented, hired or borrowed by the Contractor, as well as liability coverage for mobile equipment subject to compulsory insurance or financial responsibility laws or other motor vehicle insurance laws with the following minimum limit:

| | |
|---|---|
| $1,000,000 | Any One Accident- Combined Single Limit |

- Policy shall be endorsed to name METRO as Additional Insureds as respects Contractor's operations in performance of this contract.
- Policy shall be endorsed with a waiver of subrogation recognizing the waiver of all rights of subrogation or recovery against METRO as stated in paragraph B. below.
- Such insurance shall be primary and non-contributing with any other valid and collectible insurance or self-insurance available to METRO.

**CONTRACTOR'S EQUIPMENT**: Contractors/subcontractors are responsible for their construction tools and equipment, including construction trailers and their contents, temporary scaffolding, whether owned, leased, rented, borrowed or used at the Project Site; and the contractors/subcontractors agree that METRO will not be responsible for any loss or damage to its tools and equipment. If insured, the contractors/subcontractors' insurance policy covering tools and equipment will include a waiver of subrogation in favor of METRO. If uninsured, the contractors/subcontractors will hold harmless METRO, designer and engineer for loss or damage to their tools and equipment.

**The following provisions apply with respect to all insurance coverages required above:**

The insurance coverages required in this section shall not limit the Contractor's liability or limit the indemnification provisions set forth herein.

If the Contractor maintains higher limit than the minimums shown above, METRO requires and shall be entitled to coverage for the higher limits maintained by the Contractor. Any available insurance proceeds in excess of the specific minimum limits of insurance and coverage shall be available to METRO.

IFB No. 4022000021                                                          Contract No. 7022000111

The limits of liability as required above may be provided by a single policy of insurance or by a combination of primary, excess or umbrella policies. But in no event shall the total limits of liability available for any one occurrence or accident be less than the amount required above.

All policies of insurance presented as proof of compliance with the above requirements shall be on forms and with insurance companies approved by METRO. All such insurance policies shall be provided by insurance companies having Best's ratings of A- or greater and VI or greater (A-/VI) as shown in the most current issue of Best's Key Rating Guide. Policies of insurance issued by insurance companies not rated by Best's or having Best's ratings lower than A-VI will not be accepted as complying with the insurance requirements of the contract unless such insurance companies were approved in writing prior to award of contract.

B.     Contractor agrees to waive all rights of subrogation or recovery against METRO arising out of any claims for injury(ies) or damages resulting from the work performed by or on behalf of Contractor under this agreement and/or the use of any METRO premises or equipment in the performance of this agreement.

C.     Proof of compliance with these insurance requirements shall be furnished to METRO in the form of an original certificate of insurance including the endorsements mentioned in section A. above, or copies of the applicable policy language effecting required coverage signed by an authorized representative or agent of the insurance company(ies), within fourteen (14) days of notice of award of contract and before any work under this contract will be allowed to commence. Certificates will be unacceptable unless they clearly show that all of the above stipulated requirements have been met. Renewal or replacement certificates shall be furnished METRO not less than seven (7) days prior to the expiration or termination date of the applicable policy(ies). Otherwise, METRO may halt all work under this contract upon expiration or other termination of any required coverage, and work will not be allowed to resume until a satisfactory renewal certificate is received.

D.     The Certificate Holder shall read as follows on the Certificate of Insurance:

**Metropolitan Transit Authority of Harris County, TX (METRO)**
**1900 Main St**
**Houston, TX 77002**

E.     Contractor shall require any and all subcontractors performing work under this contract to obtain and maintain the insurance coverage specified in this section. Such insurance shall be endorsed to name METRO and its directors, officers and employees as Additional Insured as respects to subcontractor's operations in performance of this contract. In addition, subcontractor and their respective insurers providing the required insurance coverage will waive all rights of subrogation or recovery against METRO providing such coverage shall be endorsed to recognize this required waiver of subrogation. The insurance limits may be provided through a combination of primary and excess policies, including the umbrella form of policy. In the event a subcontractor is unable to furnish insurance in the limits required under this contract, the Contractor shall endorse the subcontractor as an Additional Insured on its General Liability and Automobile Liability policies and provide METRO a certificate of insurance showing such coverage.

Such insurance will be primary and non-contributing with any other insurance and be in a form and from insurance companies reasonably acceptable to METRO.

Any request to deviate from the stipulated insurance limits required of subcontractor must be approved by METRO and will be based solely on the scope of work to be performed by the subcontractor. Contractor shall obtain and make available for inspection by METRO upon request current certificates of insurance evidencing insurance coverages carried by subcontractor.

2.     **INDEMNIFICATION AGREEMENT**

A.     **CONTRACTOR AGREES TO AND SHALL INDEMNIFY AND HOLD HARMLESS METRO, ITS DIRECTORS AND EMPLOYEES FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, DAMAGES, CAUSES OF ACTION, SUITS AND LIABILITY OF EVERY KIND, INCLUDING ALL EXPENSES OF LITIGATION, COURT COSTS AND ATTORNEY'S FEES, FOR BODILY INJURY, SICKNESS, DISEASE OR DEATH OF ANY PERSON, OR FOR DAMAGES TO ANY PROPERTY, INCLUDING CONSEQUENTIAL DAMAGES OR LOSS OF USE THEREOF, BROUGHT OR RECOVERABLE BY THIRD PARTIES AGAINST METRO, ITS DIRECTORS AND/OR EMPLOYEES AND ARISING OUT OF OR RESULTING FROM ANY NEGLIGENT ACT OR OMISSION BY CONTRACTOR IN THE PERFORMANCE OF THIS CONTRACT. CONTRACTOR AGREES TO PROVIDE ACKNOWLEDGEMENT OF INDEMNIFICATION WITHIN TEN DAYS FROM RECEIPT OF DEMAND FOR INDEMNIFICATION FROM METRO.**

B.     **THE INDEMNITY PROVIDED FOR IN THIS ARTICLE SHALL HAVE NO APPLICATION TO ANY CLAIM, LOSS OR DAMAGE, CAUSE OF ACTION, SUIT OR LIABILITY BROUGHT OR RECOVERABLE AGAINST METRO, ITS DIRECTORS AND/OR EMPLOYEES TO THE EXTENT THE INJURY, DEATH OR DAMAGE RESULTS SOLELY FROM A GROSS NEGLIGENT ACT OR WILLFUL BEHAVIOR BY METRO**

IFB No. 4022000021                                    Contract No. 7022000111

**SECTION VII - SMALL BUSINESS PROGRAM ARTICLES FOR CONTRACTS WITH SMALL BUSINESS GOALS**

A.    The Contractor hereby agrees to attain Small Business participation in the amount of <u>94%</u> of the total Contract amount.

B.    The Contractor shall enter into agreements for the Work identified in the 'Contractor Utilization Plan Form' (Plan) and submit copies of the agreements to the Contracting Officer within <u>15</u> days of contract award. The agreements will include:

    1.    Prompt payment clause;

    2.    Non-discrimination clause;

    3.    Release of retainage clause, where applicable;

    4.    Business Assurance clauses;

    5.    Federal clauses, where applicable; and

    6.    Subcontractor's obligation to participate in the B2GNow Payment Compliance System.

C.    The Contractor shall adhere to the Plan submitted, <u>including self-performing a minimum thirty percent (30%) of the Contract,</u> unless a waiver is received from the Office of Small Business. Any changes in the Plan regarding the proposed use of certified subcontractors in discharging the Contract duties must be approved by the Office of Small Business. The approval of the Office of Small Business will not be unreasonably withheld upon a showing of good cause to make the change. When adding a certified subcontractor to the Plan, the Contractor must submit a copy of the subcontract agreement to the Contracting Officer within <u>15</u> days of receiving approval from the Office of Small Business

D.    The Contractor's failure to comply with the aforementioned Small Business participation provisions <u>and the Contractor Utilization Plan Pledge provisions</u> may result in the:

    1.    Withholding of payment until such compliance is achieved or a waiver of the provisions is provided by METRO;

    2.    Revocation of the benefits and incentives provided under the Program; or

    3.    Cancellation, termination or suspension of the Contract, in whole or in part.

E.    Where applicable, the Contractor's Small Business Participation goal achievement and compliance with the Small Business Program will be considered during evaluation for future METRO contracts.

F.    The Contractor and Subcontractors shall permit access to their books, records, and accounts by the Contracting Officer, <u>Office of Small Business representative</u> or a designated representative for the purpose of investigation to ascertain compliance with these specified requirements. Such records shall be maintained by the Contractor in a fashion which is readily accessible to METRO for a minimum of three (3) years following completion of this Contract. <u>The Contractor will include this provision in the subcontractor agreements.</u>

G.    To ensure that all obligations under this Contract are met, METRO will conduct periodic reviews of the Contractor's Small Business efforts during Contract performance. The Contractor shall bring to the attention of METRO's Contracting Officer <u>and Office of Small Business</u> any situation in which regularly scheduled progress payments are not made to Small Business subcontractors. <u>Failure to make prompt payment or to notify METRO could result in the action outlined in item D above.</u>

H.    The Contractor may review documents at METRO which specify:

    1.    Guidance for making determinations of Small Business participation in the Program;

    2.    The procedure used to determine whether a company is in fact a Small Business; and

    3.    Appeals procedure for denial of certification as a Small Business.

IFB No. 4022000021                                                                 Contract No. 7022000111

## SECTION VIII - SPECIAL TERMS AND CONDITIONS ARTICLES

### 1     CONFIDENTIALITY AND NONDISCLOSURE

A.     The Contractor acknowledges that in rendering these services, METRO Confidential Information [will or may] be revealed to the Contractor. 'Confidential Information' means non-public, sensitive or proprietary information disclosed before, on or after the effective date, by METRO to the Contractor or its employees, agents, officers, directors, or affiliates. Except as required by applicable federal, state or local law or regulation, Confidential Information does not include information that at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of this Contract, information from a lawful third-party source, and information that was already in the possession of the Contractor. The Contractor shall not use any such Confidential Information without METRO's written permission. The Contractor shall not disclose METRO Confidential Information to any person or entity other than its representatives involved in this Contract.

B.     If the Contractor knows or suspects any misuse or disclosure of METRO Confidential Information, the Contractor will immediately notify METRO and restrict the use and disclosure of such Confidential Information.

C.     On METRO's request, the Contractor shall promptly return or destroy all Confidential Information in its possession.

D.     At any time during the term of this and for a period of three (3) years from the date of expiration of this Contract, at METRO's request, the Contractor shall provide to METRO or its designated agents full access to the Contractor's premises to inspect and audit the relevant books, records, physical and electronic controls to verify the Contractor's compliance with the terms of this clause. Notwithstanding the above, any valid order of disclosure under the Texas Public Information Act shall be lawful if prompt written notice is given to METRO before disclosure. The Contractor understands that disclosure can lead to irreparable harm which injunctive relief alone may not be an adequate remedy. METRO reserves its right to all other remedies available at law.

### 2     CONTRACTOR'S EMPLOYEES

A.     The Contractor shall screen all employees and require satisfactory personal references in order to determine the character of prospective employees before hiring.

B.     Access to METRO facilities is limited to Contractor and subcontractor personnel performing the Work and to suppliers making deliveries related to the Work. The Contractor, subcontractor(s) and supplier(s) shall comply with all facility access requirements as designated by the Contracting Officer. All Contractor, subcontractor and supplier personnel shall comply with METRO's increased security requirements during heightened security levels. No claim shall be allowed for delays in access to METRO facilities.

C.     All Contractor, subcontractor and supplier personnel shall submit to vehicle searches by METRO's security personnel and shall comply with METRO's regulations on the possession of firearms and weapons.

D.     All Contractor, subcontractor and supplier personnel shall, while on duty at a METRO facility, wear in plain view on the upper portion of the outer garment, a metal or plastic identification badge to be furnished by the Contractor, containing the company name, employee's name or company identification number of employee, if any. All prescribed identification shall immediately be delivered to the Contractor for cancellation upon release of any employee.

E.     All Contractor and Subcontractor employees shall be neatly attired at all times in a manner that will reflect credit both upon Contractor and the facility in which they are working.

F.     All Contractor and subcontractor employees shall be U.S. citizens or possess written documentation verifying legal authorization to work in the United States.

G.     When working in METRO facilities, the Contractor shall prohibit the disruption of papers on desks, opening of desk drawers or cabinets, or the use of telephone or office equipment provided for official METRO use.

H.     At the request of the Contracting Officer, the Contractor shall remove an employee from its work force who is found unacceptable or unsatisfactory by the Contracting Officer. It shall be the Contractor's responsibility to find a suitable replacement for the removed employee. No claim associated with such an action will be authorized.

I.     The Contractor's personnel shall comply with all written rules and regulations supplied to the Contractor regarding personal and professional conduct, safety, security and other matters that are generally applicable to METRO's employees at the site of METRO's Work, such as the Electronic Communications Guideline; and otherwise conduct themselves in a businesslike manner.

J.     The Contractor shall have the responsibility to see that its employees and employees of its subcontractors shall at all times be fit to work and that their performance not be impaired by alcohol or drugs. The Contractor shall not permit the introduction to the Work or use by its employees and Subcontractors' employees of any intoxicant, including but not limited to alcohol, unlawful drugs, prescription drugs not prescribed for current personal treatment of the user by an accredited physician, or any other unauthorized substance.

K.     METRO shall have the right to require the Contractor to immediately remove from the Work any employee of the Contractor or its subcontractor whom METRO knowingly believes has violated any of the above conditions and such person shall not again be employed on the Work without the consent of METRO.

L.     The Contractor shall replace the removed worker, at the Contractor's expense, with a suitable replacement within twenty four (24) hours after immediately removing the violating employee.

**3     GOVERNMENT CODE 2258, PREVAILING WAGE RATES**

For non-federally funded projects, the Contractor shall comply with Government Code, Title 10, General Government, Subtitle F, State and Local Contracts and Fund Management, Chapter 2258, Prevailing Wage Rates.

**4     NO DAMAGES FOR DELAYS**

No claims for increased costs, charges, expenses, or damages of any kind shall be made by the Contractor against METRO for any delays or hindrances from any cause whatsoever; provided that METRO, in METRO's discretion, may extend the time for completion of the Contract for METRO caused delays, as necessary.

**5     USE OF LOW SULFUR DIESEL**

The Contractor shall use low-sulfur (500 ppm or less) diesel fuel in all diesel operating vehicles and motorized equipment used by the Contractor and its Subcontractors in the performance of this Work. No diesel operating vehicle or motorized equipment used in the performance of this Work shall utilize a high-sulfur diesel fuel in excess of the required 500 ppm sulfur content. If the Contractor or its Subcontractors are found to be using high-sulfur diesel fuel during the performance of this Work, METRO may, at its discretion, order the Contractor to cease operation of all such vehicles and motorized equipment until this requirement has been complied with. The Contractor shall not be entitled to any claims for compensation therefore. Either off-road low-sulfur 'red-dye' diesel fuel or on-road low-sulfur diesel containing 500 ppm or less sulfur content may be used to comply with this requirement. Contractors and subcontractors using this type of fuel must have invoices/receipts available upon demand by METRO's Contracting Officer to ensure compliance with this low-sulfur fuel use requirement.

IFB No. 4022000021

Contract No. 7022000111

## SECTION IX - GENERAL TERMS AND CONDITIONS ARTICLES

### 1    ACCESS REQUIREMENTS FOR INDIVIDUALS WITH DISABILITIES

The Contractor agrees to comply with, and assures that any subcontractor or any other third-party Contractor under this Contract complies with, all applicable requirements regarding Access for Individuals with Disabilities contained in the Americans with Disabilities Act of 1990 (ADA), as amended, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; 49 U.S.C. § 5301(d); and any other applicable federal regulations, including any amendments thereto.

### 2    ASSIGNMENT

The performance of the services under the Contract shall not be assigned by the Contractor except upon written consent of METRO. The Contractor may assign monies due or to become due to him under the Contract and such assignment will be recognized by METRO, if given proper notice thereof, to the extent permitted by law. Assignment of monies will be subjected to proper offsets in favor of METRO and to deductions provided for in this Contract. Money withheld, whether assigned or not, will be subject to being used by METRO for the completion of the Work in the event that the Contractor defaults under the contract. The validity of the assignment and the rights of the assignee against METRO shall be governed by the laws of the state of Texas. METRO reserves the right to assign all or portion of the services awarded under this Contract including options. METRO's right of assignment will remain in force over the period of the Contract until completion of the Contract to include options, whichever occurs first.

### 3    CHANGES

A.    The President & Chief Executive Officer or the duly authorized representative may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the Work within the general scope of the contract, including any one or more of the following:

    1.   The specifications, drawings, and designs;

    2.   In the method or manner of performance of the Work;

    3.   In METRO-furnished facilities, equipment, materials, services, or site; or

    4.   Directing acceleration in the performance of the Work.

B.    Any other written order or an oral order (which, as used in this paragraph, includes direction, instruction, interpretation, or determination) from the President & Chief Executive Officer or the duly authorized representative that causes a change shall be treated as a change order under this Article; provided, that the Contractor gives the Contracting Officer written notice stating the date, circumstances, and source of the order and that the Contractor regards the order as a change order.

C.    Except as provided in this Article, no order, statement, or conduct of the President & Chief Executive Officer or the duly authorized representative shall be treated as a change under this Article or entitle the Contractor to an equitable adjustment hereunder.

D.    If any change under this Article causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the Work under this Contract, whether or not changed by any such order, the President & Chief Executive Officer or the duly authorized representative shall make an equitable adjustment and modify the Contract in writing. However, except for a 'proposal for adjustment' (hereafter referred to as 'proposal') based on defective specifications, no proposal for any change under Paragraph B above shall be allowed for any costs incurred more than twenty calendar (20) days before the Contractor gives written notice as required.

E.    The parties agree that the terms and conditions of this Contract may only be modified and/or amended by mutual agreement between the parties. Said mutually agreed upon amendment and/or modification shall be written and executed by both parties prior to becoming effective.

F.    The Contractor must submit any proposal under this Article within thirty calendar (30) days after:

    1.   Receipt of a written change order under Paragraph A above, or

    2.   The furnishing of a written notice under Paragraph B above by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal, unless this period is extended by METRO. The statement of proposal for adjustment may be included in the notice under Paragraph B above.

G.    No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this Contract.

IFB No. 4022000021                                                                                           Contract No. 7022000111

**4        CLEANING UP**

The Contractor shall at all times keep the work area, including storage areas, free from accumulations of waste materials. Before completing the Work, the Contractor shall remove from the Work area and premises any rubbish, tools, scaffolding, equipment, and materials that are not the property of METRO. Upon completing the Work, the Contractor shall leave the work area in a clean and orderly condition satisfactory to the METRO Project Manager. Final cleanup of the premises shall be included in the Period of Performance of this Contract.

**5        COMPOSITION OF CONTRACTOR**

If the Contractor hereunder is comprised of more than one legal entity, each such entity shall be jointly and severally liable hereunder.

**6        CONTRACT ORDER OF PRECEDENCE**

In the event of an inconsistency between provisions of this Contract, the inconsistency shall be resolved by giving precedence in the following order:

1.   Contract Modifications, if any

2.   Contract Articles;

3.   Scope of Services;

4.   Technical Specifications; and

5.   Drawings.

**7        COVENANT AGAINST CONTINGENT FEES**

The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this Contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty METRO shall have the right to annul this Contract without liability or in its discretion, to deduct from the Contract price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

**8        DIFFERING SITE CONDITIONS**

A.    The Contractor shall promptly, and before the conditions are disturbed, give written notice to the METRO Project Manager of:

1.   Subsurface or latent physical conditions at the site which differ materially from those indicated in this Contract, or

2.   Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract.

B.    The METRO Project Manager shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work under this Contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made and the Contract modified in writing accordingly.

C.    No request by the Contractor for an equitable adjustment to the contract under this Article shall be allowed, unless the Contractor has given the written notice required.

D.    No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this Contract.

**9        DISPUTES**

Any dispute concerning a question of fact arising under this Contract that is not disposed of by agreement will be decided by the Contracting Officer, who will reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer will be final unless, within ten (10) calendar days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the METRO Contract Disputes Appeals Committee. The Contract Disputes Appeals Committee will be designated by the President & Chief Executive Officer and will hear the Contractor's appeal and make a recommendation to the President & Chief Executive Officer for the final decision. In connection with any appeal proceeding under this Article, the Contractor will be afforded an opportunity to be heard and to offer evidence in support of his appeal. The decision of the President

23

IFB No. 4022000021                                                                                          Contract No. 7022000111

& Chief Executive Officer will be final and conclusive with respect to the Contractor's administrative remedies under this 'Disputes' Article. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the Contract and in accordance with the Contracting Officer's decision. This 'Disputes' Article does not preclude consideration of questions of law in connection with decisions provided for above. Nothing in this Contract, however, shall be construed as making final the decision of any administrative official, representative, or committee on a question of law.

## 10   DISSEMINATION OF CONTRACT INFORMATION

The Contractor shall not publish, permit to be published, or distribute for public consumption, any information, oral or written, concerning the performance of this Contract, without prior written consent of METRO's President & Chief Executive Officer. Two (2) copies of any material proposed to be published or distributed shall be submitted to the METRO President & Chief Executive Officer through the Contracting Officer.

## 11   EQUAL OPPORTUNITY FOR VEVRAA PROTECTED VETERANS[3]

[3]The definitions set forth in 41 C.F.R. § 60-300.2 apply to the terms used throughout this Clause, and they are incorporated herein by reference.

A.   The Contractor will not discriminate against any employee or applicant for employment because he or she is a disabled veteran, recently separated veteran, active duty wartime or campaign badge veteran, or Armed Forces service medal veteran (hereinafter collectively referred to as 'protected veteran[s]') in regard to any position for which the employee or applicant for employment is qualified. The Contractor agrees to take affirmative action to employ, advance in employment and otherwise treat qualified individuals without discrimination based on their status as a protected veteran in all employment practices, including the following:

1.   Recruitment, advertising, and job application procedures;

2.   Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff and rehiring;

3.   Rates of pay or any other form of compensation and changes in compensation;

4.   Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

5.   Leaves of absence, sick leave, or any other leave;

6.   Fringe benefits available by virtue of employment, whether or not administered by the Contractor;

7.   Selection and financial support for training, including apprenticeship, and on-the-job training under 38 U.S.C. 3687, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training;

8.   Activities sponsored by the Contractor including social or recreational programs; or

9.   Any other term, condition, or privilege of employment.

B.   The Contractor agrees to immediately list all employment openings which exist at the time of the execution of this Contract and those which occur during the performance of this Contract, including those not generated by this Contract and including those occurring at an establishment of the Contractor other than the one where the contract is being performed, but excluding those of independently operated corporate affiliates, with the appropriate employment service delivery system where the opening occurs. Listing employment openings with the state workforce agency job bank or with the local employment service delivery system where the opening occurs will satisfy the requirement to list jobs with the appropriate employment service delivery system. In order to satisfy the listing requirement described herein, Contractors must provide information about the job vacancy in any manner and format permitted by the appropriate employment service delivery system which will allow that system to provide priority referral of veterans protected by VEVRAA for that job vacancy. Providing information on employment openings to a privately run job service or exchange will satisfy the Contractor's listing obligation if the privately run job service or exchange provides the information to the appropriate employment service delivery system in any manner and format that the employment service delivery system permits which will allow that system to provide priority referral of protected veterans.

C.   Listing of employment openings with the appropriate employment service delivery system pursuant to this Clause shall be made at least concurrently with the use of any other recruitment source or effort and shall involve the normal obligations which attach to the placing of a *bona fide* job order, including the acceptance of referrals of veterans and nonveterans. The listing of employment openings does not require the hiring of any particular job applicants or from any particular group of job applicants, and nothing herein is intended to relieve the Contractor from any requirements in executive orders or regulations regarding non-discrimination in employment.

IFB No. 4022000021                                                                                      Contract No. 7022000111

D.      Whenever a Contractor, other than a state or local governmental Contractor, becomes contractually bound to the listing provisions in paragraphs 2 and 3 of this Clause, it shall advise the employment service delivery system in each state where it has establishments that: (a) it is a federal Contractor, so that the employment service delivery systems are able to identify them as such; and (b) it desires priority referrals from the state of protected veterans for job openings at all locations within the state. The Contractor shall also provide to the employment service delivery system the name and location of each hiring location within the state and the contact information for the Contractor official responsible for hiring at each location. The 'Contractor Official' may be a chief hiring official, a Human Resources contact, a senior management contact, or any other manager for the Contractor who can verify the information set forth in the job listing and receive priority referrals from employment service delivery systems. In the event that the Contractor uses any external job search organizations to assist in its hiring, the Contractor shall also provide to the employment service delivery system the contact information for the job search organization(s). The disclosures required by this Paragraph shall be made simultaneously with the Contractor's first job listing at each employment service delivery system location after the effective date of this final rule. Should any of the information in the disclosures change since it was last reported to the employment service delivery system location, the Contractor shall provide updated information simultaneously with its next job listing. As long as the Contractor is contractually bound to these provisions and has so advised the employment service delivery system, there is no need to advise the employment service delivery system of subsequent contracts. The Contractor may advise the employment service delivery system when it is no longer bound by this Contract clause.

E.      The provisions of Paragraphs B and C of this Clause do not apply to the listing of employment openings which occur and are filled outside of the 50 states, the District of Columbia, the commonwealth of Puerto Rico, Guam, the Virgin Islands, American Samoa, the commonwealth of the Northern Mariana Islands, Wake Island, and the Trust Territories of the Pacific Islands.

F.      As used in this Clause:

        1.   All employment openings includes all positions except executive and senior management, those positions that will be filled from within the Contractor's organization, and positions lasting three days or less. This term includes full-time employment, temporary employment of more than three days' duration, and part-time employment.

        2.   *Executive and senior management* means: (1) Any employee (a) compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the federal government), exclusive of board, lodging or other facilities; (b) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (c) who customarily and regularly directs the work of two or more other employees; and (d) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight; or (2) any employee who owns at least a bona fide 20-percent equity interest in the enterprise in which the employee is employed, regardless of whether the business is a corporate or other type of organization, and who is actively engaged in its management.

        3.   *Positions that will be filled from within the Contractor's organization* means employment openings for which no consideration will be given to persons outside the Contractor's organization (including any affiliates, subsidiaries, and parent companies) and includes any openings which the Contractor proposes to fill from regularly established 'recall' lists. The exception does not apply to a particular opening once an employer decides to consider applicants outside of his or her own organization.

G.      The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

H.      In the event of the Contractor's noncompliance with the requirements of this Clause, actions for noncompliance may be taken in accordance with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

I.      The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Director, Office of Federal Contract Compliance Programs, provided by or through the Contracting Officer. Such notices shall state the rights of applicants and employees as well as the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified employees and applicants who are protected veterans. The Contractor must ensure that applicants or employees who are disabled veterans are provided the notice in a form that is accessible and understandable to the disabled veteran (e.g., providing Braille or large print versions of the notice, posting the notice for visual accessibility to persons in wheelchairs, providing the notice electronically or on computer disc, or other versions). With respect to employees who do not work at a physical location of the Contractor, a Contractor will satisfy its posting obligations by posting such notices in an electronic format, provided that the Contractor provides computers that can access the electronic posting to such employees, or the Contractor has actual knowledge that such employees otherwise are able to access the electronically posted notices. Electronic notices for employees must be posted in a conspicuous location and format on the company's intranet or sent by electronic mail to employees. An electronic posting must be used by the Contractor to notify job applicants of their rights if the Contractor utilizes an electronic application process. Such electronic applicant notice must be conspicuously stored with, or as part of, the electronic application.

25

IFB No. 4022000021                                                                         Contract No. 7022000111

J.      The Contractor will notify each labor organization or representative of workers with which it has a collective bargaining agreement or other contract understanding that the Contractor is bound by the terms of VEVRAA, and is committed to take affirmative action to employ and advance in employment, and shall not discriminate against, protected veterans.

K.      The Contractor will include the provisions of this Clause in every subcontractor purchase order of $100,000 or more, unless exempted by the rules, regulations, or orders of the Secretary issued pursuant to VEVRAA so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontractor purchase order as the Director, Office of Federal Contract Compliance Programs, may direct to enforce such provisions, including action for noncompliance.

L.      The Contractor must, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to their protected veteran status.

## 12      ETHICAL CONDUCT

A.      The METRO Board of Directors has adopted a Code of Ethics governing the conduct of its officers and employees. The Contractor agrees it will familiarize itself with this Code of Ethics and that it will not offer, confer or agree to confer any prohibited benefit as consideration for a METRO Board Member's or employee's decision, opinion, recommendation, vote or other exercise of discretion as a public servant or in exchange for the Board Member's or employee's having exercised his official powers or performed his official duties nor will the Contractor participate in any other violation of this Code.

B.      The Contractor is required to maintain those records necessary to prove beyond a reasonable doubt the Contractor's compliance with the METRO Code of Ethics Policy. METRO shall have the right to review for the purpose of determining compliance with the Code of Ethics Policy all disbursement records and supporting documents including invoices, payment vouchers, employee expense reports and petty cash records.

C.      Breach of this Article by the Contractor may result in termination of the Contract and exclusion of the Contractor from future contracts with METRO for a period of time determined by the METRO Board of Directors.

## 13      EXTRAS

Except as otherwise provided in this Contract, no payment for extra Work shall be made unless such extra Work and the price therefore have been authorized by advanced written order of METRO pursuant to the 'Changes' Article of this Contract.

## 14      FORCE MAJEURE

A       To the extent that the Contractor shall be wholly or partially prevented from its performance within the terms specified of any obligation or duty placed on the Contractor by reason of or through riot, acts of war, acts of terrorism, insurrection, by order of court, legislative action, act of God, or specific cause reasonably beyond parties' control and not attributable to its neglect or nonfeasance, in such event, the time for the performance of such obligation or duty may be suspended until such disability to perform is removed. Determination of force majeure shall rest solely with METRO.

B.      In the event the Contractor seeks to characterize an event as a 'Force Majeure Event,' the Contractor shall have the obligation to immediately notify METRO at the time the Contractor becomes aware of said Force Majeure event. Further, the Contractor shall have the obligation to provide METRO with written notice upon the cessation of said Force Majeure event.

## 15      INDEPENDENT CONTRACTOR

It is understood and agreed that the Contractor shall be deemed to be an Independent Contractor in all its operations and activities hereunder; that the employees furnished by the Contractor to perform Work hereunder shall be deemed to be the Contractor's employees or independent subcontractors; that the Contractor's employees shall be responsible for all obligations and reports covering social security, unemployment insurance, income tax, and other reports and deductions required by state or federal law.

## 16      INTERPRETATION, JURISDICTION AND VENUE

This Contract shall be construed and interpreted solely in accordance with the laws of the state of Texas. Venue of any suit, right or cause of action arising under or in connection with this Contract shall lie exclusively in Harris County, Texas.

## 17      LAYOUT OF WORK

The Contractor shall lay out his work in accordance with the Contract plans and specifications and shall be responsible for all measurements in connection with the layout of the Work. The Contractor shall furnish, at his own expense, all stakes, templates, platforms, equipment, tools, materials, and labor required to lay out any part of the Work. The Contractor shall be responsible for executing the Work to the lines and grades that may be established or indicated by the METRO Project Manager. The Contractor shall also be responsible for maintaining and preserving all control points

established by the METRO Project Manager. If such control points are destroyed or removed by the Contractor before their removal is authorized, the METRO Project Manager may have them replaced and deduct the expense of the replacement from any amounts due or to become due to the Contractor.

**18    MATERIAL AND WORKMANSHIP**

A.    All equipment, material, and articles incorporated in the Work covered by this Contract shall be new and of the most suitable grade for the purpose intended, unless otherwise specifically provided in this Contract. References in the specifications to equipment, material, article, or patented process by trade name, make, or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition. The Contractor may, at its option, use any equipment, material, article, or process that, in the judgment of the METRO Project Manager, is equal to that named in the specifications, unless otherwise specifically provided in this Contract.

B.    The Contractor shall obtain the METRO Project Manager's approval of the machinery and mechanical and other equipment to be incorporated into the Work. When requesting approval, the Contractor shall furnish to the METRO Project Manager the name of the manufacturer, the model number, and other information concerning the performance, capacity, nature, and rating of the machinery and mechanical and other equipment. When required by the METRO Project Manager, the Contractor shall also obtain the METRO Project Manager's approval of the material or articles that the Contractor contemplates incorporating into the Work. When requesting approval, the Contractor shall provide full information concerning the material or articles. All materials submitted for review and approval by METRO shall be accompanied by the METRO 'Construction Submittal' form (see Exhibit D). When directed to do so, the Contractor shall submit samples for approval at the Contractor's expense, with all shipping charges prepaid. Machinery, equipment, material and articles that do not have the required approval shall be installed or used at the risk of subsequent rejection.

C.    All work under this Contract shall be performed in a skillful and workmanlike manner.

**19    METRO-FURNISHED DOCUMENTS**

The following quantities of the Contract documents will be provided to the Contractor at no additional expense after execution of the Contract:

| Document | Quantity |
|---|---|
| Contract | 3 copies |
| Contract Drawings, 11 X 17 format | 5 copies |

**20    METRO-FURNISHED PROPERTY**

A.    METRO shall provide to the Contractor, at the times and locations stated in this Contract, the METRO-furnished property described in this Contract.

B.    Title to METRO-furnished property shall remain with METRO. The Contractor shall use the METRO-furnished property only in connection with this Contract. The Contractor shall maintain adequate property control records of METRO-furnished property in accordance with sound industrial practice and shall make such records available for METRO's inspection at all reasonable times.

C.    The Contractor shall inspect the METRO-furnished property prior to acceptance. Upon acceptance of METRO-furnished property, the Contractor assumes the risk and responsibility for its loss or damage, except:

1.    For reasonable wear and tear;

2.    To the extent the property is consumed in performing this Contract; or

3.    As otherwise provided for by the provisions of this Contract.

D.    The Contract performance period is based upon the expectation that METRO-furnished property, suitable for use, will be available to the Contractor at the times stated in the Schedule or if not stated, in sufficient time to enable the Contractor to meet the performance dates.

E.    If the METRO-furnished property is not available to the Contractor by the required time, or is unsuitable for use as determined by the METRO Project Manager, the Contracting Officer shall, upon the Contractor's timely written request, make a determination of delay, if any, caused the Contractor, and shall make an adjustment in the Contract performance period. The right to adjustment in the performance period shall be the Contractor's exclusive remedy. METRO shall not be liable for suit for breach of contract for:

1.    Any delay in availability of METRO-furnished property;

IFB No. 4022000021                                                                     Contract No. 7022000111

2.  Availability of METRO-furnished property in a condition not suitable for its intended use;

3.  A decrease in, or substitution of, METRO-furnished property; or

4.  Failure to replace METRO-furnished property for which METRO is responsible.

F.  Upon completing this Contract, the Contractor shall follow the instructions of METRO regarding the disposition of all METRO-furnished property not consumed in the performance of this Contract.

**21   OPERATIONS AND STORAGE AREAS**

A.  The Contractor shall confine all operations (including storage of materials) on METRO premises to areas authorized or approved by the METRO Project Manager.

B.  Temporary buildings (e.g., storage sheds, shops, offices) and utilities may be erected by the Contractor only with the approval of the METRO Project Manager and shall be built with labor and materials furnished by the Contractor without expense to METRO. The temporary buildings and utilities shall remain the property of the Contractor and shall be removed by the Contractor at its expense upon the completion of the Work. With the written consent of the METRO Project Manager, the buildings and utilities may be abandoned and need not be removed.

C.  The Contractor shall use only established roadways or may construct and use temporary roadways when and if such temporary roadways are authorized by the METRO Project Manager. The Contractor shall comply with all Federal, state, and local laws and regulations when transporting materials. When it is necessary to cross curbs or sidewalks, the Contractor shall protect them from damage. The Contractor shall repair or pay for the repair of any damaged curbs, sidewalks, or roads.

**22   OTHER CONTRACTS**

METRO may undertake or award other contracts for additional work at or near the site of the Work under this Contract. The Contractor shall fully cooperate with the other Contractors and with METRO employees and shall carefully adapt scheduling and performing the Work under this Contract to accommodate the additional Work, heeding any direction that may be provided by the Contracting Officer. The Contractor shall not commit or permit any act that will interfere with the performance of Work by any other Contractor or by METRO employees.

**23   PATENT INDEMNITY**

Except as otherwise provided, the Contractor agrees to indemnify METRO and other government agencies, if this is a joint government project, and its officers, agents, and employees against liability, including costs and expenses, for infringement upon any United States patent arising out of the performance of this Contract or out of the use or disposal by or for the account of METRO and any other government agency of supplies furnished or construction work performed hereunder.

**24   PERFORMANCE OF WORK BY THE CONTRACTOR**

The Contractor shall perform on the site, and with its own organization, work equivalent to at least thirty percent (30%) of the total amount of Work to be performed under the Contract. This percentage may be reduced by agreement of the parties if, during performance of the Work, the Contractor requests a reduction and the Contracting Officer determines that the reduction would be to the advantage of METRO.

**25   PERMITS AND RESPONSIBILITIES**

The Contractor shall, without additional expense to METRO, be responsible for obtaining any necessary licenses and permits, and for complying with any federal, state and municipal laws, codes, and regulations applicable to the performance of the Work. The Contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence, and shall take proper safety and health precautions to protect the Work, the workers, the public, and the property of others. The Contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire Work, except for any completed unit of work which may have been accepted under the Contract.

**26   PRICING ADJUSTMENTS**

A.  The Contractor, in connection with any proposal he makes for a Contract modification shall furnish a price breakdown itemized as required by the Contracting Officer. Unless otherwise directed, the breakdown shall be in sufficient detail to permit an analysis of all material, labor, equipment, subcontract, and overhead costs, as well as profit, and shall cover all work involved in the modification, whether such Work was deleted, added or changed. Any amount claimed for subcontracts shall be supported by a similar price breakdown. All costs claimed are subject to negotiation, however, markup (including administrative overhead, extended overhead, profit and bonds) shall not exceed:

IFB No. 4022000021                                                                 Contract No. 7022000111

    1.   Fifteen percent (15%) total on work performed by the prime Contractor; nor

    2.   Twenty percent (20%) total - fifteen percent (15%) for the subcontractor + five percent (5%) for the prime Contractor when work is to be performed by subcontractors.

B.    Justification shall be furnished for any proposed extension in the period of performance. The proposal, together with the price breakdown and period of performance extension justification, shall be furnished by the date specified by the Contracting Officer.

## 27    PROTECTION OF EXISTING VEGETATION, STRUCTURES, UTILITIES AND IMPROVEMENTS

A.    The Contractor shall preserve and protect all structures, equipment and vegetation (such as trees, shrubs, and grass) on or adjacent to the Work site, which are not to be removed and which do not unreasonably interfere with the Work required under this Contract. The Contractor shall only remove trees when specifically authorized to do so, and shall avoid damaging vegetation that will remain in place. If any limbs or branches of trees are broken during the Contract performance, or by the careless operation of equipment, or by workmen, the Contractor shall trim those limbs or branches with a clean cut and paint the cut with a tree pruning compound as directed by the METRO Project Manager.

B.    The Contractor shall protect from damage all existing improvements and utilities (1) at or near the work site and (2) on adjacent property of a third party, the locations of which are made known to or should be known by the Contractor. The Contractor shall repair any damage to those facilities, including those that are the property of a third party, resulting from failure to comply with the requirements of this Contract for failure to exercise reasonable care in performing the Work. If the Contractor fails or refuses to repair the damage promptly, the Contracting Officer may have the necessary Work performed and charge the cost to the Contractor.

## 28    SAFETY

A.    The Contractor shall be responsible for compliance with all safety rules and regulations of the Federal Occupational Safety and Health Act of 1970 and those of METRO and all applicable state and local laws, ordinances, and regulations during the performance of this Work.

B.    The Contractor shall indemnify METRO for fines, penalties, and corrective measures that result from the acts of commission or omission of the Contractor, its Subcontractors (if any), agents, employees, and assigns and their failure to comply with such safety rules and regulations.

C.    The Contractor shall furnish and enforce the use of individual protective equipment as needed to complete the Work, including hard hats, rain gear, protective foot wear, protective clothing and gloves, eye protection, ear protection, respirators, safety belts, safety harnesses, safety lifelines and lanyards, and high visibility reflective safety vests. Refer to Exhibit J,' Personal Protective Equipment,' in Section XI.

D.    The Contractor shall provide its employees safety training to include special training prior to working with hazardous materials or operations. The Contractor shall also provide such training to its subcontractors' employees, or assure itself that these subcontractors have similar, adequate safety training programs.

E.    The Contractor shall provide warning signs, barricades and verbal warnings as required.

F.    The Contractor shall inform its employees of emergency procedures to be adhered to in case of a fire, medical emergency, or any other life-threatening catastrophes.

G.    None of the Contractor's workmen will work alone. The Contractor must employ the Buddy System at all times while work is being performed at the job site.

H.    The Contractor shall promptly notify the METRO Project Manager of any accident involving personnel or damage to material and equipment. The Contractor shall provide a copy of the required accident investigation report to the METRO Project Manager. In no case shall notification be later than twenty-four (24) hours after the occurrence of the accident.

I.    The Contractor shall hold weekly safety meetings for all foremen, craft supervisors and workmen and maintain a written report of all such meetings. Copies of these written reports shall be made available to METRO when requested.

J.    The Contractor shall perform weekly job site safety inspections. A report of the Contractor's findings and observations, as well as corrective measures taken, where required, shall be prepared and made available to METRO when requested.

K.    The Contractor shall maintain a set of OSHA Articles at the job site as they apply to the work being performed. Copies shall be provided to METRO when requested.

L.    The Contractor shall submit to METRO a copy of its standard safety policies and program procedures that establish the safety rules and regulations as they are to be applied to the performance of the Work. These documents shall be submitted by the Contractor within 14 calendar days after award of the Contract.

IFB No. 4022000021                                                                                      Contract No. 7022000111

M.   The Contractor shall assign, during performance of the work, a designated safety representative (in writing) to develop and monitor the project safety program. The name, company address, and telephone number of the assigned individual shall be submitted to METRO by the Contractor along with its safety policies and program procedures.

N.   The Contractor shall provide and maintain on the job site, at all times, a completely stocked first aid kit which contain all emergency medical supplies as currently recommended by the American Red Cross.

O.   The Contractor shall make available for its employees and those of its Subcontractors, while they are performing work on the job site, emergency medical treatment either at the job site or at a nearby medical facility.

P.   METRO reserves the right to approve, prior to commencing work, and monitor the Contractor's safety policies and program procedures as applied during performance of the work. Failure to comply with safety policies and program procedures, once approved by METRO, shall be just cause for the complete termination of the Contract in accordance with the 'Default' Article in this Contract.

Q.   The Contractor shall comply with all requirements of Texas revised Civil Statute Annotated, Article 2368a (1989) and the Occupational Safety and Health Administration Standard 29 C.F.R., Part 1926, Subpart P - Excavations, dated October 31, 1989, and shall provide a copy of tables, charts, diagrams, drawings or tabulated data applicable to the manufacturer's equipment to the METRO Project Manager prior to the commencement of any trenching operations that will be more than five (5) feet in depth.

## 29   SEVERABILITY

If any provision of this Contract the application thereof to any person or circumstance, is rendered or declared illegal for any reason and shall be invalid or unenforceable, the remainder of this Contract and the application of such provision to other persons or circumstances shall not be affected thereby but shall be enforced to the greatest extent permitted by applicable law.

## 30   SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK

A.   The Contractor acknowledges that it has taken all steps necessary to ascertain the nature and location of the Work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the Work, its cost, or performance time, including but not limited to:

1.   Conditions bearing upon transportation, disposal, handling, and storage of materials;

2.   The availability of labor, water, electric power, and roads;

3.   Uncertainties of weather, river stages, tides, or similar physical conditions at the site;

4.   The conformation and conditions of the ground;

5.   The character of equipment and facilities needed preliminary to and during work performance;

6.   The location and/or relocation of existing utility lines, poles, and meters including the necessity for timely coordination with all involved utility owners; and

7.   The requirements for obtaining city, county, state, or federal permits and licenses necessitated by project right-of-way alignments and boundaries.

B.   The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by METRO, as well as from the drawings and specifications made a part of this Contract.

## 31   SPECIFICATIONS AND DRAWINGS

A.   The Contractor shall keep on the work site a copy of the scope of services, specifications and drawings and shall at all times give the METRO Project Manager access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In case of discrepancy either in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the METRO Project Manager, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at his own risk and expense. The METRO Project Manager shall furnish from time to time such detail drawings and other information as considered necessary.

IFB No. 4022000021                                                                Contract No. 7022000111

B.  Wherever in the scope of services, specifications or upon the drawings the words 'directed,' 'required,' 'ordered,' 'designated,' 'prescribed,' or words of like import are used, it shall be understood that the 'direction,' 'requirement,' 'order,' 'designation,' or 'prescription,' of the METRO Project Manager is intended and similarly the words 'approved,' 'acceptable,' 'satisfactory,' or words of like import shall mean 'approved by,' or 'acceptable to,' or 'satisfactory to' the METRO Project Manager, unless otherwise expressly stated.

C.  Where 'as shown,' 'as indicated,' 'as detailed,' or words of similar import are used, it shall be understood that the reference is made to the drawings accompanying this Contract unless stated otherwise. The word 'provided' as used herein shall be understood to mean 'provide complete in place,' that is 'furnished and installed.'

D.  Shop drawings means drawings submitted to METRO by the Contractor, subcontractor, or any lower tier subcontractor pursuant to a construction contract, showing in detail:

    1.  The proposed fabrication and assembly of structural elements; and

    2.  The installation (i.e., form, fit and attachment details) of materials or equipment.

    Includes drawings, diagrams, layouts, schematics, descriptive literature, illustrations, schedules, performance and test data, and similar materials furnished by the Contractor to explain in detail specific portions of the work required by the Contract. METRO may duplicate, use, and disclose in any manner and for any purpose shop drawings delivered under this Contract.

E.  The Contractor shall coordinate all shop drawings, and review them for accuracy, completeness, and compliance with Contract requirements and shall indicate his approval thereon as evidence of such coordination and review. Shop drawings submitted to the METRO Project Manager without evidence of the Contractor's approval may be returned for resubmission. The METRO Project Manager will indicate his approval or disapproval of the shop drawings and if not approved as submitted shall indicate METRO's reasons therefor. Any work done before such approval shall be at the Contractor's risk. Approval by the METRO Project Manager shall not relieve the Contractor from responsibility for any errors or omissions in such drawings, nor from responsibility for complying with the requirements of this Contract, except with respect to variations described and approved in accordance with Paragraph F below.

F.  If shop drawings show variations from the Contract requirements, the Contractor shall describe such variations in writing, separate from the drawings, at the time of submission. If the Contracting Officer approves any such variation, the Contracting Officer shall issue an appropriate contract modification, except that, if the variation is minor and does not involve a change in price or in time of performance, a modification need not be issued.

G.  The Contractor shall submit to the METRO Project Manager for approval one (1) set of sepias and four (4) sets of blue line prints (unless otherwise indicated herein) of all shop drawings as called for under the various headings of these specifications. One (1) blue line set will be returned to the Contractor.

H.  Omissions from the drawings or specifications or the mis-description of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or mis-described details of the work but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

I.  The Contractor shall check all drawings furnished him immediately upon their receipt and shall promptly notify the METRO Project Manager of any discrepancies. Figures marked on drawings shall in general be followed in preference to scale measurements. Large scale drawings shall in general govern small scale drawings. The Contractor shall compare all drawings and verify the figures before laying out the work and will be responsible for any errors which might have been avoided thereby.

J.  This Article shall be included in all subcontracts at any tier.

## 32  SUBCONTRACTORS

A.  Prior to entering into a subcontract for work to be performed, the Contractor shall secure the consent of METRO. Information submittal requirements for prospective subcontractors shall be the same as presented by the Contractor in its bid except as may have been otherwise consented to by METRO. METRO may, at its discretion, waive or reduce subcontractor information submittal requirements. METRO reserves the right to obtain copies off any or all Subcontracts from the Contractor during the term of this Contract.

B.  The Contractor shall not, without the written consent of METRO, either replace a subcontractor previously listed (See Bid/Award Form 'Contractor Utilization Plan Form), or permit such Subcontract to be assigned or transferred, or allow that portion of the Work to be performed by anyone other than the listed Subcontractor, except the Contractor may perform a previously subcontracted portion of the Work itself with qualified personnel upon written notice to METRO.

C.  Nothing contained in the Contract shall be construed as creating any contractual relationship between any subcontractor and METRO. The Contractor shall be responsible to METRO for acts and omissions of its own employees, and of

IFB No. 4022000021                                                        Contract No. 7022000111

subcontractors and their employees. The Contractor shall also be responsible for the coordination of the work of the trades, subcontractors and material men. The Contractor shall, without additional expense to METRO, employ specialty subcontractors where required. Neither METRO nor its representatives will undertake to settle any differences between the Contractor and its Subcontractors, or between subcontractors.

**33     SUPERINTENDENCE BY CONTRACTOR**

At all times during performance and until the Work is completed and accepted, the Contractor shall directly superintend the Work of this Contract and have on the work site a competent Superintendent who is satisfactory to the Contracting Officer and has authority to act for the Contractor.

**34     SUSPENSION OF WORK**

A.     The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the Work of this Contract for the period of time that the Contracting Officer determines appropriate for the convenience of METRO.

B.     If the performance of all or any part of the Work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer in the administration of this Contract, or by the Contracting Officer's failure to act within the time specified in this Contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this Contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the Contract modified in writing accordingly. However, no adjustment shall be made under this Article for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this Contract.

C.     A claim under this Article shall not be allowed for any costs incurred more than twenty calendar (20) days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order), and unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of such suspension, delay, or interruption, but not later than the date of final payment under the Contract.

**35     TERMINATION FOR CONVENIENCE OF METRO**

A.     METRO may terminate performance of the work under this Contract in whole or, from time to time in part, if the Contracting Officer determines that a termination is in METRO's best interest. The Contracting Officer shall effect such a termination by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.

B.     After receipt of a Notice of Termination, and except as directed by the Contracting Officer, the Contractor shall immediately proceed with the following obligations, regardless of any delay in determining or adjusting any amounts due under this Article:

1.     Stop Work as specified in the notice;

2.     Place no further Subcontracts or orders (referred to as Subcontracts in this Article) for materials, services or facilities, except as necessary to complete the continued portion of this Contract;

3.     Terminate all Subcontracts to the extent they relate to the Work terminated;

4.     Assign to METRO, as directed by the Contracting Officer, all right, title, and interest of the Contractor under the Subcontracts terminated, in which case METRO shall have the right to settle or to pay any termination settlement proposal arising out of those terminations;

5.     With approval or ratification, to the extent required by the Contracting Officer, settle all outstanding liabilities and termination settlement proposals arising from the termination of subcontracts, the approval or ratification of which will be final for purposes of this Article;

6.     As directed by the Contracting Officer, transfer title and deliver to METRO:

   a.     The fabricated or unfabricated parts, Work in process, completed Work, supplies, and other material produced or acquired for the Work terminated; and

   b.     The completed or partially completed plans, drawings, information, and other property that, if the Contract had been completed, would be required to be furnished to METRO;

7.     Complete performance of the Work not terminated;

8.     Take any action that may be necessary, or that the Contracting Officer may direct, for the protection and preservation of the property related to this Contract that is in the possession of the Contractor and in which METRO has or may

acquire an interest; or

9.  Use its best efforts to sell, as directed or authorized by the Contracting Officer, any property of the types referred to in Subparagraph B.6 above; provided, however, that the Contractor is not required to extend credit to any purchaser and may acquire the property under the conditions prescribed by, and at prices approved by, the Contracting Officer. The proceeds of any transfer or disposition will be applied to reduce any payments to be made by METRO under this Contract, credited to the price or cost of the Work, or paid in any other manner directed by the Contracting Officer.

C.  The Contractor may submit to the Contracting Officer a list, certified as to quantity and quality, of termination inventory not previously disposed of, excluding items authorized for disposition by the Contracting Officer. The Contractor may request METRO to remove those items or enter into an agreement for their storage. Within fifteen (15) calendar days, METRO will accept title to those items and remove them or enter into a storage agreement. The Contracting Officer may verify the list upon removal of the items, or if stored, within forty-five (45) calendar days from submission of the list, and shall correct the list, as necessary, before final settlement.

D.  After termination, the Contractor shall submit a final termination settlement proposal to the Contracting Officer in the form and with the certification prescribed by the Contracting Officer. The Contractor shall submit the proposal promptly, but no later than one (1) year from the effective date of termination, unless extended in writing by the Contracting Officer upon written request by the Contractor within this one-year period. However, if the Contracting Officer determines that the facts justify it, a termination settlement proposal may be received and acted on after one year or any extension. If the Contractor fails to submit the proposal within the time allowed, the Contracting Officer may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

E.  The Contractor and the Contracting Officer may agree upon the whole or any part of the amount to be paid because of the termination. The amount may include a reasonable allowance for profit on work done. However, the agreed amount, whether under this Paragraph F. or Paragraph F. below, exclusive of costs shown in Subparagraph F.2 below, may not exceed the total Contract price as reduced by the amount of payments previously made and the contract price of Work not terminated. The Contract shall be amended, and the Contractor paid the agreed amount. Paragraph F. below shall not limit, restrict, or affect the amount that may be agreed upon to be paid under this paragraph.

F.  If the Contractor and Contracting Officer fail to agree on the whole amount to be paid the Contractor because of the termination of Work, the Contracting Officer shall pay the Contractor the amounts determined as follows, but without duplication of any amounts agreed upon under Paragraph E, above:

1.  For Contract Work performed before the effective date of termination, the total (without duplication of any items) of:

   a.  The cost of this Work;

   b.  The cost of settling and paying termination settlement proposals under terminated Subcontracts that are properly chargeable to the terminated portion of the Contract if not included in Subdivision a. above; and

   c.  A sum, as profit on a. above, determined by the Contracting Officer to be fair and reasonable; however, if it appears that the Contractor would have sustained a loss on the entire Contract had it been completed, the Contracting Officer shall allow no profit under this subdivision and shall reduce the settlement to reflect the indicated rate of loss.

2.  The reasonable costs of settlement of the Work terminated, including:

   a.  Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

   b.  The termination and settlement of Subcontracts (excluding the amounts of such settlements); and

   c.  Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

G.  Except for normal spoilage, and except to the extent that METRO expressly assumed the risk of loss, the Contracting Officer shall exclude from the amounts payable to the Contractor under Paragraph F, above, the fair value, as determined by the Contracting Officer, of property that is destroyed, lost, stolen, or damaged so as to become undeliverable to METRO or to a buyer.

H.  The cost principles and procedures of Part 31 of the Federal Acquisition Regulation, in effect on the date of this Contract, shall govern all costs claimed, agreed to, or determined under this Article.

I.  In arriving at the amount due the Contractor under this Article, there shall be deducted:

1.  All unliquidated advance or other payments to the Contractor under the terminated portion of this Contract;

IFB No. 4022000021                                                              Contract No. 7022000111

2. Any claim which METRO has against the Contractor under this Contract; and

3. The agreed price for, or the proceeds of sale of, materials, supplies, or other things acquired by the Contractor or sold under the provisions of this Article and not recovered by or credited to METRO.

J. If the termination is partial, the Contractor may file a proposal with the Contracting Officer for an equitable adjustment of the price(s) of the continued portion of the contract. Any proposal by the Contractor for an equitable adjustment under this Article shall be requested within ninety (90) calendar days from the effective date of termination unless extended in writing by the Contracting Officer. METRO may, under the terms and conditions it prescribes, make partial payments and payments against costs incurred by the Contractor for the terminated portion of the contract if the Contracting Officer believes the total of these payments will not exceed the amount to which the Contractor will be entitled.

K. If the total payments exceed the amount finally determined to be due, the Contractor shall repay the excess to METRO upon demand, together with interest computed at the legal rate applicable established by the Revised Civil Statutes of the state of Texas under Article 5069-1.03. Interest shall be computed for the period from the date the excess payment is received by the Contractor to the date the excess is repaid. Interest shall not be charged on any excess payment due to a reduction in the Contractor's termination settlement proposal because of retention or other disposition of termination inventory until ten (10) calendar days after the date of the retention of disposition, or a later date determined by the Contracting Officer because of the circumstances.

L. Unless otherwise provided in this Contract or by statute, the Contractor shall maintain all records and documents relating to the terminated portion of this Contract for three (3) years after final settlement. This includes all books and other evidence bearing on the Contractor's costs and expenses under this Contract. The Contractor shall make these records and documents available to METRO, at the Contractor's office, at all reasonable times, without any direct charge. If approved by the Contracting Officer, photographs, microphotographs, or other authentic reproductions may be maintained instead of original records and documents.

M. The Contractor shall have the right of appeal, under the 'Disputes' Article, from any determination made by the Contracting Officer under Paragraph D, F, or K., except that if the Contractor failed to submit the termination settlement proposal within the time provided in Paragraph D or K, and failed to request a time extension, there is no right of appeal. If the Contracting Officer has made a determination of the amount due under Paragraph D, F, or K, METRO shall pay the Contractor the amount determined by the Contracting Officer if there is no right of appeal or if no timely appeal has been taken, or the amount finally determined on an appeal.

## 36   TERMINATION FOR DEFAULT

A. If the Contractor refuses or fails to prosecute the Work, or any separable part, with the diligence that will insure its completion within the time specified in this Contract including any extension, or fails to complete the Work within this time, METRO may, by written notice to the Contractor, terminate the right to proceed with the Work (or separable part of the Work) that has been delayed. In this event, METRO may take over the Work and complete it by the Contract or otherwise and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the Work. The Contractor shall be liable for any damage to METRO resulting from the Contractor's refusal or failure to complete the Work within the specified time, whether or not the Contractor's right to proceed with the Work is terminated. This liability includes any increased costs incurred by METRO in completing the Work.

B. The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this Article, if:

1. The delay in completing the Work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include:
   a. Acts of God or of the public enemy;
   b. Acts of another Contractor in the performance of a contract with METRO, the State, or the City of Houston;
   c. Fires;
   d. Floods;
   e. Epidemics;
   f. Quarantine restrictions;
   g. Freight embargoes; or
   h. Acts of terrorism.

2. The Contractor, within five calendar (5) days from the beginning of any such delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the Work shall be extended. The findings of the Contracting Officer shall be final and conclusive on the parties, but subject to appeal under the 'Disputes' Article.

C. If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of METRO.

IFB No. 4022000021                                                                                    Contract No. 7022000111

D.    The rights and remedies of METRO in this Article are in addition to any other rights and remedies provided by law or under this Contract.

**37    TESTING OF MATERIALS**

The Contractor shall be responsible for required testing of materials prior to delivery at the site of Work, including the design of concrete mixes. Testing of materials at the site of the Work will be in accordance with the technical specifications.

**38    USE AND POSSESSION PRIOR TO COMPLETION**

A.    METRO shall have the right to take possession of or use any completed or partially completed part of the Work. Before taking possession of or using any Work, the Contracting Officer shall furnish the Contractor a list of items of work remaining to be performed or corrected on those portions of the Work that METRO intends to take possession of or use. However, failure of the Contracting Officer to list any item of work shall not relieve the Contractor of responsibility for complying with the terms of this Contract. METRO's possession or use shall not be deemed to be an acceptance of any Work under this Contract.

B.    While METRO has such possession or use, the Contractor shall be relieved of the responsibility for the loss of or damage to the Work resulting from METRO's possession or use, notwithstanding the terms of the 'Permits and Responsibilities' Article in this Contract. If prior possession or use by METRO delays the progress of the Work, or causes additional expense to the Contractor, an equitable adjustment shall be made in the Contract price or the time of completion, and the Contract shall be modified in writing accordingly.

**39    USE OF METRO'S NAME IN CONTRACTOR ADVERTISING OR PUBLIC RELATIONS**

If the Contractor should desire to use METRO's name, logo or any other material in its advertisement or public relations programs, the Contractor shall receive prior written approval from METRO. Any such information relating to METRO shall be factual and in no way imply that METRO endorses the Contractor's firm, services, or products. The Contractor shall insert the substance of this Article in each Subcontract and Supply Contractor purchase order.

**40    USE OF SPECIFICATIONS, DRAWINGS AND NOTES**

All drawings (to include as-built drawings), sketches, designs, design data, specifications, note books, technical and scientific data provided to the Contractor or developed by the Contractor pursuant to this Contract and all photographs, negatives, reports, findings, recommendations, data and memoranda of every description relating thereto, as well as all copies of the foregoing relating to the Work or any part thereof, shall be the property of METRO and may be used by METRO for any use whatsoever without any claim of ownership by the Contractor or request for additional compensation. The Contractor shall not use any documents listed above for any purpose outside the scope of this Contract without the prior written consent of METRO.

**41    VARIATIONS IN ESTIMATED QUANTITY**

If the quantity of a unit-priced item in this Contract is an estimated quantity and the actual quantity of the unit-priced item varies within an allowable range of 20 percent (20%) above or below the estimated quantity, the overrun/underrun quantities shall be adjusted at the time of final closeout of the Contract at the fixed unit prices, stated in the Contract. The Contractor shall not exceed 120 percent (120 %) of any line item estimated quantity without the prior written approval of METRO. If the Contractor exceeds this limit without METRO's written approval, he does so at his own risk. Any quantity previously approved and consumed in the performance of this Contract which is greater or lower than the original allowable variation shall be subject (on the written request of either party) to a renegotiation of unit price solely for that quantity. Any request for a unit price adjustment, due to quantity variations outside the range of 20 percent (20%) above or below the estimated quantity, must be fully supported by documentation to justify any Contractor claim for increased costs experienced. However, adjustments will not be allowed for items with a total cost less than five percent (5%) of the original Contract amount or less than $100,000.00, whichever is less. If the quantity variation is such as to cause a justifiable increase in the time necessary for completion, the Contractor may request, in writing, an extension of time, to be received by the Contracting Officer within ten (10) days from the beginning of the delay, or within such further period as may be granted by the Contracting Officer, before the date of final completion of the Work. Upon the receipt of a written request for an extension, the Contracting Officer shall ascertain the facts and extend the Contract completion date as justified.

**42    WAIVERS**

A.    Neither METRO's review, approval or acceptance of, nor payment for, the Work required under this Contract shall be construed to operate as a waiver of any rights under this Contract of any cause of action arising out of the performance of the Contract, and the Contractor shall be and remain liable to METRO in accordance with applicable law and the terms of this Contract for all damages to METRO caused by the Contractor's negligent act, error or omission in the performance of any of the Work furnished under this Contract.

IFB No. 4022000021                                                      Contract No. 7022000111

B.    The waiver by METRO of any breach of any term, covenant, condition, or agreement herein contained shall not be deemed to be a waiver of any subsequent breach of the same, or of a breach of any other term, covenant, condition, or agreement herein contained.

**43    WARRANTY OF CONSTRUCTION**

A.    In addition to any other warranties in this Contract, the Contractor warrants, except as provided in Paragraph I of this Article, that Work performed conforms to the Contract requirements and is free of any defect in equipment, material or design furnished, or workmanship performed by the Contractor or any of his Subcontractors or Suppliers at any tier.

B.    This warranty shall continue for a period of one (1) year from the date of final acceptance of the Work. If METRO takes possession of any part of the Work before final acceptance, this warranty shall continue for a period of one (1) year from the date METRO takes possession.

C.    The Contractor shall remedy, at the Contractor's expense, any failure to conform any defect. In addition, the Contractor shall remedy, at the Contractor's expense, any damage to METRO - owned or controlled real or personal property, when that damage is the result of:

1.    The Contractor's failure to conform to Contract requirements; or

2.    Any defect of equipment, material, workmanship, or design furnished.

D.    The Contractor shall restore any work damaged in fulfilling the terms and conditions of this Article. The Contractor's warranty with respect to work repaired or replaced will run for one (1) year from the date of repair or replacement.

E.    The Contracting Officer shall notify the Contractor, in writing, within a reasonable time after the discovery of any failure, defect, or damage.

F.    If the Contractor fails to remedy any failure, defect, or damage within a reasonable time after receipt of notice, METRO shall have the right to replace, repair, or otherwise remedy the failure, defect or damage at the Contractor's expense.

G.    With respect to all warranties, expressed or implied, from Subcontractors, Manufacturers, or Suppliers for work performed and materials furnished under this Contract, the Contractor shall:

1.    Obtain all warranties that would be given in normal commercial practice;

2.    Require all warranties to be executed, in writing, for the benefit of METRO; and

3.    Enforce all warranties for the benefit of METRO.

H.    In the event the Contractor's warranty under Paragraph B of this Article has expired, METRO may bring suit at its expense to enforce a subcontractor's, manufacturer's, or supplier's warranty.

I.    Unless a defect is caused by the negligence of the Contractor or subcontractor or supplier at any tier, the Contractor shall not be liable for the repair of any defects of material or design furnished by METRO nor for the repair of any damage that results from any defect in METRO furnished material or design.

J.    This warranty shall not limit METRO's rights under the 'Inspection of Construction' Article of this Contract with respect to latent defects, gross mistakes, or fraud.

IFB No. 4022000021                                                                    Contract No. 7022000111

## SECTION X - FEDERAL REQUIREMENTS ARTICLES

**1      ACCESS TO RECORDS**

A.      The Contractor agrees to provide METRO, the FTA Administrator, the Comptroller General of the United States or any of their authorized representatives access to any books, documents, papers and records of the Contractor that are directly pertinent to this Contract for the purposes of making audits, examinations, excerpts and transcriptions. The Contractor also agrees, pursuant to 49 C.F.R. § 633.17, to provide the FTA Administrator or his authorized representatives including any Project Management Oversight Contractor (PMOC) access to the Contractor's records and construction sites pertaining to a major capital project, defined at 49 U.S.C. § 5302(a)1, that is receiving federal financial assistance through the programs described at 49 U.S.C. §§ 5307, 5309 or 5311.

B.      The Contractor agrees to provide METRO, the FTA Administrator or his authorized representatives, including any PMO Contractor, access to the Contractor's records and construction sites pertaining to a major capital project, defined at 49 U.S.C. § 5302(a)1, that is receiving federal financial assistance through the programs described at 49 U.S.C. §§ 5307, 5309 or 5311. By definition, a major capital project excludes contracts of less than the simplified acquisition threshold currently set at $100,000.

C.      Where METRO enters into a contract for a capital project or improvement (defined at 49 U.S.C. § 5302(a)1) through other than competitive bidding, the Contractor shall make available records related to the contract to METRO, the Secretary of Transportation and the Comptroller General or any authorized officer or employee of any of them for the purposes of conducting an audit and inspection.

D.      The Contractor agrees to permit any of the foregoing parties to reproduce by any means whatsoever or to copy excerpts and transcriptions as reasonably needed.

E.      The Contractor agrees to maintain all books, records, accounts and reports required under this Contract for a period of not less than three (3) years after the date of termination or expiration of this Contract, except in the event of litigation or settlement of claims arising from the performance of this Contract, in which case the Contractor agrees to maintain same until METRO, the FTA Administrator, the Comptroller General, or any of their duly authorized representatives, have disposed of all such litigation, appeals, claims or exceptions related thereto. Reference 49 C.F.R. § 18.39(i)(11).

F.      The FTA does not require the inclusion of these requirements in subcontracts.

**2      APPENDIX II TO PART 200: CONTRACT PROVISIONS FOR NON-FEDERAL ENTITY CONTRACTS UNDER FEDERAL AWARDS**

A.      Contracts for the simplified acquisition threshold currently set at $150,000, which is the inflation adjusted amount determined by the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) as authorized by 41 U.S.C. 1908, must address administrative, contractual or legal remedies where contractors violate or breach contract terms, and provide for such sanctions and penalties as appropriate.

B.      All contracts in excess of $10,000 must address termination for cause and for convenience by the non-Federal entity, including the manner by which it will be effected, and the basis for settlement.

C.      Equal Employment Opportunity. Except as otherwise provided under 41 C.F.R. Part 60, all contracts that meet the definition of 'federally assisted construction contract' in 41 C.F.R. Part 60-1.3 must include the equal opportunity clause provided under 41 C.F.R. 60-1.4(b), in accordance with Executive Order 11246, 'Equal Employment Opportunity' (30 F.R. 12319, 12935, 3 C.F.R. Part, 1964-1965 Comp., p. 339), as amended by Executive Order 11375, 'Amending Executive Order 11246 Relating to Equal Employment Opportunity,' and implementing regulations at 41 C.F.R. Part 60, 'Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor.

D.      Davis-Bacon Act, as amended (40 U.S.C. 3141-3147). When required by Federal program legislation, all prime construction contracts in excess of $2,000 awarded by non-Federal entities must include a provision for compliance with the Davis-Bacon Act (40 U.S.C. 3141-3144, and 3146-3148) as supplemented by Department of Labor regulations (29 C.F.R. Part 5, 'Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction'). In accordance with the statute, contractors must be required to pay wages to laborers and mechanics at a rate not less than the prevailing wages specified in a wage determination made by the Secretary of Labor. In addition, contractors must be required to pay wages not less than once a week. The non-Federal entity must place a copy of the current prevailing wage determination issued by the Department of Labor in each solicitation. The decision to award a contract or subcontract must be conditioned upon the acceptance of the wage determination. The non-Federal entity must report all suspected or reported violations to the Federal awarding agency. The contracts must also include a provision for compliance with the Copeland 'Anti-Kickback' Act (40 U.S.C. 3145), as supplemented by Department of Labor regulations (29 C.F.R. Part 3, 'Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States'). The Act provides that each contractor or subrecipient must be prohibited from inducing, by any means, any person employed in the construction, completion, or repair of public work, to give up any Part of the compensation to which he or she is otherwise entitled. The non-Federal entity must report all suspected or reported violations to the Federal awarding agency.

E.   Contract Work Hours and Safety Standards Act (40 U.S.C 3701-3708). Where applicable, all contracts awarded by the non-Federal entity in excess of $100,000 that involve the employment of mechanics or laborers must include a provision for compliance with 40 U.S.C. 3702 and 3704, as supplemented by Department of Labor regulations (29 C.F.R. Part 5). Under 40 U.S.C. 3702 of the Act, each contractor must be required to compute the wages of every mechanic and laborer on the basis of a standard work week of 40 hours. Work in excess of the standard work week is permissible provided that the worker is compensated at a rate of not less than one and a half times the basic rate of pay for all hours worked in excess of 40 hours in the work week. The requirements of 40 U.S.C. 3704 are applicable to construction work and provide that no laborer or mechanic must be required to work in surroundings or under working conditions which are unsanitary, hazardous or dangerous. These requirements do not apply to the purchases of supplies or materials or articles ordinarily available on the open market, or contracts for transportation or transmission of intelligence.

F.   Rights to Inventions Made Under a Contract or Agreement. If the Federal award meets the definition of 'funding agreement' under 37 C.F.R. §401.2 (a) and the recipient or subrecipient wishes to enter into a contract with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that 'funding agreement,' the recipient or subrecipient must comply with the requirements of 37 C.F.R. Part 401, 'Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements,' and any implementing regulations issued by the awarding agency.

G.   Clean Air Act (42 U.S.C 7401-7671q and Federal Water Pollution Control Act (33 U.S.C. 1251-1387), as amended. Contracts and subgrants of amounts in excess of $150,000 must contain a provision that requires the non-Federal award to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. 7401-7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. 1251-1387). Violations must be reported to the Federal awarding agency and the Regional Office of the Environmental Protection Agency (EPA).

H.   Debarment and Suspension (Executive Orders 12549 and 12689. A contract award (see 2 C.F.R. 180.220) must not be made to parties listed on the governmentwide exclusions in the System for Award Management (SAM). in accordance with the OMB guidelines at 2 C.F.R. 180 that implement Executive Orders 12549 (3 C.F.R. Part 1986 Comp., p. 189) and 12689 (3 C.F.R. Part 1989 Comp., p. 235), 'Debarment and Suspension.' SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549.

I.   Byrd Anti-Lobbying Amendment (31 U.S.C. 1352). Contractors that apply or bid for an award exceeding $100,000 must file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any Federal contract, grant or any other award covered by 31 U.S.C. 1352. Each tier must also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier-to-tier up to the non-Federal award.

J.   See §200.322 Procurement of Recovered Materials. A non-Federal entity that is a state agency or agency of a political subdivision of a state and its contractors must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 C.F.R. Part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

K.   Prohibition on contracting for certain Telecommunications and video surveillance services or equipment.

   1   Definitions. The definitions set forth in 48 C.F.R. 52.204-25(a) shall apply to this Section K

   2   Prohibitions.
       a.   The Contractor is prohibited from providing to METRO any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, unless an exception at Paragraph C of this Section applies or the covered telecommunication equipment or services are covered by a waiver described in FAR 4.2104.

       b.   The Contractor is prohibited from using any equipment, system or services that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, unless an exception under Paragraph C of this Section applies or the covered telecommunication equipment or services are covered by a waiver described in FAR 4.2104. This prohibition applies to the use of covered telecommunications equipment or services, regardless of whether that use is in performance of work under a federal contract.

IFB No. 4022000021                                                               Contract No. 7022000111

3    Exceptions. This Section does not prohibit the Contractor from providing.
    a    A service that connects to the facilities of a third party, such as backhaul, roaming, or interconnection arrangements; or
    b    Telecommunications equipment that cannot route or redirect user data traffic or permit visibility into any user data or packets that such equipment transmits or otherwise handles

4    Reporting Requirement.
    a.   In the event the Contractor identifies covered telecommunications equipment or services used as a substantial or essential component of any system, or as critical technology as part of any system, during contract performance, or the Contractor is notified of such by a subcontractor at any tier or by any other source, the Contractor shall report the information in Paragraph D.2 of this clause to the Contracting Officer, unless elsewhere in this Contract are established procedures for reporting the information.
    b.   The Contractor shall report the following information pursuant to Paragraph D.1 of this Section :

       1.   Within one business day from the date of such identification or notification: The contract number; the order number(s), if applicable; supplier name; supplier unique entity identifier (if known); supplier Commercial and Government Entity (CAGE) code (if known); brand; model number (original equipment manufacturer number, manufacturer part number, or wholesaler number); item description; and any readily available information about mitigation actions undertaken or recommended.

       2.   Within 10 business days of submitting the information in Paragraph D.2.b of this Section by further available information about mitigation actions undertaken or recommended. In addition, the Contractor shall describe the efforts it undertook to prevent use or submission of covered telecommunications equipment or services, and any additional efforts that will be incorporated to prevent future use or submission of covered telecommunications equipment or services.

5    Subcontracts. The Contractor shall insert the substance of this clause, including this Paragraph E and excluding Paragraph B.2 in all subcontracts and other contractual instruments, including subcontracts for the acquisition of commercial items.

L.   Domestic Preferences for Procurements

As appropriate and to the extent consistent with law, the Contractor and all subcontractors shall provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States (including but not limited to iron, aluminum, steel, cement, and other manufactured products). This requirement must be included in all subcontracts.

M.   National Intelligent Transportation Systems Architecture and Standards

The Contractor agrees to conform to the National Intelligent Transportation Systems (ITS) Architecture requirements of 23 U.S.C. § 517(d), unless it obtains an exemption from those requirements, and to follow FTA Notice, "FTA National ITS Architecture Policy on Transit Projects," 66 Fed. Reg. 1455, January 8, 2001, and all other applicable federal guidance.

[78 FR 78608, Dec. 26, 2013, as amended at 79 FR 75888, Dec. 19, 2014]

3    **CARGO PREFERENCE–USE OF UNITED STATES-FLAG VESSELS**

The Contractor agrees to:

1.   Use privately owned United States-flag commercial vessels to ship at least fifty percent (50%) of the gross tonnage (computed separately for dry bulk carriers, dry cargo liner and tankers) involved, whenever shipping any equipment, materials, or commodities pursuant to the contract to the extent such vessels are available at fair and reasonable rates of United States-flag commercial vessels;

2.   Furnish within twenty (20) working days following the date of loading for shipment originating within the United States or within thirty (30) working days following the date of loading, for shipment originating outside the United States, a legible copy of a rated, 'on-board' commercial ocean bill-of-lading in English for each shipment of cargo described in Paragraph 1 above to the Division of National Cargo, Office of Market Development, Maritime Administration, Washington, D.C. 20590, and to METRO (through the Contractor in the case of a subcontractor's bill-of-lading); and

3.   Include these requirements in all subcontracts issued pursuant to this Contract when the subcontract may involve the transport of equipment, material or commodities by ocean vessel.

IFB No. 4022000021                                                                      Contract No. 7022000111

**4    CONTRACT WORK HOURS - SAFETY STANDARDS – OVERTIME COMPENSATION**

This Contract, to the extent that it is of a character specified in the Contract Work Hours and Safety Standards Act (40 U.S.C. § 327-333), is subject to the following provisions and to all other applicable provisions and exceptions of such Act and the regulations of the Secretary of Labor thereunder.

A.    Overtime Requirements. No Contractor or subcontractor contracting for any part of the Contract work which may require or involve the employment of laborers or mechanics shall require or permit any such laborer or mechanic in any workweek in which he or she is employed on such work to work in excess of forty (40) hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times the basic rate of pay for all hours worked in excess of forty hours in such workweek.

B.    Violation; Liability for Unpaid Wages; Liquidated Damages. In the event of any violation of the Clause set forth in Paragraph A of this Article, the Contractor and any subcontractor responsible therefore shall be liable for the unpaid wages. In addition, the Contractor and subcontractor shall be liable to the United States for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of the Clause set forth in Paragraph A of this Article, in the sum of $10 for each calendar day on which such individual was required or permitted to work in excess of the standard workweek of forty (40) hours without payment of the overtime wages required by the Clause set forth in Paragraph A of this Article.

C.    Withholding for unpaid wages and Liquidated Damages. METRO shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld, from any moneys payable on account of work performed by the Contractor or subcontractor under any such Contract or any other federal contract with the same prime Contractor, or any other federally assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime Contractor, such sums as may be determined to be necessary to satisfy any liabilities of such Contractor or subcontractor for unpaid wages and liquidated damages as provided in the Clause set forth in Paragraph B of this Article.

D.    Subcontracts. The Contractor or subcontractor shall insert in any subcontracts the Clauses set forth in paragraphs A through D of this Article, and a clause requiring the subcontractors to include these Clauses in any lower tier subcontracts. The Contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with the Clauses set forth in paragraphs A through D of this Article.

E.    Records. The Contractor shall maintain payroll records containing the information specified in 29 C.F.R. § 516.2(a). Such records shall be preserved for three (3) years from the completion of this Contract.

**5    CONTRACTOR NON-DISCRIMINATION**

A.    The Contractor or subcontractor(s) shall not discriminate on the basis of race, color, national origin, religion, sex (including gender identity and sexual orientation), disability, or age in the performance of this Contract. The Contractor shall carry out applicable requirements of 49 C.F.R. Part 26 in the award and administration of DOT-assisted contracts. Failure by the Contractor to carry out these requirements is a material breach of this Contract, which may result in the termination of this Contract or such other remedy as METRO deems appropriate.

**6    DAVIS-BACON AND COPELAND ANTI-KICKBACK ACTS**

A.    Minimum Wages
1.    All laborers and mechanics employed or working upon the site of the Work, will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account [except such payroll deductions as are permitted by regulations issued by the Secretary of Labor under the Copeland Act (29 C.F.R. Part 3)], the full amount of wages and bona fide fringe benefits (or cash equivalents thereof) due at time of payment computed at rates not less than those contained in the wage determination which is attached hereto as Exhibit E and made a part hereof, regardless of any contractual relationship which may be alleged to exist between the Contractor and such laborers and mechanics. Contributions made or costs reasonably anticipated for bona fide fringe benefits under Section 1(b)(2) of the Davis-Bacon Act on behalf of laborers or mechanics are considered wages paid to such laborers or mechanics, subject to the provisions of Paragraph A.7 of this Article; also, regular contributions made or costs incurred for more than a weekly period (but not less often than quarterly) under plans, funds, or programs which cover the particular weekly period, are deemed to be constructively made or incurred during such weekly period. Such laborers and mechanics shall be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of Work actually performed, without regard to skill, except as provided in 29 C.F.R. Part 5.5(a)(4). Laborers or mechanics performing work in more than one classification may be compensated at the rate specified for each classification for the time actually worked therein, provided that the employer's payroll records accurately set forth the time spent in each classification in which work is performed. The wage determination (including any additional classifications and wage rates conformed under paragraphs A.2 through A7 of this Article) and the Davis-Bacon poster (WH-1321) shall be posted at all times by the Contractor and its subcontractors at the site of the work in a prominent and accessible place where it can be easily seen by the workers.

2.    The Compliance Officer shall require that any class of laborers or mechanics, including helpers, which is not listed in

the wage determination and which is to be employed under the Contract shall be classified in conformance with the wage determination. METRO shall approve an additional classification and wage rate and fringe benefits therefore only when the following criteria have been met:

    a.   Except with respect to helpers as defined as 29 C.F.R. § 5.2(n)(4), the Work to be performed by the classification requested is not performed by a classification in the wage determination; and

    b.   The classification is utilized in the area by the construction industry; and

    c.   The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination; and

    d.   With respect to helpers as defined in 29 C.F.R. § 5.2(n)(4), such a classification prevails in the area in which the Work is performed.

3.   If the Contractor and the laborers and mechanics to be employed in the classification (if known), or their representatives, and METRO agree on the classification and wage rate (including the amount designated for fringe benefits where appropriate), a report of the action taken shall be sent by the Compliance Officer to the Administrator of the Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Washington, DC 20210. The Administrator, or an authorized representative, will approve, modify, or disapprove every additional classification action within thirty (30) days of receipt and so advise the Compliance Officer or will notify the Compliance Officer within the 30-day period that additional time is necessary.

4.   In the event the Contractor or the laborers or mechanics to be employed in the classification or their representatives, and METRO do not agree on the proposed classification and wage rate (including the amount designated for fringe benefits, where appropriate), the Compliance Officer shall refer the questions, including the views of all interested parties and the recommendation of METRO, to the Administrator for determination. The Administrator, or an authorized representative, will issue a determination within 30 days of receipt and advise the Compliance Officer or notify the Compliance Officer within the 30-day period that additional time is necessary.

5.   The wage rate (including fringe benefits where appropriate) determined pursuant to paragraphs A.3 and A.4 of this Article, shall be paid to all workers performing Work in the classification under this Contract from the first day on which Work is performed in the classification.

6.   Whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly rate, the Contractor shall either pay the benefit as stated in the wage determination or shall pay another bona fide fringe benefit or an hourly cash equivalent thereof.

7.   If the Contractor does not make payments to a trustee or other third person, the Contractor may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing bona fide fringe benefits under a plan or program, provided that the Secretary of Labor has found, upon the written request of the Contractor, that the applicable standards of the Davis-Bacon Act have been met. The Secretary of Labor may require the Contractor to set aside in a separate account assets for the meeting of obligations under the plan or program.

B.    **Withholding**

METRO shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld from the Contractor under this Contract any other federal contract with the same prime Contractor, or any other federally assisted contract subject to Davis-Bacon prevailing wage requirements, which is held by the same prime Contractor, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the Contractor or any subcontractor the full amount of wages required by the Contract. In the event of failure to pay any laborer or mechanic, including any apprentice, trainee, or helper, employed or working on the site of the work, all or part of the wages required by the contract, METRO may, after written notice to the Contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

C.    **Payrolls and basic records**

1.   Payrolls and basic records relating thereto shall be maintained by the Contractor during the course of the Work and preserved for a period of three (3) years thereafter for all laborers and mechanics working at the site of the Work. Such records shall contain the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalents thereof of the types described in Article 1(b)(2)(B) of the Davis-Bacon Act), daily and weekly number of hours worked, deductions made and actual wages paid. Whenever the Secretary of Labor has found under 29 C.F.R. 5.5(a)(1)(iv) that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(B) of the Davis-Bacon Act, the Contractor shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, and that the plan or program has been communicated

IFB No. 4022000021                                                    Contract No. 7022000111

in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual cost incurred in providing such benefits. Contractors employing apprentices or trainees under approved programs shall maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage rates prescribed in the applicable programs.

2. The Contractor shall submit to the Project Manager weekly, for each week in which any Contract Work is performed, a copy of its certified payroll (CPR) within four (4) working days after the regular payment date of its payroll period. Contractors are also responsible for the submission of copies of certified payrolls by all subcontractors. CPR's for Subcontractors shall be submitted within seven (7) calendar days of the respective Subcontractors' scheduled pay dates for those pay periods that each subcontractor has worked on the project. All such CPR's must be received by METRO's Close of Business (5:00 P.M. local time) on the applicable date. Once the first work week is established, the Contractor will submit a CPR for that week and each subsequent week, even when Work is not performed, until the Contract Work is completed. For the purposes of this Article, 'Work' shall mean any labor performed on the site of construction for which the Contractor will be paid by METRO. Performance of repairs, services and/or warranty work to rectify errors, defects and/or problems with the Work do not meet this definition of 'Work.' Regularly scheduled maintenance work (such as landscape maintenance) for which the Contractor will be paid, does meet this definition of 'Work.' Subcontractor CPR's need only be submitted for the weeks in which the subcontractors actually worked. In addition to all required information on the CPR's, the Contractor shall furnish the following data:

   a. A statement as to whether or not the Contractor actually performed work during the applicable period;

   b. A statement listing the subcontractors that actually performed work during the applicable period;

   c. A list of the applicable pay periods, reflecting the start and ending dates for the Contractor and each subcontractor that worked during the applicable period;

   d. A list of the applicable paydays for the Contractor and each subcontractor that worked during the applicable period; and

   e. The date of submission to METRO.

   METRO's Project Manager will record METRO's receipt of the Contractor's submission by date stamping it.

3. Penalty for failure to submit certified payrolls: The President and CEO of METRO may immediately terminate a Contractor that fails to comply with the Davis Bacon and Related Acts, and/or restrict the Contractor from working on METRO contracts for up to five (5) years.

4. These certified payrolls shall set out accurately and completely all of the information required to be maintained under Section 5.5(a)(3)(i) of Regulations, 29 C.F.R. Part 5. The Contractor shall submit such information via the use of the FM International Labor Compliance Program software (LCPtracker), as provided by METRO. The software is a web-based system. Each Contractor and subcontractor will be given Logon identification and a password to access METRO's reporting system. Use of the system will entail data entry of weekly payroll information, including employee identification, labor classification, total hours worked and hours worked on the project, wage and benefit rates paid, etc. Online training is available for all Contractors anytime via the web. The Contractor's representative(s) will be required to attend any scheduled training classes on the use of LCPtracker as deemed necessary. This requirement applies to every lower-tier subcontractor required to provide LCP documentation.

5. Each payroll submitted shall be accompanied by a 'Statement of Compliance,' signed by the Contractor or subcontractor or his or her agent who pays or supervises the payment of the persons employed under the Contract, and shall certify the following:

   a. That the payroll for the payroll period contains the information required to be maintained under Section 5.5(a)(3)(i) of Regulations, 29 C.F.R. Part 5 and that such information is correct and complete;

   b. That each laborer or mechanic (including each helper, apprentice, and trainee) employed on the Contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth in Regulations, 29 C.F.R. Part 3;

   c. That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the contract.

6. The falsification of any of the above certifications may subject the Contractor or subcontractor to civil or criminal prosecution under Section 1001 of Title 18 and Section 231 of title 31 of the United States Code.

7. The Contractor or subcontractor shall make the records required under Paragraph C.1 of this Article available for inspection, copying, or transcription by authorized representatives of the FTA or the Department of Labor, and shall

IFB No. 4022000021                                                      Contract No. 7022000111

permit such representatives to interview employees during working hours on the job. If the Contractor or subcontractor fails to submit the required records or to make them available, the federal agency may, after written notice to the Contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 C.F.R. § 5.12.

D.      **Apprentices and Trainees**

1.      **Apprentices.** Apprentices will be permitted to work at less than the predetermined rate for the Work they perform when they are employed pursuant to and individually registered in a bona fide apprenticeship program registered with the U.S. Department of Labor, Employment and Training Administration, Bureau of Apprenticeship and Training, or with a state apprenticeship agency recognized by the Bureau, or if a person is employed in his or her first 90 days of probationary employment as an apprentice in such an apprenticeship program, who is not individually registered in the program, but who has been certified by the Bureau of Apprenticeship and Training or a state apprenticeship agency (where appropriate) to be eligible for probationary employment as an apprentice. The allowable ratio of apprentices to journeymen on the job site in any craft classification shall not be greater than the ratio permitted to the Contractor as to the entire workforce under the registered program. Any worker listed on a payroll at an apprentice wage rate, who is not registered or otherwise employed as stated above, shall be paid not less than the applicable wage rate on the wage determination for the classification of Work actually performed. In addition, any apprentice performing Work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the Work actually performed.

Where a Contractor is performing construction on a project in a locality other than that in which its program is registered, the ratios and wage rates (expressed in percentages of the journeyman hourly rate) specified in the Contractor's or subcontractor's registered program shall be observed. Every apprentice must be paid at not less than the rate specified in the registered program for the apprentice's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. Apprentices shall be paid fringe benefits in accordance with the provisions of the apprenticeship program. If the apprenticeship program does not specify fringe benefits, apprentices must be paid the full amount of fringe benefits listed on the wage determination for the applicable classification. If the Administrator of the Wage and Hour Division of the U.S. Department of Labor determines that a different practice prevails for the applicable apprentice classification, fringes shall be paid in accordance with that determination. In the event the Bureau of Apprenticeship and Training, or a state apprenticeship agency recognized by the Bureau, withdraws approval of an apprenticeship program, the Contractor will no longer be permitted to utilize apprentices at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

2.      **Trainees.** Except as provided in 29 C.F.R. § 5.16, will not be permitted to work at less than the predetermined rate for the Work performed unless they are employed pursuant to and individually registered in a program which has received prior approval, evidenced by formal certification by the U.S. Department of Labor, Employment and Training Administration. The ratio of trainees to journeymen on the job site shall not be greater than permitted under the plan approved by the Employment and Training Administration. Every trainee must be paid at not less than the rate specified in the approved program for the trainee's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. Trainees shall be paid fringe benefits in accordance with the provisions of the trainee program. If the trainee program does not mention fringe benefits, trainees shall be paid the full amount of fringe benefits listed on the wage determination unless the Administrator of the Wage and Hour Division determines that there is an apprenticeship program associated with the corresponding journeyman wage rate on the wage determination which provides for less than full fringe benefits for apprentices. Any employee listed on the payroll at a trainee rate who is not registered and participating in a training plan approved by the Employment and Training Administration shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any trainee performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the Work actually performed. In the event the Employment and Training Administration withdraws approval of a training program, the Contractor will no longer be permitted to utilize trainees at less than the applicable predetermined rate for the Work performed until an acceptable program is approved.

3.      **Equal Employment Opportunity.** The utilization of apprentices, trainees and journeymen under this part shall be in conformity with the equal employment opportunity requirements of Executive Order 11246, as amended, and 29 C.F.R. Part 30.

E.      Compliance with Copeland Act Requirements. The Contractor shall comply with the requirements of 29 C.F.R. Part 3, which are incorporated by reference in this Contract.

F.      Subcontracts. The Contractor or subcontractor shall insert in any subcontracts the Clauses contained in this Contract Article, 29 C.F.R. § 5.5(a)(1) through (10) and such other clauses as METRO may by appropriate instructions require, and also a clause requiring the subcontractors to include these Clauses in any lower tier subcontracts. The Contractor shall be responsible for the compliance by any subcontractor or lower tier subcontractor with all the Contract Clauses in 29 C.F.R. § 5.5.

IFB No. 4022000021                                                         Contract No. 7022000111

G.  Contract Termination: Debarment. A breach of the contract clauses in 29 C.F.R. § 5.5 may be grounds for termination of the contract, and for debarment as a Contractor and a subcontractor as provided in 29 C.F.R. § 5.12.

H.  Compliance with Davis-Bacon and Related Act Requirements. All rulings and interpretations of the Davis-Bacon and Related Acts contained in 29 C.F.R. Parts 1, 3, and 5 are herein incorporated by reference in this Contract.

I.  Disputes concerning Labor Standards. Disputes arising out of the labor standards provisions of this Contract shall not be subject to the 'Disputes' Clause of this Contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 C.F.R. Parts 5, 6, and 7. Disputes within the meaning of this Clause include disputes between the Contractor (or any of its Subcontractors) and METRO, the U.S. Department of Labor, or the employees or their representatives.

J.  Certification of Eligibility.
    1.  By entering into this Contract, the Contractor certifies that neither it (nor he or she) nor any person or firm who has an interest in the Contractor's firm is a person or firm ineligible to be awarded Government contracts by virtue of Article 3(a) of the Davis-Bacon Act or 29 C.F.R. § 5.12(a)(1).

    2.  No part of this Contract shall be subcontracted to any person or firm ineligible for award of a government contract by virtue of Section 3(a) of the Davis-Bacon Act or 29 C.F.R. § 5.12(a)(1).

K.  The penalty for making false statements is prescribed in the U.S. Criminal Code, 18 U.S.C. § 1001.

**7  DEBARMENT AND SUSPENSION**

A.  This Contract is a covered transaction for purposes of 49 C.F.R. Part 29. As such, the Contractor is required to verify that none of the Contractor's principals, as defined at 49 C.F.R. § 29.995, or affiliates, as defined at 49 C.F.R. § 29.905, are excluded or disqualified as defined at 49 C.F.R. §§ 29.940 and 29.945.

B.  The Contractor is required to comply with 49 C.F.R. § 29, Subpart C and must include the requirement to comply with 49 C.F.R. § 29, Subpart C in any lower tier covered transaction it enters into.

C.  The Contractor must sign and submit the 'Debarment and Suspension Certification', included herein as Exhibit G. The certification in this Clause is a material representation of fact relied upon by METRO. If it is later determined that the bidder knowingly rendered an erroneous certification, in addition to remedies available to METRO, the federal government may pursue available remedies, including but not limited to suspension and/or debarment. The bidder agrees to comply with the requirements of 49 C.F.R. § 29, Subpart C while this offer is valid and throughout the period of any contract that may arise from this offer. The bidder further agrees to include a provision requiring such compliance in its lower tier covered transactions.

**8  DRUG AND ALCOHOL TESTING**

A.  This Clause pertains if the Contractor is required to perform safety-sensitive functions under this Contract.

B.  A safety-sensitive function is defined as:

    1.  Operating a revenue service vehicle, including when not in revenue service;

    2.  Operating a non-revenue service vehicle, when required to be operated by a holder of a Commercial Driver's License;

    3.  Controlling dispatch or movement of a revenue service vehicle;

    4.  Maintaining (including repairs, overhaul and rebuilding) a revenue service vehicle or equipment used in revenue service;

    5.  Carrying a firearm for security purposes.

C.  The Contractor agrees to establish and implement a drug and alcohol testing program that complies with 49 C.F.R. Part 655, produce any documentation necessary to establish its compliance with 49 C.F.R. Part 655, 49 C.F.R. Part 40, and 49 C.F.R. Part 29 and permit any authorized representative of the United States Department of Transportation or its operating administrations, the State Oversight Agency of the state of Texas or METRO, to inspect the facilities and records associated with the implementation of the drug and alcohol testing program as required under 49 C.F.R. Part 655, 49 C.F.R. Part 40, and 49 C.F.R. Part 29 and review the testing process.

D.  The Contractor agrees further to certify annually its compliance with Part 655 before March 1st and to submit the Management Information System (MIS) reports before March 15th to METRO's Drug and Alcohol Coordinator at METRO, 1900 Main Street, P.O. Box 61429, Houston, Texas 77208-1429.

E.  To certify compliance, the Contractor shall use the 'Substance Abuse Certifications' in the 'Annual List of Certifications

IFB No. 4022000021                                                                    Contract No. 7022000111

and Assurances for the Federal Transit Administration Grants and Cooperative Agreements,' which is published annually in the Federal Register.

F.    The Contractor agrees further to submit for review and approval before acting on a Notice to Proceed, a copy of the policy statement the Contractor has developed to implement its drug and alcohol testing program.

G.    In addition, the Contractor agrees to consult with METRO on the selection of a certified laboratory, substance abuse professional, or Medical Review Officer, or the use of a consortium.

**9    ENVIRONMENTAL REQUIREMENTS**

The Contractor and any subcontractor or third-party Contractor under this Contract shall comply with all applicable environmental requirements and regulations, including any amendments, as follows:

A.    **Clean Air**

1.    The Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq. The Contractor agrees to report each violation to METRO and understands and agrees that METRO will, in turn, report each violation as required to assure notification to the Federal Transportation Agency (FTA) and the appropriate Environmental Protection Agency (EPA) Regional Office.

2.    The Contractor also agrees to include these requirements in each subcontract exceeding $100,000 financed in whole or in part with federal assistance provided by the FTA.

B.    **Clean Water**

1.    The Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq. The Contractor agrees to report each violation to METRO and understands and agrees that METRO will, in turn, report each violation as required to assure notification to the FTA and the appropriate EPA Regional Office.

2.    The Contractor also agrees to include these requirements in each subcontract exceeding $100,000 financed in whole or in part with federal assistance provided by the FTA.

C.    Energy Conservation. The Contractor agrees to comply with the mandatory standards and policies relating to energy efficiency that are contained in the state energy conservation plan issued in compliance with the Energy Policy and Conservation Act.

**10    FEDERAL CHANGES**

The Contractor shall at all times comply with all applicable Federal Transit Administration (FTA) regulations, policies, procedures and directives, including without limitation those listed directly or by reference in the FTA Master Agreement (Form FTA MA (19) dated October 1, 2012) between METRO and FTA, as they may be amended or promulgated from time to time during the term of this Contract. The Contractor's failure to so comply shall constitute a material breach of this Contract.

**11    FLY AMERICA**

The Contractor agrees to comply with 49 U.S.C. § 40118 (the 'Fly America' Act) in accordance with the General Services Administration's regulations at 41 C.F.R. Part 301-10, which provide that recipients and sub-recipients of federal funds and their Contractors are required to use U.S. flag air carriers for U.S. Government-financed international air travel and transportation of their personal effects or property, to the extent such service is available, unless travel by foreign air carrier is a matter of necessity, as defined by the Fly America Act. The Contractor shall submit, if a foreign air carrier was used, an appropriate certification or memorandum adequately explaining why service by a U.S. flag air carrier was not available or why it was necessary to use a foreign air carrier and shall, in any event, provide a certificate of compliance with the Fly America requirements. The Contractor agrees to include the requirements of this Section all subcontracts that may involve international air transportation.

**12    FRAUD AND FALSE OR FRAUDULENT STATEMENTS AND RELATED ACTS**

A.    The Contractor acknowledges that the provisions of the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. § 3801 et seq. And U.S. DOT regulations, 'Program Fraud Civil Remedies,' 49 C.F.R. Part 31, apply to its actions pertaining to this Project. Upon execution of the underlying Contract, the Contractor certifies or affirms the truthfulness and accuracy of any statement it has made, it makes, it may make, or causes to be made, pertaining to the underlying contract or the FTA-assisted project for which the Contract Work is being performed. In addition to other penalties that may be applicable, the Contractor further acknowledges that if it makes or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification, the federal government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986 on the Contractor to the extent the federal government deems

IFB No. 4022000021                                                          Contract No. 7022000111

appropriate.

B.      The Contractor also acknowledges that if it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification to the federal government under a contract connected with a project that is financed in whole or in part with federal assistance originally awarded by FTA under the authority of 49 U. S. C. § 5307, the government reserves the right to impose the penalties of 18 U. S. C. § 1001 and 49 U. S. C. § 5307 (n) (1) on the Contractor, to the extent the federal government deems appropriate.

C.      The Contractor agrees to include the above two (2) clauses in each subcontract financed in whole or in part with federal assistance provided by FTA. It is further agreed that the clauses shall not be modified, except to identify the subcontractor who will be subject to the provisions.

## 13     INCORPORATION OF FEDERAL TRANSIT ADMINISTRATION (FTA) TERMS

The preceding provisions include, in part, certain Standard Terms and Conditions required by the Department of Transportation (DOT), whether or not expressly set forth in the contract provisions. All contractual provisions required by DOT, as set forth in the latest edition of FTA Circular 4420.1F in effect at the time of this Contract award, are hereby incorporated by reference. Anything to the contrary herein notwithstanding, all FTA mandated terms shall be deemed to control in the event of a conflict with other provisions contained in the Contract. The Contractor shall not perform any act, fail to perform any act, or refuse to comply with any METRO requests, which would cause METRO to be in violation of the FTA terms and conditions.

## 14     METRO NON-DISCRIMINATION

METRO shall not discriminate on the basis of on the basis of race, color, national origin, religion, sex (including gender identity and sexual orientation), disability, or age in the award and performance on any DOT-assisted Contractor in the administration of its program or the requirements of 49 C.F.R. Part 26. METRO shall take all necessary and reasonable steps under 49 C.F.R. Part 26 to ensure non-discrimination in the award and administration of DOT-assisted contracts. METRO's program, as required by 49 C.F.R. Part 26 and as approved by the DOT, is incorporated by reference in this Contract. Implementation of this program is a legal obligation and failure to carry out its terms shall be treated as a violation of this Contract. Upon notification to METRO of its failure to carry out its approved program, the Department may impose sanctions as provided for under Part 26 and may, in appropriate cases, refer the matter for enforcement under 18 U.S.C. § 1001 and/or the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. § 3801, et seq.).

## 15     NO OBLIGATION BY THE FEDERAL GOVERNMENT

A.      METRO and the Contractor acknowledge and agree that, notwithstanding any concurrence by the federal government in or approval of the solicitation or award of the underlying Contract, absent the express written consent by the federal government, the federal government is not a party to this Contract and shall not be subject to any obligations or liabilities to METRO, the Contractor, or any other party (whether or not a party to that Contract) pertaining to any matter resulting from the underlying Contract.

B.      The Contractor agrees to include the above Clause in each subcontract financed in whole or in part with federal assistance provided by the FTA. It is further agreed that the Clause shall not be modified, except to identify the subcontractor who will be subject to its provisions.

## 16     OFFICIALS NOT TO BENEFIT

A.      No member or delegate to the Congress of the United States shall be admitted to any share or part of this Contract to any benefit arising therefrom.

B.      No member, officer or employee of METRO, or of any other local public body having jurisdiction over METRO, during his tenure or for one year thereafter, shall have any interest direct or indirect, in the Contract or the proceeds thereof.

C.      The Contractor covenants that he presently has no interest and shall not acquire any interest, direct or indirect, which would conflict in any manner or degree with the performance of the services required under this Contract. In the event any question of possible conflict should arise, the determination of METRO shall be controlling. The Contractor further covenants that in the performance of this Contract no person having any such interest shall be employed by the Contractor.

## 17     PROJECT SIGNS

The Contractor shall erect, at the site of construction, and maintain during construction, signs meeting the requirements of the specification and drawings of the Contract and satisfactory to the Department of Transportation (DOT) identifying the project and indicating the government agencies that are participating in the development of the project.

IFB No. 4022000021                                                                                   Contract No. 7022000111

**18      RECYCLED PRODUCTS**

The Contractor agrees to comply with all the requirements of Section 6002 of the Resource Conservation and Recovery Act (RCRA), as amended (42 U.S.C. § 6962), including but not limited to the regulatory provisions of 40 C.F.R. Part 247, and Executive Order 12873, as they apply to the procurement of the items designated in Subpart B of 40 C.F.R. Part 247.

**19      RESTRICTIONS ON LOBBYING**

Contractors who apply or bid for an award of $100,000 or more shall file the certification required by 49 C. F. R. Part 20, 'New Restrictions on Lobbying.' Each tier certifies to the tier above that it will not and has not used federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any federal contract, grant or any other award covered by 31 U.S.C. § 1352. Each tier shall also disclose the name of any registrant under the Lobbying Disclosure Act of 1995 who has made lobbying contracts on its behalf with non-federal funds with respect to that federal contract, grant or award covered by 31 U.S.C. § 1352. Such disclosures are forwarded from tier to tier, up to the recipient. See Section XI, Exhibit F, 'Certification of Restrictions on Lobbying.'

**20      SEISMIC SAFETY**

The Contractor agrees that any new building or addition to an existing building will be designed and constructed in accordance the standards for seismic safety required in the Department of Transportation Seismic Safety Regulations 49 C. F. R. Part 41 and will certify to compliance to the extent required by the regulation. The Contractor also agrees to ensure that all Work performed under this Contract including Work performed by a subcontractor is in compliance with the standards required by the seismic safety regulations and the certification of compliance issued on the project.

**21      VALUE ENGINEERING**

A.      General. The Contractor is encouraged to develop, prepare, and submit value engineering change proposals (VECPs) voluntarily. The Contractor shall share in any instant contract savings realized from accepted VECPs, in accordance with Paragraph F below.

B.      Definitions. 'Collateral costs,' as used in this Article, means METRO costs of operation, maintenance, logistic support, or METRO-furnished property.

'Collateral' savings,' as used in this Article, means those measurable net reductions resulting from a VECP in METRO's overall projected collateral costs, exclusive of acquisition savings, whether or not the acquisition cost changes.

'Contractor's development and implementation costs,' as used in this Article, means those costs the Contractor incurs on a VECP specifically in developing, testing, preparing, and submitting the VECP, as well as those costs the Contractor incurs to make the contractual changes required by METRO acceptance of a VECP.

'METRO costs,' as used in this Article, means those METRO costs that result directly from developing and implementing the VECP, such as any net increases in the cost of testing, operations, maintenance, and logistic support. The term does not include the normal administrative costs of processing the VECP.

'Instant contract savings,' as used in this Article, means the estimated reduction in the Contractor's cost of performance resulting from acceptance of the VECP, minus allowable Contractor's development and implementation costs (see Paragraph H below).

'Value engineering change proposal (VECP)' means a proposal that—

1.      Requires a change to this, the instant Contract, to implement; and

2.      Results in reducing the contract price or estimated cost without impairing essential functions or characteristics; provided, that it does not involve a change to the contract type only.

C.      VECP Preparation. As a minimum, the Contractor shall include in each VECP the information described in subparagraphs 1 through 7 below. If the proposed change is affected by contractually required configuration management or similar procedures, the instructions in those procedures relating to format, identification, and priority assignment shall govern VECP preparation. The VECP shall include the following:

1.      A description of the difference between the existing Contract requirement and that proposed, the comparative advantages and disadvantages of each, a justification when an item's function or characteristics are being altered, and the effect of the change on the end item's performance.

2.      A list and analysis of the Contract requirement that must be changed if the VECP is accepted, including any suggested specification revisions.

3.      A separate, detailed cost estimate for (i) the affected portions of the existing Contract requirement and (ii) the VECP. The cost reduction associated with the VECP shall take into account the Contractor's allowable development and implementation costs, including any amount attributable to subcontracts under Paragraph H below.

47

IFB No. 4022000021                                                          Contract No. 7022000111

    4.   A description and estimate of costs that METRO may incur in implementing the VECP, such as test and evaluation and operating and support costs.

    5.   A prediction of any effects the proposed change would have on collateral costs to METRO.

    6.   A statement of the time by which a contract modification accepting the VECP must be issued in order to achieve the maximum cost reduction, noting any effect on the contract completion time or delivery schedule.

    7.   Identification of any previous submissions of the VECP, including the dates submitted, the agencies and contract numbers involved, and previous METRO actions, if known.

D.    Submissions. The Contractor shall submit VECPs to the Project Manager at the work site, with a copy to the Contracting Officer.

E.    **METRO Action**

    1.   The Contracting Officer shall notify the Contractor of the status of the VECP within forty-five (45) calendar days after the Contracting Officer receives it. If additional time is required, the Contracting Officer shall notify the Contractor within the forty-five (45) day period and provide the reason for the delay and the expected date of the decision. METRO will process VECP's expeditiously; however, it shall not be liable for any delay in acting upon a VECP.

    2.   If the VECP is not accepted, the Contracting Officer shall notify the Contractor in writing, explaining the reasons for rejection. The Contractor may withdraw any VECP, in whole or in part, at any time before it is accepted by METRO. The Contracting Officer may require that the Contractor provide written notification before undertaking significant expenditures for VECP effort.

    3.   Any VECP may be accepted, in whole or in part, by the Contracting Officer's award of a modification to this Contract citing this Article. The Contracting Officer may accept the VECP, even though an agreement on price reduction has not been reached, by issuing the Contractor a Notice to Proceed (NTP) with the change. Until a NTP is issued or a contract modification applies a VECP to this Contract, the Contractor shall perform in accordance with the existing Contract. The Contracting Officer's decision to accept or reject all or part of any VECP shall be final and not subject to the 'Disputes' Article of this Contract.

F.    **Sharing**

    1.   Rates. The Contractor's share of savings is determined by subtracting METRO's costs from instant contract savings and multiplying the result by 55 percent for fixed-priced contracts.

    2.   Payment. Payment of any share due the Contractor for use of a VECP on this Contract shall be authorized by a modification to this Contract to:

        a.   Accept the VECP;

        b.   Reduce the Contract price or estimated cost by the amount of instant contract savings; and

        c.   Provide the Contractor's share of savings by adding the amount calculated under subparagraph F1 above to the Contract price or fee.

G.    **Collateral Savings.**

If a VECP is accepted, the instant Contract amount shall be increased by 20 percent of any projected collateral savings determined to be realized in a typical year of use after subtracting any METRO costs not previously offset. However, the Contractor's share of collateral savings shall not exceed (i) the contract's firm-fixed-price or estimated cost, at the time the VECP is accepted, or (ii) $100,000, whichever is greater. The Contracting Officer shall be the sole determiner of the amount of collateral savings, and that amount shall not be subject to the 'Disputes' Article or otherwise subject to litigation under 41 U.S.C. § 601-613.

H.    **Subcontracts.**

The Contractor shall include an appropriate value engineering article in any subcontract of $50,000 or more and may include one in subcontracts of lesser value. In computing any adjustment in this Contract's price under Paragraph F above, the Contractor's allowable development and implementation costs shall include any Subcontractor's allowable development and implementation costs clearly resulting from a VECP accepted by METRO under this Contract, but shall exclude any value engineering incentive payments to a Subcontractor. The Contractor may choose any arrangement for subcontractor value engineering incentive payments; provided, that these payments shall not reduce METRO's share of the savings resulting from the VECP.

IFB No. 4022000021                                                    Contract No. 7022000111

I.       **Data.**

The Contractor may restrict METRO's right to use any part of a VECP or the supporting data by marking the following legend on the affected parts:

'These data, furnished under the Value Engineering Article of Contract _____, shall not be disclosed, in whole or in part, for any purpose other than to evaluate a value engineering change proposal submitted under the Article. This restriction does not limit METRO's right to use information contained in these data if it has been obtained or is otherwise available from the Contractor or from another source without limitations.'

If a VECP is accepted, the Contractor hereby grants METRO unlimited rights in the VECP and supporting data, except that, with respect to data qualifying and submitted as limited rights technical data, METRO shall have the rights specified in the contract modification implementing the VECP and shall appropriately mark the data. (The terms 'unlimited rights' and 'limited rights' are defined in Part 27 of the Federal Acquisition Regulations).

22.      **BUY AMERICA**

A.       The Contractor agrees to comply with 49 U.S.C. § 5323(j) and 49 C. F. R. Part 661, which provide that federal funds may not be obligated unless steel, iron, and manufactured products used in FTA-funded projects are produced in the United States, unless a waiver has been granted by FTA or the product is subject to a general waiver. General waivers are listed in 49 C. F. R. § 661.7. Separate requirements for rolling stock are set out at § 5323 (j)(2)(C) and 49 C. F. R. § 661.11. Rolling stock must be manufactured in the United States and have a 60 percent domestic content.

B.       A bidder or offeror must submit to METRO the appropriate Buy America certification with all bids on FTA-funded contracts, except those subject to a general waiver. Bids or offers that are not accompanied by a completed Buy America certification must be rejected as non-responsive. This requirement does not apply to lower tier subcontractors. See Exhibit K, entitled 'Buy America Certification.'

23       **ENTIRE AGREEMENT**

This Contract and attached Exhibits constitute the entire agreement between the parties and shall supersede all prior offers, negotiations, exceptions and understandings, whether oral or written, between the parties hereto. No modification of this Contract (including any change in the Work) shall be binding upon METRO or the Contractor unless evidenced by a written modification issued pursuant to the 'Changes Provision' or by other written order modification hereof, as appropriate.

IFB No. 4022000021                                      Contract No. 7022000111

## SECTION XI - EXHIBITS

### 1.    EXHIBIT A SCOPE OF SERVICES

As part of METRO's mission to provide safe, clean, reliable, accessible and friendly public transportation, METRO is implementing enhanced service along BOOST routes where speed, reliability and access improvements are designed to enhance the customer experience.

The scope of services specifies the requirements for the Construction of BOOST Corridor Enhancements, by the Contractor, herein referred to as the "Contractor".  BOOST Corridor Enhancements may include, but not be limited to bus stop relocation, new shelters and accessibility upgrades, transit signal priority, and real-time passenger information.

The Contractor shall furnish all supervision, labor, materials, tools, supplies, equipment, transportation, bonds, insurance, including taxes, overhead & profit to perform all operations necessary and required for the construction of bus stop improvements including but not limited to: sidewalk, ramps, pads and shelter foundations, roadway repairs, bike lanes, and traffic signal modifications in accordance with the specifications, drawings and the terms & conditions of the proposed Contract for the firm fixed unit prices shown in the Bid Tab.

The Metropolitan Transit Authority of Harris County, herein referred to as "METRO", shall determine and direct work that is to be done under this contract.

METRO reserves the right to inspect the construction and installation of any Bus Stop Improvement at any time and/or modify whenever deemed necessary by METRO.

METRO reserves the right to add to or deduct work from the contract without altering the unit prices.

### SUMMARY OF WORK:

Location: BOOST improvements will be on Route 56 Airline/Montrose, or other BOOST routes as determined by METRO.  This contract shall include the portion of Route 56 from the TMC Transit Center to the Greenspoint Area near IH-45 and Greens Rd.  The project will also include bike lane improvements along Cavalcade St, Benmar St and Airline Dr.



### General:

The Scope of Work for this Project shall consist of providing all supplies, support services, data, labor, tools, materials, , equipment, supervision, construction and all else required to prepare the sites and construct the BOOST improvements as shown in the construction documents.

IFB No. 4022000021

Contract No. 7022000111

**Project Scope:**

Work along the BOOST corridor(s) shall be assigned by Work Authorizations.

The work shall include, but not be limited to, the following major items, to the extent specified and indicated:
1.   Provide administration and construction support services to complete the work.
2.   Perform demolition and removal as indicated in plans
3.   Construct BOOST improvements, including but not limited to, shelter pads, sidewalk, curb, retaining walls, as indicated.
4.   Construct bike lanes and associated improvements, as indicated
5.   Construct traffic signal upgrades and modification, as indicated
6.   Construct signing and pavement markings, as indicated
7.   Provide a clean work site during the work

**Quality Assurance:**

The work shall comply with the requirements of the Contract Documents including cited specifications and standards; state and local government authority codes, regulations, and specifications.

In case of conflicts or discrepancies between cited national and local standards, local requirements shall govern unless otherwise directed in writing.  In case of conflicts or discrepancies between institutional, national and federal specifications as referenced for inclusion in a standard specification, the most stringent of the specifications listed shall govern unless otherwise directed in writing.  All conflicts shall be brought to the attention of METRO in writing for resolution.

**Other Requirements:**

Contractor shall be responsible for all governmental permits, licenses and fees required for execution and completion of the work, in the contractor's name.

**PROJECT MANAGEMENT:**

The Contractor shall provide project management and other support services for project coordination, scheduling and cost control. The Contractor shall provide administrative direction for the project and shall insure that proper documentation is maintained throughout the project.

The Contractor shall organize, schedule, and lead meetings related to the project with METRO staff or others as directed by the METRO Project Manager.  All meetings shall be approved by the METRO Project Manager and held at locations approved by the METRO Project Manager and include other applicable parties.

The Contractor shall develop and maintain a Project Schedule that includes all the activities of the project and the relationships between the activities. The project schedule shall be updated monthly and presented to the METRO Project Manager and the Contract Administrator at the project meetings.

The Contractor shall provide weekly updates to the METRO Project Manager and others as directed on the progress and planned activities.

The Contractor shall make submittals for METRO's approval prior to proceeding with work per the project specifications.

The Contractor shall maintain records and submit invoices in accordance with this contract.

Upon completion of the work effort, Contractor shall transmit to the METRO Project Manager a copy of the project documentation in electronic form. This documentation is to include QA/QC documentation, project schedules, meeting Agendas/meeting notes and Status Reports.

**CONTRACT AMOUNT, ITEMS AND PRICES:**

Bids in which unit prices are obviously unbalanced may be rejected.

Each firm unit price shall include all costs associated with performing that line item including, but not limited to, supervision, labor, materials, equipment, insurance, overhead and profit, as well as all incidental work required to provide complete items of work. All work not specifically listed in this attachment but included in the drawings, and, not included for measurement and payment in the specifications, shall be considered incidental to the project. The Contractor will not be compensated extra for such work.

The quantities appearing on the bid tab are estimated and do not commit nor obligate METRO to order the quantities shown. Quantities for which payment will become due, shall be those consumed during performance of the Work as approved and accepted by METRO's Authorized Representative.

IFB No. 4022000021                                                        Contract No. 7022000111

**BID ITEM MEASUREMENT AND PAYMENT:**

Items listed on the bid tab as Lump Sum (LS) shall be bid for the entire job.  A portion of this lump sum shall be assigned to each Work Authorization.  The sum of all Work Authorizations lump sums shall not exceed the lump sum amount listed on the bid tab for the entire contract.  Lump sum items in each Work Authorization shall be paid per the specifications.

IFB No. 4022000021                                                    Contract No. 7022000111

**2.      EXHIBIT B WORK AUTHORIZATION FORM**

Rev. 11-14-17                        **METRO**                           Page 1 of 1

## WORK AUTHORIZATION

*Receipt of this Work Authorization Modification, approved and authorized by METRO, authorizes you to proceed with the subject services.*

1.  Consultant / Contractor:          **Contract No.: Oracle contract # if appl. / SAP contract #**
    Firm name                          **Shopping Cart No.:**
    Full address                       **Work Authorization No.: WA xxx, PO #xxxx**
    City, State, Zip
                                        **Date of Issue: xxxx**

2.  Consultant's Key Personnel:        Name, title   phone   email

3.  WA xxx Amount:                     NTE $                    4.  Small Business Goal: xxx%

5.  Scope of Services:                 Descript
                                        Descript con't, if needed
                                        See Attachment A

6.  Period of Performance:             xxxxxx - xxxxxx

7.  Place of Performance:              Consultant's Office and/or METRO's Offices at _____ and xxxxxxx

8.  METRO Project Manager:             xxx xxxxxx email: xxxxxxx.xxxxx@ridemetro.org
                                        will monitor, inspect and accept the services performed pursuant to this Work Authorization

9.  Contract Administrator:            713 xxx xxxx   email: xxxxxx.xxxxx@ridemetro.org

10. Payment:                           All payments shall be based on actual hours worked at the rates stipulated in the Price
                                        Schedule of the base contract, No. 701XXXXXXX, and in made in accordance with the
                                        contract clause entitled "INVOICING AND PAYMENT."

11. ☑ indicates 'yes':  Federally funded? ☐   Certified payroll required? ☐   Payment and performance bonds required? ☐

ACCEPTED FOR CONSULTANT By:            APPROVED AND AUTHORIZED BY METRO By:

Signature: _____    Signature: _____
Name: _____         Name: _____
(Print or Type)                        (Print or Type)

Title: _____        Title:  Contracting Officer

Date: _____         Date: _____

12. WA xxx Activity:                   13.    Attachments:

                                              A: Scope
                                              B. Drawings xxxx

IFB No. 4022000021                                                    Contract No. 7022000111

**3      EXHIBIT C CONTRACTOR'S RELEASE**

Pursuant to the terms of METRO Contract No. 7022000111, as amended, and in consideration of the sum of _____
Dollars ($_____), which has been or is to be paid under said Contract to _____ (hereinafter called the
Contractor) or its assignees, if any, the Contractor for itself and its subcontractors, upon payment of the said sum by the
Metropolitan Transit Authority (hereinafter called METRO), does release and discharge METRO, its officers, agents, and
employees, of and from all liabilities, obligations, claims and demand whatsoever under or arising from the said Contract, except
specified claims as follows:

_____.

(IF                                          NONE,                                                      SO
STATE)_____.

IN WITNESS WHEREOF, this release has been executed this ___ day of _____, 20__.


        By: _____
                        (Signature of Company Official)


CERTIFICATE

I, _____, certify that I am _____ (title) of the firm named as the Contractor
in the foregoing release; that _____, (name) who signed said release on behalf of the Contractor and its
subcontractors, was the _____(title) of said firm; that said release was duly signed for on behalf of said firm and
is within the scope of its powers as so constituted.


        By: _____
                        (Signature of Certifying Person)


(If a Corporation, affix the Corporate Seal)

IFB No. 4022000021                                                    Contract No. 7022000111

**4      EXHIBIT D CONSTRUCTION SUBMITTAL**

Rev. 4-24-17                            METRO                           Page 1 of 1

## CONSTRUCTION SUBMITTAL FORM

| PROJECT TITLE: | |
| CONTRACT NO. | |
| CONTRACTOR NAME: | |

Routing sequence - Follow numbers.
Always forward original of this form and retain copy.

SAMPLE

**SUBMITTAL NO.**

1. _____ Date: _____
2. _____ Date: _____ Sheet ____ of ____
3. _____ Date: _____ _____ Submittal
4. _____ Date: _____
5. _____ Date: _____

**ACTION TAKEN (X)**

SPEC. SECT. NO.: _____

SUBCONTRACTOR: _____

By signing this submittal, the Contractor hereby certifies that any iron, steel or manufactured product(s), including components, included in this submittal are produced in the United States.

Signatures:

CONTRACTOR: _____

SYSTEM ENGINEER: _____

PROJECT MANAGER: _____

Columns (left side): Submitted for Approval | Forwarded for Review | Review Returned | Submittal Returned | Submittal Returned by Subcontractor or Supplier

Columns (right side): Approved | Approved as Noted | REJECTED: Revise and Resubmit | For Info Only | See Remarks

| SEPIA COPIES | | | | | IDENTIFICATION | DESCRIPTION | | | | | |
| 1 | 2 | 3 | 4 | 5 | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Remarks:                                                    Distribution:

55

IFB No. 4022000021

Contract No. 7022000111

5     **EXHIBIT E FEDERAL**          **CONSTRUCTION WAGE RATES**

GENERAL DECISION NUMBER: TX20220038
MODIFICATION: 0
STATE: TEXAS
CONSTRUCTION TYPE: HIGHWAY CONSTRUCTION
PUBLISHED DATE: January 7, 2022

| LABOR CLASSIFICATION | HOURLY RATES | LABOR CLASSIFICATION | HOURLY RATES |
|---|---|---|---|
| CEMENT MASON/ CONCRETE FINISHER (Paving and Structures) | $ 12.98 | SERVICER | $13.97 |
| ELECTRICIAN | $ 27.11 | STEEL WORKER | |
| | | Reinforcing Steel | $ 15.15 |
| FORM BUILDER / FORM SETTER | | Structural Steel Welder | $ 12.85 |
| Paving & Curb | $ 12.34 | Structural Steel | $ 14.39 |
| Structures | $ 12.23 | | |
| | | TRUCK DRIVER | |
| LABORER | | Low Boy-Float | $ 16.03 |
| Asphalt Raker | $ 12.36 | Single Axle | $ 11.46 |
| Flagger | $ 10.33 | Single or Tandem Axle Dump | $ 11.48 |
| Laborer, Common | $ 11.02 | Tandem Axle Tractor w/Semi Trailer | $ 12.27 |
| Laborer, Utility | $ 11.73 | | |
| Pipelayer | $ 12.12 | | |
| Work Zone Barricade Servicer | $ 11.67 | | |
| PAINTER (Structures) | $ 18.62 | | |
| POWER EQUIPMENT OPERATOR | | | |
| Asphalt Distributor | $ 14.06 | | |
| Asphalt Paving Machine | $ 14.32 | | |
| Broom or Sweeper | $ 12.68 | | |
| Concrete Pavement Finishing Machine | $ 13.07 | | |
| Concrete Paving, Curing, Float, Texturing Machine | $ 11.71 | | |
| Concrete Saw | $ 13.99 | | |
| Crane , Hydraulic  80-tons or less | $ 13.86 | | |
| Crane, Lattice boom  80-tons or less | $ 14.97 | | |
| Crane, Lattice boom  Over 80-tons | $ 15.80 | | |
| Crawler Tractor | $ 13.68 | | |
| Excavator,  50,000 lbs. or less | $ 12.71 | | |
| Excavator,  Over 50,000 lbs. | $ 14.53 | | |
| Foundation Drill, Crawler Mounted | $17.43 | | |
| Foundation Drill, Truck Mounted | $ 15.89 | | |
| Front End Loader,  3 cu yd or less | $ 13.32 | | |
| Front End Loader,  over 3 cu yd | $ 13.17 | | |
| Loader / Backhoe | $ 14.29 | | |
| Mechanic | $ 16.96 | | |
| Milling Machine | $ 13.53 | | |
| Motor Grader, Fine Grade | $ 15.69 | | |
| Motor Grader, Rough | $ 14.23 | | |
| Off Road Hauler | $ 14.60 | | |
| Pavement Marking Machine | $ 11.18 | | |
| Piledriver | $ 14.95 | | |
| Roller, Asphalt | $ 11.95 | | |
| Roller, Other | $ 11.57 | | |
| Scraper | $ 13.47 | | |
| Spreader Box | $ 13.58 | | |

WELDERS - Receive rate prescribed for craft performing operation to which welding is incidental.

Unlisted classifications needed for work not included within the scope of the classifications listed may be added after award only as provided in the labor standards contract clauses (29 CFR, 5.5 (a) (1) (ii)).

IFB No. 4022000021                                                    Contract No. 7022000111

**6      EXHIBIT F CERTIFICATION OF RESTRICTIONS ON LOBBYING**

The undersigned certifies, to the best of his or her knowledge and belief, that:

A.   No federal appropriated funds have been or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an office or employee of any agency, a member of Congress, an officer or employee of Congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement.

B.   If any funds other than federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with this federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, 'Disclosure Form to Report Lobbying,' in accordance with its instructions. After a Contract is awarded by METRO, if applicable, the undersigned is also required to submit to METRO's Contracting Officer a signed copy of the Form-LLL, 'Disclosure Form to Report Lobbying,' for all sub-awards at all tiers in excess of $100,000.00.

C.   The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants, and contracts under grants, loans, and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly. Once a Contract is awarded by METRO, the undersigned is also required to submit to METRO's Contracting Officer a signed copy of the certificate for all sub-contracts at all tiers in excess of $100,000.00.

This certification is a material representation of fact upon which reliance is placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, title 31 U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Executed this __27th__ day of __December__, 20_21_

Company Name: __PRCHOU, LLC__

By: _____
              (Signature of Company Official)

__CEO__
              (Title of Company Official)

IFB No. 4022000021                                                    Contract No. 7022000111

**7      EXHIBIT G DEBARMENT AND SUSPENSION FORM**

The undersigned certifies, by submission of this certification, that neither the bidder's/contractor's company nor its principals are presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any federal department or agency.

If the company is unable to certify to any of the statements in this certification, the company shall attach an explanation to this certification.

I hereby certify that I am authorized to execute this certification on behalf of the company and certify the truthfulness and accuracy of the contents herein or attached hereto to the best of my belief. The company does/does not (strike one) have in-house legal counsel.

Company Name: __PRCHOU, LLC.__

By: _____      __12/27/21__
      Signature of Company Official           Date

__CEO__
Title of Company Official

The following shall also be completed if the Company has in-house legal counsel:

The undersigned legal counsel for _____ hereby certifies that _____ has authority under state and local law to comply with the subject assurances and that the certification above has been legally made.

_____
Signature of Company's Attorney          Date

IFB No. 4022000021                                                              Contract No. 7022000111

**8      EXHIBIT H CODE OF ETHICS OF THE METROPOLITAN TRANSIT AUTHORITY**


Please refer to the current versions of METRO's Codes of Ethics for METRO Employees and for the METRO Board of Directors at
https://www.ridemetro.org/Pages/ConflictsDisclosure.aspx

IFB No. 4022000021

Contract No. 7022000111

**9      EXHIBIT I SMALL BUSINESS FORMS**

**Form 1  CONTRACTOR UTILIZATION PLAN FORM**

**INSTRUCTIONS TO COMPLETING CONTRACTOR UTILIZATION PLAN FORM**

he Contractor Utilization Plan identifies the bidder's/proposer's (prime) team of certified and non-certified subcontractors and suppliers. It is also used to determine the percent (%) of Small Business (SB) participation on the team. **All team members must be listed on the form regardless of certification status.** Make additional copies of the appropriate Section(s) of the form, if needed, to include all team members.

**Information applicable to all members of the team in Sections 1, 2, 3 & 4 of the CUP:**

- Name, tax identification number, business address and contact information of prime, subcontractors and suppliers.

- Brief description of work to be performed by prime or subcontractors; or products to be provided by the suppliers.

- Certification status of prime, subcontractor(s) and supplier(s). Include a copy of the METRO SBE certificate or a DBE certificate for any applicable members of the team. Be sure to reference the solicitation regarding the types of SB certifications that METRO accepts or visit the METRO website **www.ridemetro.org** and go to the Small Business link.

- Percentages of the total contract value to be performed by the prime and each subcontractor and supplier. (Note: The total of all team members must equal 100%.)

- Price is REQUIRED on this form when responding to "Invitations for Bid" (IFB) solicitations.
  **Price is only required on the FINAL CUP for "Requests for Qualifications" (RFQ) or "Requests for Proposals" (RFP) solicitations.**

| | | | Type of Work to be Performed or Materials Supplied | Indicate if SBE/DBE (Y/N) | | Percent of Contract Effort | Price (IFB ONLY) |
|---|---|---|---|---|---|---|---|
| | | | | SBE | DBE | | |
| Name of Business | | | | | | | |
| Tax ID No. | | | | | | | |
| Business Address | | | | | | | |
| Telephone No. | | | | | | | |
| Contact Person | | | | | | | |
| Title | | | | | | | |
| Email Address | | | | | | | |

**CUP Completion Instructions continued on next page**

IFB No. 4022000021                                                                    Contract No. 7022000111

**Section 1 – Prime Contractor:  This Section is only for the bidder's/proposer's information.**

**Section 2 – Subcontractors:** This Section is used to list all certified and non-certified subcontractors.

**Section 3 – Suppliers – Manufacturers (100%):  In this section, list all certified and non-certified suppliers that manufacturer or produce the product they are providing.**

- 100% of each certified supplier's contract value (or percentage) will count towards the SB goal.

**Section 4 – Suppliers – Dealers (60%):  In this section, list all certified and non-certified suppliers that purchase their products from a wholesaler.**

- 60% of each certified supplier's contract value (or percentage) will count towards the SB goal.

- Note that the "Percent of Contract Effort" in this section is divided into 2 parts: **"100%"** and **"60%"**. BOTH PERCENTAGES MUST BE SPECIFIED IF A SUPPLIER IS CERTIFIED.

- The **"100%"** represents the total value of the P.O. (or Contract) as a percentage of the total value of the bid. *For example:* If the total bid is $1,000,000 and the P.O. value is $100,000, then the **100% value = 10%** and the **60% value = 6%**. In this example, only 6% ($60,000) will be counted towards the SB goal. See example below:

| Percent of Contract Effort | | Price (IFB ONLY) |
|---|---|---|
| **100%** | **60%** | |
| 100% Value (%): **10%** | | 100% Value ($): **$100,000** |
| 60% Value (%): **6%** | | 60% Value ($): **$60,000** |

- Reminder: In the case of an RFP or RFQ, only specify the percentages.

**Summary Totals & SBE/DBE Participation Section**

- In this section, under **"TOTAL AMOUNT OF BID/PROPOSAL"**, specify the dollar amounts and the corresponding percentages relative to the total bid amount from Sections 1, 2, 3, & 4. **(Important: The total dollars must match your bid amount and the corresponding percentages must total to 100%.)**

- Under **"% SBE/DBE Participation"** specify the percent of SB participation per Sections 1,2,3 & 4. See IFB example below:

  <u>EXAMPLE ONLY SCENARIO:</u> **The Prime is not certified, and all of the subcontractors and suppliers are certified firms. The Small Business goal is 35%.**

|  | TOTAL AMOUNT OF BID/PROPOSAL | | % SBE/DBE Participation |
|---|---|---|---|
| PRIME: | $ 500,000 | 50 % | 0 % |
| SUBCONTRACTORS: | $ 300,000 | 30 % | 30 % |
| SUPPLIER-MANUFACTURERS: | $ 100,000 | 10 % | 10 % |
| SUPPLIERS-DEALERS: | $ 100,000 | 10 % | 6 % |
| TOTAL BID/PROPOSAL AMOUNT: | $ 1,000,000 | **100 %** | **46 %** |

**(Note: If the solicitation is an RFP or RFQ, only specify the percentages.)**

**Remember to submit all Sections, enter the information highlighted in yellow below, sign and date the form.**

Submitted By: ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨        Business Name: ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
                 Signature of Owner/Officer of Business          (Date)

Address: ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨        Telephone/Email: ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

IFB No. 4022000021

Contract No. 7022000111

Bidder/Proposer presents the following participants in this solicitation and any resulting contract.

| Section 1 – PRIME CONTRACTOR | Type of Work to be Performed or Materials Supplied | Indicate if SBE/DBE (Y/N) SBE | DBE | Percent of Contract Effort | Price (IFB ONLY) |
|---|---|---|---|---|---|
| Name of Business **PRCHOU, LLC.** | **METRO Certified SBE, DBE Prime Contractor** | X | X | 64% | $7,380,680.95 |
| Tax ID No. 46-4992427 | | | | | |
| Business Address 3411 Richmond Ste. 610, Houston, TX 77046 | | | | | |
| Telephone No. 281-846-5125 | | | | | |
| Contact Person Mukadas D. Kurban | | | | | |
| Title CEO | | | | | |
| Email Address dansi@premiergrouptx.com | | | | | |

| Section 2 – SUBCONTRACTORS | Type of Work to be Performed or Materials Supplied | Indicate if SBE/DBE (Y/N) SBE | DBE | Percent of Contract Effort | Price (IFB ONLY) |
|---|---|---|---|---|---|
| Name of Business **NSS Construction, LLC.** | **METRO Certified SBE Contractor** Roadwork, paving,concrete, demo, clearing, grubbing. | X | | 19% | $2,183,623.30 |
| Tax ID No. 85-3033194 | | | | | |
| Business Address 13963 Fondren Rd Houston TX 77085 | | | | | |
| Telephone No. 346-464-7413 | | | | | |
| Contact Person Sofia Dawood | | | | | |
| Title CEO | | | | | |
| Email Address nssconstruction20@gmail.com | | | | | |
| Name of Business Reliable Signal & Lighting Solutions, LLC. | Lighting and Signal Work | | X | 11% | $1,266,376.70 |
| Tax ID No. 20-5173853 | | | | | |
| Business Address 2617 Lazy Bend St. Pearland, TX 77581 | | | | | |
| Telephone No. 281-997-1111 | | | | | |
| Contact Person Ricky Del Cid | | | | | |
| Title President | | | | | |
| Email Address rdelcid@reliable-signal.com | | | | | |

IFB No. 4022000021

Contract No. 7022000111

Bidder/Proposer presents the following participants in this solicitation and any resulting contract.

| Section 1 – PRIME CONTRACTOR | Type of Work to be Performed or Materials Supplied | Indicate if SBE/DBE (Y/N) SBE | DBE | Percent of Contract Effort | Price (IFB ONLY) |
|---|---|---|---|---|---|
| Name of Business | CONTINUED FROM LAST PAGE | | | | |
| Tax ID No. | | | | | |
| Business Address | | | | | |
| Telephone No. | | | | | |
| Contact Person | | | | | |
| Title | | | | | |
| Email Address | | | | | |

| Section 2 – SUBCONTRACTORS | Type of Work to be Performed or Materials Supplied | Indicate if SBE/DBE (Y/N) SBE | DBE | Percent of Contract Effort | Price (IFB ONLY) |
|---|---|---|---|---|---|
| Name of Business   Highway 1 LLC | Road Signage Work | N | N | 6% | $669,319.05 |
| Tax ID No.   47-5501808 | | | | | |
| Business Address   20411 Cook Road Tomball, TX 77377 | | | | | |
| Telephone No.   713-344-1279 | | | | | |
| Contact Person   Todd Druin | | | | | |
| Title   President | | | | | |
| Email Address   todd@highway1tx.com | | | | | |

| Name of Business | | | | | |
| Tax ID No. | | | | | |
| Business Address | | | | | |
| Telephone No. | | | | | |
| Contact Person | | | | | |
| Title | | | | | |
| Email Address | | | | | |

63

IFB No. 4022000021

Contract No. 7022000111

Bidder/Proposer presents the following participants in this solicitation and any resulting contract.

## Section 3 – SUPPLIERS – MANUFACTURERS 100%

Counts for 100% toward small business goal when purchased from small business manufacturer (see Instructions to Bidders/Proposers).

| Type of Work to be Performed or Materials Supplied | Indicate if SBE/DBE (Y/N) SBE | DBE | Percent of Contract Effort (100%) | Price (IFB ONLY) |
|---|---|---|---|---|
| Name of Business<br>Tax ID No.<br>Business Address<br>Telephone No<br>Contact Person<br>Title<br>Email Address | | | | |
| Name of Business<br>Tax ID No.<br>Business Address<br>Telephone No.<br>Contact Person<br>Title<br>Email Address | | | | |
| Name of Business<br>Tax ID No.<br>Business Address<br>Telephone No.<br>Contact Person<br>Title<br>Email Address | | | | |

64

IFB No. 4022000021

Contract No. 7022000111

Bidder/Proposer presents the following participants in this solicitation and any resulting contract.

Counts for 60% toward small business goal when purchased from small business regular dealer (see Instructions to Bidders/Proposers).

| Section 4.— SUPPLIERS - DEALERS 60% | Type of Work to be Performed or Materials Supplied | Indicate if SBE/DBE (Y/N) | | Percent of Contract Effort | | Price (IFB ONLY) |
|---|---|---|---|---|---|---|
| | | SBE | DBE | 100% | 60% | |
| **Name of Business** _____ | | | | 100% Value (%): | | 100% Value ($): |
| **Tax ID No.** _____ | | | | | | |
| **Business Address** _____ | | | | | | |
| **Telephone No.** _____ | | | | 50% Value (%): | | 60% Value ($): |
| **Contact Person** _____ | | | | | | |
| **Title** _____ | | | | | | |
| **Email Address** _____ | | | | | | |
| **Name of Business** _____ | | | | 100% Value (%): | | 100% Value ($): |
| **Tax ID No.** _____ | | | | | | |
| **Business Address** _____ | | | | | | |
| **Telephone No.** _____ | | | | 50% Value (%): | | 60% Value ($): |
| **Contact Person** _____ | | | | | | |
| **Title** _____ | | | | | | |
| **Email Address** _____ | | | | | | |

TOTAL AMOUNT OF BID/PROPOSAL

| | | | % SBE/DBE Participation |
|---|---|---|---|
| PRIME: | $ 7,380,680.95 | 64 % | 64 % |
| SUBCONTRACTORS: | $ 4,119,319.05 | 36 % | 30 % |
| SUPPLIERS-MANUFACTURERS: | $ | % | % |
| SUPPLIERS-DEALERS: | $ | % | % |
| TOTAL BID/PROPOSAL AMOUNT: | $ 11,500,000.00 | 100 % | 94 % |

The Contractor agrees to adhere to this Plan submitted unless a waiver is received from the Office of Small Business. Any changes in the Plan regarding the proposed use of certified subcontractors in discharging the contract duties must be approved by the Office of Small Business. The approval of the Office of Small Business will not be unreasonably withheld upon a showing of good cause to make the change.

Business Name: _____ PRCHOU, LLC. _____

Telephone/Email: _____ 832- 858-1239/ dansi@premiergrouptx.com _____

Submitted By: _____

Signature of Owner/Officer of Business        (Date)

Address   3411 Richmond Ste. 610, Houston, TX 77046

65

IFB No. 4022000021                                                                    Contract No. 7022000111

**Form 2      BUSINESS ASSURANCE STATEMENT**

The undersigned certifies that he/she has read, understands and agrees to be bound by the small business provisions set forth in this Solicitation. The undersigned further certifies that he/she is legally authorized by the bidder/contractor to make the statements and representations in this solicitation and that said statements and representations are true and accurate to the best of his/her knowledge and belief. The undersigned agrees to attain the small business utilization percentages of the total offer amount as set forth below:

Small Business contract Goal Commitment = **94%** - must match commitment on the Contractor Utilization Plan form

The undersigned will enter into formal agreement(s) for work to be identified on the 'Contractor Utilization Plan Form' form conditioned upon execution of a contract with METRO and agrees to include the two assurance statements below in all subcontracts.

**Copies of the subcontract agreements will be submitted to the Contracting Officer within fifteen <u>15</u> days of contract award and within fifteen <u>15</u> days of the addition of new subcontractors to the Contractor Utilization Plan.**

The undersigned certifies that the firm shown below has not discriminated against any subcontractors on the basis of race, color, national origin, religion, sex (including gender identity and sexual orientation), disability, or age, but has provided full and equal opportunity to all potential subcontractors irrespective of race, color, national origin, religion, sex (including gender identity and sexual orientation), disability, or age.

The undersigned understands that if any of the statements and representations are made knowing them to be false or there is a failure to implement any of the stated intentions, objectives, goals, and commitments set forth herein without prior approval of METRO's President & Chief Executive Officer or duly authorized representative, the bidder/contractor will be subject to the loss of any Contractor, the termination thereof resulting from this bid, and could be ineligible for future METRO contract awards.

Signature: _____

Title: __**CEO**_____          Date of Signing: __**12/27/21**_____

Firm or Corporation: __**PRCHOU, LLC.**_____

Address: __**3411 Richmond Ave. Ste. 610 Houston, TX 77046**_____

_____

Telephone Number: __**281-846-5125**_____

66

IFB No. 4022000021                                              Contract No. 7022000111

**Form 3  SUBCONTRACTOR/SUPPLIER LETTER OF INTENT**

PLEASE SUBMIT SEPARATE FORMS FOR **EACH SUBCONTRACTOR/SUPPLIER**

For use by submitters to identify subcontractors and suppliers.

Solicitation No.:  4022000021

Project Title:  56 Airline/Montrose BOOST Construction Requirements Contract

Prime Contractor:  PRCHOU, LLC.

Subcontractor/Supplier:  NSS Construction, LLC.

Small Business  Yes ☒  No ☐          Disadvantaged Business:  Yes ☐  No ☐

Contact Name:  Sofia Dawood

Address:  13953 Fondren Rd. Houston, TX 77085

Phone:  346-464-7413                    Fax:

Period of Performance:  The period of performance under this Contract shall be for twenty-four (24) months, unless otherwise extended by METRO. (See Contract Article 'Period of Performance' in Section III).

Description of proposed materials or services to be performed under the Contract Utilization Plan:

METRO Certified SBE. Subcontracting services including road work, concrete, paving, demo, clearing and grubbing.

_____          CEO
Signature of Subcontractor/Supplier          Title

_____          CEO
Signature of Prime Contractor          Title

IFB No. 4022000021

Contract No. 7022000111

**Form 3  SUBCONTRACTOR/SUPPLIER LETTER OF INTENT**

PLEASE SUBMIT SEPARATE FORMS FOR EACH SUBCONTRACTOR/SUPPLIER

For use by submitters to identify subcontractors and suppliers.

Solicitation No.:  4022000021

Project Title:  56 Airline/Montrose BOOST Construction Requirements Contract

Prime Contractor:  PRCHOU, LLC,

Subcontractor/Supplier:  Reliable Signal & Lighting Solutions, LLC

Small Business  Yes ☒  No ☐       Disadvantaged Business:  Yes ☒  No ☐

Contact Name:  Enrique "Ricky" Del Cid

Address:  2617 Lazy Bend St. Pearland, Texas 77581

Phone:  281-997-1111          Fax: 281-754-4381

Period of Performance:  Project duration

Description of proposed materials or services to be performed under the Contract Utilization Plan:

_____                    President
Signature of Subcontractor/Supplier             Title

                                               CEO

_____                    
Signature of Prime Contractor                   Title

68

IFB No. 4022000021                                                Contract No. 7022000111

Form 3  **SUBCONTRACTOR/SUPPLIER LETTER OF INTENT**

PLEASE SUBMIT SEPARATE FORMS FOR **EACH SUBCONTRACTOR/SUPPLIER**

For use by submitters to identify subcontractors and suppliers.

Solicitation No.: 4022000021

Project Title:  56 Airline/Montrose BOOST Construction Requirements Contract

Prime Contractor:  PROHOU, LLC.

---

Subcontractor/Supplier:  Highway 1, LLC

Small Business:  Yes ☐  No ☐          Disadvantaged Business:  Yes ☐  No ☐

Contact Name:  Todd Drouin

Address:  20411 Cook Road, Tomball, TX 77377

Phone:  713-344-1279          Fax:

Period of Performance:  The period of performance under this Contract shall be for twenty-four (24) months, unless otherwise extended by METRO. (See Contract Article "Period of Performance" in Section III).

Description of proposed materials or services to be performed under the Contract Utilization Plan:

| | |
|---|---|
| _Signature of Subcontractor/Supplier_ | President<br>_Title_ |
| _Signature of Prime Contractor_ | CEO<br>_Title_ |

IFB No. 4022000021                                                      Contract No. 7022000111

Form 4    CONTRACTOR UTILIZATION PLAN PLEDGE

**Copies of the Subcontract Agreements will be submitted to the Contracting Officer within fifteen (15) days of Contract award and within fifteen (15) days of the addition of new Subcontractors to the Contractor Utilization Plan and will include the Clauses below:**

**Pledge of Prompt Payments**

I pledge to pay all Subcontractors within five (5) business days after receiving payment from METRO for amounts previously invoiced for work performed or materials furnished under the Contract. I understand METRO may withhold payment if Subcontractors are not paid within five (5) business days of receipt of payment.

Signature: _____

Title: ___CEO_____

Date: ___12/27/21_____

**Pledge of Disputed Invoice Notification**

I pledge to notify Subcontractors, in writing, within five (5) business days of either receiving a disputed invoice from the Subcontractor or receiving notice from METRO of a disputed invoice, to resolve the disputed issue in a timely manner and to pay Subcontractors within
five (5) business days of receiving payment from METRO.

Signature: _____

Title: ___CEO_____

Date: ___12/27/21_____

**METRO's Non-discrimination Mandate**

I affirm that _____ (Company name) adheres to METRO's Non-discrimination Mandate and has not discriminated against any subcontractors in considering subcontracting opportunities on the basis of race, color, national origin, religion, sex (including gender identity and sexual orientation), disability, or age.

Signature: _____

Title: ___CEO_____

Date: ___12/27/21_____

**(FOR CONSTRUCTION CONTRACTS)**

I pledge to release the retainage of all Subcontractors within thirty (30) days after satisfactory completion and approval of work performed. Subcontractors may petition the prime Contractor to make the final payment and may notify METRO of the request.  As METRO releases retainage for payment to the Subcontractor, the prime Contractor is required to immediately (within 15 days) pay the Subcontractor. The release of retainage will be made to the Subcontractor regardless of the prime invoicing METRO.

Signature: _____

Title: ___CEO_____

Date: ___12/27/21_____

IFB No. 4022000021                                                      Contract No. 7022000111

**10    EXHIBIT J- PERSONAL PROTECTIVE EQUIPMENT**

|  | **METROPOLITAN TRANSIT AUTHORITY**<br>**INDUSTRIAL SAFETY MANUAL** |
|---|---|
| SECTION 2: **SAFETY STANDARDS** | ISSUE DATE: **JANUARY 2021** |
| STANDARD XVII: **PERSONAL PROTECTIVE EQUIPMENT** | REVISION NO: **003** |

**A. PURPOSE**

To establish safety guidelines regarding the use of Personal Protective Equipment (PPE) at
METRO Facilities, Construction Sites, and other locations where employees are exposed to
hazards.

**B. SCOPE**

This guideline outlines mandatory requirements for wearing PPE for all employees, contractors, and visitors of the
Metropolitan Transit Authority of Harris County. PPE for eyes, head, face, and extremities shall be provided to all
employees and maintained in a reliable and sanitary manner per these guidelines. PPE is issued whenever by reason of
hazards of process, environmental, chemical hazards, or have the potential to exist within the employee's task assignment.
The PPE issued will be of the type needed to afford protection against the hazards to be encountered.

***This guideline does not supersede any local, state, or federal law.*** If this guideline is in conflict
with any other law, rule, or regulation the stricter of the two will apply.

In cases where PPE is required as the result of a contagious virus response, reference Section 3(Health Standards,
Standard VII (Respiratory Protection), paragraph L, Appendix A and B

**C. RESPONSIBILITY**

Safety will provide guideline oversight and is responsible for subsequent updates.
All METRO employees and contractors are responsible for compliance with and enforcement of this guideline.

**D. GENERAL**

**1. Eye & Face Protection**

Eye and face protection meeting the ANSI Z87.1 (appropriate for the hazard or potential hazard) shall
be worn by all affected employees in any METRO maintenance shop, construction areas, areas so
designated by signage and/or during work activities where there is a potential for injury to the eyes.
Protective eyewear will not be required when employees are in office areas, break areas, storerooms or
inside the primary walkway y through the maintenance shop (as designated by the yellow lines). Eye and
face PPE must be distinctly marked to facilitate and document compliance.

a. **Safety Glasses**: Safety glasses (equipped with side shields) are protective devices intended to shield
the wearer's eyes from a variety of hazards. While safety glasses are primary protectors and may be
used alone, they may also be used in conjunction with other protectors.

b. **Goggles**: Goggles are protective devices intended to fit the immediate surrounding area of the eyes,
and to protect the eyes from a variety of hazards. Goggles are more suited than safety glasses for
liquids and dust. They may be used in conjunction with other protectors.

| PERSONAL PROTECTIVE EQUIPMENT | PAGE 1 OF 3 | SECTION2.XVII |
|---|---|---|

IFB No. **4022000021**                                    Contract No. **7022000111**



| SECTION 2: **SAFETY STANDARDS** | ISSUE DATE: **JANUARY 2021** |
|---|---|
| STANDARD XVII: **PERSONAL PROTECTIVE EQUIPMENT** | REVISION NO: **003** |

1. **Face shields:** Face shields are protective devices intended to shield the wearers face, or portions thereof, in addition to the eyes from certain hazards.

   **NOTE:**   Face shields are secondary protectors and shall be used only with primary protectors.

2. **Welding Helmets:** Welding helmets are protective devices intended to shield the wearer's eyes from optical radiation and impact.

   **NOTE:**   Welding helmets are secondary protective devices and shall only be used in conjunction with primary protectors.

   Employees who wear prescription lenses while engaged in operations where a potential for eye hazards exist shall wear eye protection that incorporates the prescription in its design or shall wear eye protection that can be worn over the prescription without disturbing the proper fit or position of the lenses.

   Maintenance employees may enroll in the Prescription Safety Eyewear Program.  Contact METRO Safety for more information.

**E. Head Protection**

All employees, contractors, and visitors must wear bump caps when there is a potential for injury to the head from bumping into objects.

ANSI Z89.1 Class E&G hard hats must be worn while performing/supporting aerial device work, in construction areas, or where there is a potential for injury to the head from falling objects.

**F. Foot Protection**

Individuals who have the potential to incur foot injuries because of their work activities must wear safety toe shoes that meet two ASTM standards – ASTM F 2412 and ASTM F 2413. This includes mechanics, LRV technicians, shop employees, cleaners, storeroom personnel, painters, wrecker operators, Facilities Maintenance personnel, Maintenance of Way personnel, and High Occupancy Vehicle (HOV) lane personnel.

All other employees, contractors, and visitors must wear safety toe shoes in work areas where there is potential for foot injuries from falling or rolling objects, objects piercing the sole, and exposure to electrical hazards. Safety toe footwear worn at construction sites must cover the ankle.

| PERSONAL PROTECTIVE EQUIPMENT | PAGE 2 OF 3 | SECTION 2.XVII |
|---|---|---|

IFB No. **4022000021**                                                    Contract No. **7022000111**



| METROPOLITAN TRANSIT AUTHORITY<br>INDUSTRIAL SAFETY MANUAL | |
| --- | --- |
| SECTION 2: **SAFETY STANDARDS** | ISSUE DATE: **JANUARY 2021** |
| STANDARD XVII: **PERSONAL PROTECTIVE EQUIPMENT** | REVISION NO: **003** |

### G.  Hand Protection

Affected employees shall use the proper hand protection when hazards exist from skin absorption of harmful substances, severe cuts or lacerations, severe abrasions, punctures, chemical or thermal burns, and harmful temperature extremes. Hand protection shall be selected on the basis of the tasks to be performed, conditions present, duration of use, the hazards and potential hazards identified.

### H.  Safety Vests

*All METRO employees, visitors, and contractors working on bus and rail yards are required to wear ANSI Class II*, or better, high visibility safety vests *at **all** times*.

*Safety Vests are also required for employees:*

- While operating 3-wheel carts, tugs, forklifts and similar equipment.
- While working along the rail alignment.
- Anywhere employees are directly exposed to vehicular traffic.
- On construction sites.

(Intentionally left blank)

| PERSONAL PROTECTIVE EQUIPMENT | PAGE 3 OF 3 | SECTION 2.XVII |
| --- | --- | --- |

**11      EXHIBIT K BUY AMERICA CERTIFICATE**

The bidder/contractor hereby certifies that it will meet the requirements of 49 U.S.C. 5323 (j)(1), and the applicable regulations in 49 C. F. R. Part 661.5.

Name of Bidder/Contractor: _PRCHOU, LLC._

Date of Signing: _12/27/21_

Signature: _____

Title: _CEO_

<div align="center">OR</div>

The bidder/contractor hereby certifies that it cannot comply with the requirements of 49 U.S.C. 5323 (j)(1) and 49 C.F.R. 661.5, but it may qualify for an exception pursuant to 49 U.S.C. 5323(j)(2)(B) or (j)(2)(A), 5323(j)(2)(B), or 5323(j)(2)(D), and 49 C.F.R. 661.7.

Name of Bidder/Contractor: _____

Date of Signing: _____

Signature: _____

Title: _____

# Exhibit 2

**NOTICE OF TERMINATION
METRO Contract No. 7022000111
BOOST 56 AIRLINE/MONTROSE**

**May 5, 2023**



**Mission Statement**

*"Provide safe, clean, reliable, accessible and friendly public transportation services to our region."*

**Board of Directors**

Sanjay Ramabhadran (Ram), P.E.
*Chair*

Don Elder, Jr.
*First Vice-Chair*

Roberto Treviño, P.E.
*Second Vice-Chair*

Troi Taylor
*Secretary*

Lex Frieden

Bob Fry

Christopher G. Hollins

Diann L. Lewter

Terry Morales

**President & Chief Executive Officer**

Thomas C. Lambert



May 05, 2023

**Via Certified Mail and Email**
Mukadas D. Kurban, CEO
PRCHOU, LLC.
3411 Richmond
Houston, Texas 77046

SUBJECT:   **NOTICE OF TERMINATION** – METRO Contract No. 7022000111
BOOST 56 AIRLINE/MONTROSE

Dear Ms. Kurban:

Over the past six (6) month METRO notified PRCHOU, LLC of numerous concerns related to PRC's noncompliance with certain contract specifications; including PRC's inability to insure completion of the Work within a specified time. PRC was provided an opportunity to cure such contract deficiencies and continues to remain in breach.

This letter serves as termination of Contract No. 7022000111 between METRO and PRCHOU, LLC effective Monday, May 05, 2023, for default based on the following contract breaches.

1.  Failure to complete the Work as required in Sections III (5), (8) and Section IV (1) of the Contract.

2.  Failure to make timely payments to subcontractors and suppliers as required in Section V(2)(C) and (E).

3.  Failure to comply with METRO's Small Business Program as required in Section VII (B)(C)(D)(G).

4.  Failure to comply with the terms and conditions required in Section IX (4), (18), (27), (28), (32).

METRO is contractually entitled to withhold payments, including retainage, based on PRC's failure to timely submit a project schedule; if work is found to be deficient or unacceptable to METRO, or PRCHOU's failure to pay its subcontractors and suppliers. Additionally, METRO intends to charge PRCHOU for increased costs incurred due to PRCHOU's failure to complete the work, METRO's correction of PRCHOU's deficient work, improper lay out of the work, and damage to structures, equipment, vegetation adjacent to the work site(s).

Furthermore, it was recently brought to our attention that on or about Monday, May 01, 2023, PRCHOU abandoned the work site at Segment 2 between Cavalcade Street to Tidwell Road and Segment 3 between Tidwell Road and Gulf Bank Road. PRCHOU's abandonment of the work site violated safety protocols, creating unsafe conditions for workers and the public. Such failure to comply with safety precautions is just cause for complete termination of the contract. PRCHOU is contractually required to indemnify METRO for any sanctions, penalties or fines related to such safety breaches.

According to Section V(I)-all material and work covered by payments made shall become the sole property of METRO. METRO also exercises its right under this contract to take possession of materials and partial work performed that was left at the work site.

METRO is notifying PRCHOU, not to remove any equipment from the jobsite, no sooner than Friday, May 12, 2023. Furthermore, PRCHOU shall not return to the jobsite without an escort by an authorized METRO representative.

METRO reserves all rights and remedies available by law resulting from PRCHOU's default and breach of this contract, including the right to file a claim(s) with PRCHOU's surety bond company.

Please sign below acknowledging your receipt of this Notice to Terminate Contract No. 7022000111 and return to Michael Diettel via hardcopy by mail and email at Michael.Diettel@ridemetro.org.

_____

Acknowledgement
PRCHOU, LLC

Sincerely,

*Michael Diettel*

Michael Diettel
Contracting Officer

CC:   Shri Reddy, EVP – Planning Engineering and Construction
Bilal Salahuddin, Director of Construction
Cecil Boone, Project Manager
Otis Johnson, Director of Small Business
Michael Kyme, Chief Procurement Officer
Karen Hudson, Deputy Chief Procurement Officer
Achilles Patrick, Director of Contracts
Melechia Miles – Manager Contracts
Charles Holmes, Supervisor Contracts
Phil Benner, Director of Management & Budget
Contract File No. 7022000111

# Exhibit 3

## PRC's May 8, 2023 Response offering Resolution to METRO

**May 8, 2023**

**To: METRO**
Michael Diettel
Contracting Officer
1900 Main Street Houston, Texas 77002

**PREMIER REGIONAL CONSTRUCTION**
HOUSTON
DBE/MBE/SBE/WBE
HUB AND WBENC
CERTIFIED COMPANY
WWW.PREMIERGROUPTX.COM

RE: METRO Route 56 BOOST Project Contract No. 7022000111 – Notice of Termination Response

This is in response to the Notice of Termination emailed on Friday, May 5 at 2:58pm by METRO Small Business and Procurement. We would appreciate the chance to respond to the allegations made about PRC and offer a mutual resolution forward.

1. PRC has not walked away or instituted a permanent work stop. Rather, we were not paid by METRO our approved invoices which caused our crews and suppliers to not extend further their time and resources. As this created a financial choke point for our business and as such that without payment, we had no further resources ourselves to pay out of pocket.

2. In order for any of our crew and suppliers to be paid and continue work, we need our invoices (March and April 2023) to be paid. Cash flow is the lifeblood of any business. When it is cut off, the business literally dies. This should be clearly apparent to METRO "Small Business". The subcontractors and suppliers mentioned in a previous email are NON SBEs - and we have replied by several emails that the two in particular - Sunbelt and CRC have misrepresented their invoices are currently in mediation. Our counsel is handling these issues as mentioned in our emails and requested for METRO to remain out of this process. From METRO's SBE documentation, it is mentioned that only METRO Small Business intervenes when dealing with SBE-certified firms. As we are a SBE/DBE certified firm, we do not understand how METRO would circumvent us to deal with NON certified firms, or take sides.

3. By taking the side of NON SBEs and not allowing for our mediation/arbitration process to take place, METRO Small Business has set up intentional tortious interference with our NON SBE subcontractor relations. We are willing to meet in person to discuss with METRO Small Business (which we have not been afforded the courtesy of to date) and explain and show documentation of our side.

4. Allow for materials escalation within the contingency amount (20%) including materials already in the ground that allows us to pay suppliers their prices increase over the last two years. We have submitted documentation over four months ago of price increases and have been given assurance of incoporating. No supplier will hold (in today's environment) any pricing beyond 60 days, much less for over two years. Attached is the B2G screenshot showing the 20% increase as well.

5. Based on METRO premise of materials escalation, PRC tripled our resources and as such incurred further debt. Significant progress has been made to both Segment 2 and 3 however our cash flow is now cut off. We have incurred direct financial harm and economic damage that is unrecoverable due to non-payment. This cannot be how METRO Small Business treats a certified small, disadvantaged business firm.

6. Due to non-payment, PRC is not responsible for traffic control, pedestrian or otherwise. If March and April invoices are not paid, there are no financial resources available for our crew and suppliers. We cannot stress the urgency of paying approved invoices so that we can re-engage traffic control and continue site work. It's all connected.

If payment is made, PRC can continue traffic control and site work for as soon May 15, 2023. The week of May 8-12 is a complete weather week due to heavy rainfall expected.

If it is the mission for METRO Small Business to support certified Small Business, we ask METRO Small Business to reconsider its decision given (without a proper due and appeals process afforded) to an SBE/DBE firm and allow us to complete Segment 2 and 3.

If you have any questions or comments, please do not hesitate to contact me via email at dansi@premiergrouptx.com or at my office line (281) 846-5125.

Sincerely,

Mukadas Dansi Kurban
President & CEO
PRCHOU, LLC

Exhibit 1

B2G Contract Amount as of May 7, 2023 showing 20% increase to $13,800,000 from $11,500,000.



# Exhibit 4

## PRC's May 15, 2023 Response and Request for Appeal

May 15, 2023



PREMIER
REGIONAL
CONSTRUCTION

HOUSTON

DBE/MBE/SBE/WBE
HUB AND WBENC
CERTIFIED COMPANY

WWW.PREMIERGROUPTX.COM

**To: METRO Contract Disputes Appeals Committee**
c/o Michael Diettel
Contracting Officer
1900 Main Street Houston, Texas 77002

RE: PRCHOU, LLC's Appeal pursuant to Section IX(9) of METRO'S Termination of Contract No. 7022000111 BOOST 54 AIRLINE/MONTROSE

Dear Mr. Diettel,

Please find enclosed PRCHOU, LLC's ("PRC") appeal of METRO's termination of Contract No. 7022000111 BOOST 54 AIRLINE/MONTROSE (the "Contract"). In this letter, we would appreciate the chance to respond to the points cited in the Termination Letter:

1. Failure to complete the Work as required in Sections III (5), (8) and Section IV (1) of the Contract.
2. Failure to make timely payments to subcontractors and suppliers as required in Section V(2)(C) and (E).
3. Failure to comply with METRO's Small Business Program as required in Section VII (B)(C)(D)(G).
4. Failure to comply with the terms and conditions required in Section IX (4), (18), (27), (28), (32).
5. P6 Project Schedule.

As mentioned in our first letter, PRC has not abandoned the job but rather could not afford to pay our subs and vendors due to lack of payment from METRO. We are ready and able to complete Segments 2 and 3 of the Project, both of which have received an extension for completion until December 31, 2023. *See* Exhibit A to this letter.

PRC further requests METRO provide a factual basis for each of its alleged defaults in the May 5 Notice of Termination and provide PRC adequate time to respond and provide evidence regarding each alleged default, as provided for in Section IX(9) of the Contract.

If it is the mission for METRO Small Business to support certified Small Business, we ask METRO Small Business to reconsider its decision to terminate an SBE/DBE general contracting firm and allow PRC to complete Segments 2 and 3. In the alternative, PRC requests METRO's termination be amended to a termination for convenience pursuant to Section IX(36)(A).

If you have any questions or comments, please do not hesitate to contact me via email at dansi@premiergrouptx.com or at my office line (281) 846-5125.

Sincerely,

Mukadas Dansi Kurban
President & CEO
PRCHOU, LLC

**CONTACT**

☎ Office +1 (281) 846-5125

✈ dansi@premiergrouptx.com

🌐 www.premiergrouptx.com

📍 3411 Richmond Ste. 610, Houston, TX 77046



RE: 56 BOOST Project Contract No. 7022000111

### _Lack of Sufficient Information to Fully  Respond to METRO's Notice of Termination_

At the outset, PRC notes that METRO's May 5 Notice of Termination does not provide sufficient notice to PRC of the factual and evidentiary basis for its alleged breaches of the Contract.  METRO provides 4 basis for its termination, however each point merely refers to multiple provisions of the Contract without any further elaboration.  PRC requests METRO provide PRC with detailed information and documentation supporting its claims of PRC's breaches of the Contract.

In order to advance the resolution of this matter, PRC will address the factual bases it believes METRO may be alleging as the basis for its termination.  PRC hereby reserves the right to address or more fully support its positions regarding the alleged breaches once it receives further information from METRO.

### 1.  *Failure to complete the Work as required in Sections III (5), (8) and Section IV (1) of the Contract.*

Regarding the Period of Performance, Work Performed and Inspection, PRC has continued performing successful site work with zero negative impact to local community and businesses, despite the multiple issues we overcame regarding theft of our equipment, face-to-face robberies, weather and holidays. We maintained a QA inspector that submitted daily reports and, along with our Project Manager and crews, submitted RFIs when ground reality diverged from plans.  We worked to rectify any site work issues that normally occur within the process of construction.

PRC was granted extensions of both Work Authorizations on April 27, 2023 to complete both Segments 2 and 3 by December 31, 2023.[1] The claims regarding PRC's work performance are solely related to administrative issues outside of PRC's control, which PRC was actively working with METRO to remedy.  The B2G software system PRC was required to use to submit subcontractor and vendor information, invoices, subcontracts and other critical information experienced numerous problems outside of PRC's control.  The Contract does not specifically reference B2G software or require PRC to be proficient in using this program.  Thus, METRO's refusal to pay based on errors in the B2G system was a wrongful withholding of payment not supported by the Contract.  PRC brought up issues with the B2G software as early as March 13, 2023 and requested OBEO's help in entering vendors into the system, but it did not receive the assistance necessary in order to resolve these issues prior to payment being due.

Please see the email embedded below (and attached as **Exhibit B**) where METRO refused to acknowledge the issues with the B2G software or correct the issues arising with the software. Instead, it  incorrectly attributed PRC's workarounds and submissions to the system to METRO's OEBO department. In Exhibit B, Mr. Johnson claimed his staff member, Danielle Smith, entered the vendor information when it was entered by PRC. Payment for work performed was being wrongfully withheld from PRC due to issues with the B2G software, and the Director of OEBO was not willing to recognize the problems with the software, nor was OBEO willing to use its administrative privileges in the software to remedy issues PRC brought to OBEO's attention. Rather, OBEO continued to require PRC to perform functions it was unable to perform due to not having administrative privileges to correct issues with the program. PRC continually expressed its willingness to meet in person to resolve these issues and , but it was never given the opportunity to do so. Instead, METRO terminated PRC without any in-person meeting.

Furthermore, the OEBO states in its email that it will not make payment to PRC until certain conditions are resolved, however one of the conditions listed is "Payment of all past-due invoices."  However, PRC cannot make payment to its subcontractors for the March Pay Application, which is listed as "past-due," because it has not received payment from METRO, and Section V(E) of the Contract requires PRC to include a Pay-When-Paid clause in all of its subcontractor and supplier contracts, so OEBO should be aware that subcontractors and suppliers reporting payment issues does not mean the amounts are past due.  Thus, OEBO's stated condition of "Payment of all past-due invoices" prior to PRC being able to receive payment from METRO makes it impossible for PRC to receive payment.  Therefore, this stated condition is a wrongful basis for withholding payment and a prior material breach of the Contract by METRO

---

[1] True and correct copies of the Work Authorizations are attached hereto as **Exhibit A.**



RE: 56 BOOST Project Contract No. 7022000111

---

**B2G Entered - Re: -- Re: 56 BOOST Project Shut Down - April 29, 2023**  `External`  Inbox

**Jacob Varghese** <jacob@premiergrouptx.com>  ·  Mon, May 1, 12:15 PM (10 days ago)
to Danielle, Gary, Bilal, Cecil, Abdul, Michael, Otis, mukadas, Ashish

Update to all --

Despite issues with B2G (i.e. multiple vendor contacts, error references, etc..) subs have been entered in B2G by possible workaround solutions -

Danielle - please approve on your end. Attached is the CUP. Gary - appreciate your help as well.

We sincerely request the release of our check as soon as possible.

Thank you,

Jacob

---

On Sun, Apr 30, 2023 at 8:21 PM Jacob Varghese <jacob@premiergrouptx.com> wrote:

Hi Otis,

I'm the one that entered those two vendors into B2G - not Danielle - once I entered them, it's pushed to her for her approval. So, it seems you may not be aware of how B2G works and the issues it has.

I will review your email and see what we can do.

Jacob

On Fri, Apr 28, 2023 at 3:59 PM Otis Johnson <Otis.Johnson@ridemetro.org> wrote:

Jacob,

In lieu of your recent email correspondences, I want to make it clear there are no software "circular reference errors" or "glitches" with B2Gnow. And to prove this point, within seconds Danielle was able to add the two vendors you claimed could not be entered, due to software issues with B2Gnow. Despite numerous emails, the Office of Economic Business Opportunity (OEBO) has been waiting for several weeks for PRC+HOU to address the open non-compliance issues. During the contract, OEBO discovered several subcontractors and suppliers were being used without our knowledge. The contract clearly states the CUP must contain all subcontractors and suppliers the Prime will use to execute the scope of work. And that the addition or removal of any vendors must first be approved by OEBO. To make matters worse, several vendors have notified METRO of non-payment issues. While the construction nature of the contract is important, the Small Business compliance requirements are no less important. Your outstanding invoices will be released once the following compliance items have been resolved:

- Add all missing subcontractors and suppliers to B2Gnow. The list below represents vendors we are aware of:
  - TAPCO, Inc. (completed by Danielle)
  - Texas Concrete Enterprise Ready Mix, Inc
  - Concrete Pros Ready Mix, Inc
  - Sunbelt Rentals
  - Montgomery Heavy Equipment
  - LEFTAMO Construction (completed by Danielle)
  - CRC & Associates
- Submit a request via B2Gnow to remove any vendors. The requests must be accompanied by written justification and supporting documentation.
- Submit a revised Contractor Utilization Plan (CUP).
- Submit subcontract agreements for all new subcontractors that are being added.
- Payment of all past-due invoices.
- Report payment activity in B2Gnow per their audit period.
- Post subcontractor invoice information in B2Gnow, per all invoices submitted to METRO.

Feel free to contact me or Danielle if you have any questions or need any further assistance.

Regards,

Otis Johnson, Director
Office of Economic Business Opportunity (OEBO)
713-615-6112
**METRO**

---

**2.  *Failure to make timely payments to subcontractors and suppliers as required in Section V (2), (C) and (E).***

METRO referenced both Sunbelt and CRC as instances of non-payment (who are both NON-SBE's). Danielle Smith had mentioned in an email to PRC on Monday, May 1, 2023 at 1:55 PM:  "Otherwise, I will need an explanation/justification for the discrepancy for our review." A few minutes later on Mon, May 1, 2023 at 2:04 PM, PRC replied with the explanation for the discrepancy of both of these vendors:



RE: 56 BOOST Project Contract No. 7022000111

On Mon, May 1, 2023 at 2:04 PM Jacob Varghese <jacob@premiergrouptx.com> wrote:

Danielle,

Yes - please find an explanation that is from a business perspective -

1) Sunbelt is not an SBE - and we have not used them since last year - but more importantly - we are dealing with their invoice department to correct these past errors and have asked respectfully for METRO to not be involved with our business affairs. Our attorneys are handling this as well. So for legal reasons, we are not going to place them in the CUP.

2) CRC & Associates is not an SBE - and we had briefly engaged them for a couple of weeks to test - but failed as they also have misrepresented their invoices and our attorneys have advised us to not directly engage - as it is now going through a legal process. We respectfully again ask METRO to be not invoiced in our business affairs of subs due to legal reasons as well not any issue than an SBE.

3) Montgomery – as you can see in B2G -- they are listed as Onnea DBA Montogomery Heavy Equipment. They go by Montgomery Heavy Equipment and checks are made out to that entity.

Thank you,

Jacob

On Mon, May 1, 2023 at 1:55 PM Danielle Smith <Danielle.Smith@ridemetro.org> wrote:

Jacob,

Thank you for submitting these for my review. However, upon reviewing them, I noticed that a few subs/suppliers were not listed on the CUP, and I did not receive any requests for them to be added via B2Gnow. Per the assessment below, please update B2Gnow and submit a revised CUP. Otherwise, I will need an explanation/justification for the discrepancy for our review.

Missing from the CUP
- Sunbelt
- CRC & Associates
- Onnea Equipment (brought to attention by Jacob via B2Gnow)

Missing from B2Gnow
- Sunbelt
- Montgomery Heavy Equipment
- CRC & Associates

Thank you,
Danielle Smith

As mentioned in PRC's email responses, we have been in active discussions with Sunbelt to resolve incorrect invoicing, and we resolved the issue on May 2. This took numerous months to resolve because they were billing for equipment that had already been returned. Sunbelt's invoices were submitted to B2G in the correct amounts on May 10.

For CRC & Associates – this is an ongoing issue due to their material misrepresentation of invoices. Our counsel is handling this issue. Further, because the B2G system requires the Contractor to certify the amount owed to the subcontractor, PRC was waiting to submit the invoicing until it reaches agreement with the subcontractor on the amount owed and can input the amount into the program. PRC should not be withheld payment due to amounts it is not yet seeking from METRO.

Also, we notified METRO of the urgency to resolve any bases for withholding payment of our Pay Apps because we need to receive payment for work performed from METRO in order to pay our subcontractors and suppliers. We asked to meet in person with METRO in order to resolve any B2G issues or to allow us to work directly with non-SBEs to resolve our issues with them, but we were not provided either of these opportunities.. We notified METRO of the serious issues created by its non-payment for work performed, which could result in more lien notices sent.

Email sent on Fri, Apr 28, 2023 at 11:05 AM embedded below and attached as **Exhibit C**:

Invoicing Re: Multiple Issues in B2G - Re: Training - Re: Revised CUP Re: Urgent: Open SB Compliance Issues (7022000111MN: 56 Airline - Montrose BOOST Contract)
1 message

Jacob Varghese <jacob@premiergrouptx.com>                                                                                                          Fri, Apr 28, 2023 at 11:05 AM
To: Danielle Smith <Danielle.Smith@ridemetro.org>, Otis Johnson <otis.johnson@ridemetro.org>
Cc: Cecil Boone <Cecil.Boone@ridemetro.org>, Michael Dietel <Michael.Dietel@ridemetro.org>, Bilal Salahuddin <Bilal.Salahuddin@ridemetro.org>, "Lehman, Gary" <Gary.Lehman@arcadis.com>, Abdul Dawood <abdul@premiergrouptx.com>, mukadas kurban <dans@premiergrouptx.com>

Hi METRO SBE,

We are in a dire situation with our invoice being held with SBE.

We understand and have agreed to update the CUP - but are not able to due to software glitches that we have no control over.

METRO has a 5-page prompt payment policy for us to pay our vendors/subs - but when it comes to our approved invoice submissions to METRO - it can take weeks and/or months for METRO to pay us. This creates a cascading negative cash flow for small businesses like us. We do not have millions in the bank like other major firms and cannot float payments for months on end. For example, invoices sent to us in Mach are now past due, and we can expect more lien notices.

If Small Business' goal is to help small businesses - this is the exact opposite effect. Cash flow is the lifeblood of business and when it's cut off - a downward spiral is created and takes even more cash flow to overcome and reverse momentum. We have also run through our entire line of credit because with each pour we run through, losing money due to materials escalation beyond our control over the last two years.

We are more than willing and assure you we will continue working on the B2G system and CUP as these errors are fixed.

Thank you for your help in releasing our payment.

Thank you

Jacob



<div align="right">RE: 56 BOOST Project Contract No. 7022000111</div>

**3.  *Failure to comply with METRO's Small Business Program as required in Section VII (B)(C)(D)(G).***

PRC is in compliance with the B2G system as much as the system allows.  As more fully explained below, the system has issues that need to be addressed by Metro and not used to claim small businesses like PRC are not in compliance.

Please see the screenshot showing all Small Business participation provisions and the Contractor Utilization Plan Pledge provisions, which are in B2G.  PRC submitted an updated CUP on May 1, 2023. PRC has been actively working to resolve any of these administrative issues however the limitations of the software have created multiple issues with our  vendors: 1) PRC has  multiple vendors in the system that reference other contacts but not the contracts with PRC that we submitted to B2G, 2) the contract amount does not allow matching the percentage system, 3) the software requires PRC to enter exact amounts or percentages of the total contract price,  neither of which were possible due to changes in the NTE contract amount, vendor material price escalation, and a dispute with a vendor regarding the correct invoice amount, all of which make it impossible to accurately submit a Pay Application and be eligible for payment, if even one subcontractor disputes their part of the Pay Application and 4) error messages when entering a vendor into the software that already exists but does not have the correct representative or contact information.[2] This screenshot shows our compliance to the extend the B2G system allows:



**4.  *Failure to comply with the terms and conditions required in Section IX (4), (18), (27), (28), (32).***

PRC has maintained all safety, traffic control, clean up, and other Contract requirements. PRC did not abandon the site for non-performance.  Rather, it performed site work through May 1. However, METRO's continued non-payment of the March and April Pay Applications  created a significant financial burden and an immediate stop of PRC's cash flow such that its crew, subcontractor site workers, and even haul-off dump trucks could not continue to operate. In fact, METRO Construction was satisfied with our performance and was working actively with PRC to finish both Segments 2 and 3. Additionally on April 27, 2023, METRO Procurement signed and issued an extension of our work through December 31,

---

[2] As an example, see the screenshots of the B2G software attached hereto as **<u>Exhibit D</u>**.  The software does not allow PRC to add Bartlett Tree Service as a new vendor, because it already exists in the system.  Yet, PRC cannot use the existing Bartlett Tree Service information because Metro's system information does not match the contact information PRC must use to notify and pay its subcontractor.



RE: 56 BOOST Project Contract No. 7022000111

2023. Please see Exhibit A for both Work Authorization extensions. If there was a default regarding the actual site work performed by PRC, it would not have been  afforded this extension or have Construction satisfied with our work.

Regarding the work schedules, PRC had previously been submitting schedules using Excel, and they were accepted by METRO. PRC began submitting schedules using Primavera P6, however the third-party inspector engaged by METRO was withholding submission of the Primavera P6 schedules without notifying PRC of any errors or basis for withholding.  PRC did not find out about this non-submission of its schedules until a meeting it attended on April 11.  At that time, it worked to resolve any alleged issues, and it was given verbal permission by Mr. Bilal Salahuddin to submit schedules via Excel once again.

In summary, PRC has not abandoned the Project, nor is it in default of the Contract. Rather, the OEBO wrongfully withheld payment of the March Pay Application in violation of the Contract, which affected PRC's performance of the Contract.  PRC notified Metro multiple times and explained that OEBO and METRO should issue payment.  METRO breached the Contract by wrongfully withholding payment, and PRC can resume execution of the Project once it receives the outstanding payments. Thus, METRO's termination for cause issued on May 5 is a wrongful termination, and PRC should be reinstated on the Project and be paid for work performed, or, in the alternative,  PRC's termination  should be amended to a termination for convenience pursuant to Section IX(36)(A), because no cause exists.

Rev. 11-20-17

**METRO**

Page 1 of 1

## WORK AUTHORIZATION #:1 PO#: 7122001390; MODIFICATION: P005

*Receipt of this Work Authorization Modification, approved and authorized by METRO, authorizes you to proceed with the subject services.*
*Except as modified herein, all terms and conditions of the base Work Authorization remain unchanged and in full force and effect.*

1. Consultant / Contractor:     Contract No.:7022000111;  Work Authorization/Mod No.: WA#1, PO 7122001390; Mod#: P005; time extension only.
   Firm name: PRCHOU, LLC
   Full address: 3411 Richmond Ave, Ste 610
   City, State, Zip Code: Houston TX. 77046                Date of Issue: April 27, 2023

2. Consultant's Key Personnel:  MS. Mukadas D. Kurban, CEO, 832-858-1239;  dansi@premiergrouptx.com

3. Scope of Services:           Segment 2 of Route 56; between Cavalcade & Tidwell; -SOW No Change.

4. Period of Performance:       May 16, 2022 through  was April 30, 2023 – extended through December 31, 2023

5. WA Not-to-Exceed Amount:  NTE $1,493,345.71

6. METRO Project Manager:    Cecil Boone; 713-739-3832; Email: Cecil.Boone@ridemetro.org
   Will monitor, inspect and accept the services performed pursuant to this  WA Modification.

7. Contract Administrator:       Michael Diettel   713-652-8018; E-mail: Michael.diettel@ridemetro.org

8. Payment:  All payments shall be based on actual hours worked at the rates stipulated in the Price Schedule of the
   Base Contract, No. 7022000111, and in accordance with the contract clause entitled 'INVOICING AND PAYMENT.'

**ACCEPTED FOR CONSULTANT By:**                  **APPROVED AND AUTHORIZED BY METRO By:**

Signature: _____           Signature: *Michael Diettel*

Name:                                          Name:
(Print or Type)    Mukadas D. Kurban          (Print or Type)    Michael Diettel

Title:    CEO                                  Title:    Contracting Officer

Date:    4/27/23                               Date:  April 27, 2023

**10.  WA Activity:**                            **11.  Attachments:**
Mod P001 – Administrtive Modification.
Mod P002 – RECINDED
Mod P003 -  For Formwork in amount of $2,873.85 and time extendtion.
May 16, 2022 thru Dec. 31, 2022 extended thru April 30, 2023
Mod P004 – For Grounted Mounted Sign/Beacon Assembly $33,711.80
Mod P005 – Administrative Modification/Time Extension Only:
May 16, 2022 thru April 30, 2023 extended thru Dec. 31, 2023

| | |
|---|---|
| Contract NTE Amount: | $11,500,000.00 |
| NTE Amt.- WA#1 – 7122001390 | $1,456,760.06 |
| Mod P001 to WA1- PO-7122001390 | $0.00 |
| Mod P002 to WA1-PO-7122001390 | Recinded |
| Mod P003 to WA1- PO-7122001390 | $1,459,633.91 |
| Mod P004 to WA1- PO-7122001390 | $1,493,345.71 |
| Mod P005 to WA1– PO-7122001390 | $0.00 |
| NTE Balance | $10,006,654.29 |

**EXHIBIT A**

Rev. 11-20-17                                                                                    Page 1 of 1

**METRO**

---

## WORK AUTHORIZATION NUMBER 2 – PO: 7122001517 MODIFICATION P002

*Receipt of this Work Authorization Modification, approved and authorized by METRO, authorizes you to proceed with the subject services.*

1. **Consultant/Contractor / Contract No.: 7022000111; Work Authorization & Mod #: WA#2, PO 7122001517, Mod.: P002**
   Firm Name:     PRCHOU, LLC
   Full address:   3411 Richmond Ave., Ste 610
   City/State/Zip:  Houston, TX. 77046          **Date of Issue:** April 27, 2023

2. **Consultant's Key Personnel:**          MS. Mukadas D. Kurban, CEO, 832-858-1239; dansi@premiergrouptx.com

3. **Scope of Services**:          Segment 3 of Route 56, Location is between Tidwell and Gulf Bank Roads. No Change in SOW.

6. **Period of Performance:**          June 9, 2022, through May 31, 2023, changed to read Dec. 31, 2023, This is a time extension. only.

7. **METRO Project Manager:**          Cecil Boone; 713-739-3832; Email: Cecil.Boone@ridemetro.org
                    Will monitor, inspect and accept the services performed pursuant to this Work Authorization.

8. **Contract Administrator:**          Michael Diettel; 713 652-8018; Email: md66@ridemetro.org

9. **Payment:**          All payments shall be based on actual hours worked at the rates stipulated in the Price
                    Schedule of the base contract, No. **7022000111**, and in accordance with the contract clause
                    entitled 'INVOICING AND PAYMENT.'

**ACCEPTED FOR CONSULTANT By:**          **APPROVED AND AUTHORIZED BY METRO By:**

Signature: _____          Signature: *Michael Diettel*

Name: (Print
or Type)   Mukadas D. Kurban          Name: (Print
or Type)   Michael Diettel

Title:   CEO          Title:   Contracting Officer

Date:   4/27/23          Date:   April 27, 2023

**10. WA Activity:**          **11. Attachments:**
Mod P001 – Administrative modification for time extension only.          A. Scope
June 9, 2022, thru Dec. 31, 2022, extended thru May 31, 2023
Mod P002 – Administrative modification for a time extension only.
June 9, 2022, through May 31, 2023, extended through Dec.31, 2023.

| | |
|---|---|
| Contract NTE Amount: | $11,500,000.00 |
| NTE Amt.- WA#1 - 7122001390 | $1,456,760.06 |
| Mods P001 thru P005 on WA1 | $36,585.65 |
| NTE Amt. – WA#2- 7122001517 | $1,410,124.72 |
| WA#2- 7122001517 P001 | $0.00 |
| WA#2- 7122001517 - NTE Balance | $8,596,529.57 |



**Jacob Varghese <jacob@premiergrouptx.com>**

---

## -- Re: 56 BOOST Project Shut Down - April 29, 2023
1 message

---

**Jacob Varghese** <jacob@premiergrouptx.com>                          Sun, Apr 30, 2023 at 8:21 PM
To: Otis Johnson <Otis.Johnson@ridemetro.org>
Cc: Shri Reddy <Shri.Reddy@ridemetro.org>, "Lehman, Gary" <Gary.Lehman@arcadis.com>, Bilal Salahuddin
<Bilal.Salahuddin@ridemetro.org>, Cecil Boone <Cecil.Boone@ridemetro.org>, Abdul Dawood
<abdul@premiergrouptx.com>, Michael Diettel <Michael.Diettel@ridemetro.org>, Michael Kyme
<Michael.Kyme@ridemetro.org>, mukadas kurban <dansi@premiergrouptx.com>, Karen Hudson
<Karen.Hudson@ridemetro.org>, Danielle Smith <Danielle.Smith@ridemetro.org>

Hi Otis,

I'm the one that entered those two vendors into B2G - not Danielle - once I entered them, it is pushed to her for her approval. So, it seems you may not be aware of how B2G works and the issues it has.

I will review your email and see what we can do.

Jacob

On Fri, Apr 28, 2023 at 3:59 PM Otis Johnson <Otis.Johnson@ridemetro.org> wrote:

> Jacob,
>
> In lieu of your recent email correspondences, I want to make it clear there are no software "circular reference errors" or "glitches" with B2Gnow. And to prove this point, within seconds Danielle was able to add the two vendors you claimed could not be entered, due to software issues with B2Gnow. Despite numerous emails, the Office of Economic Business Opportunity (OEBO) has been waiting for several weeks for PRC+HOU to address the open non-compliance issues. During the contract, OEBO discovered several subcontractors and suppliers were being used without our knowledge. The contract clearly states the CUP must contain all subcontractors and suppliers the Prime will use to execute the scope of work. And that the addition or removal of any vendors must first be approved by OEBO. To make matters worse, several vendors have notified METRO of non-payment issues. While the construction nature of the contract is important, the Small Business compliance requirements are no less important. Your outstanding invoices will be released once the following compliance items have been resolved:
>
> - Add all missing subcontractors and suppliers to B2Gnow. The list below represents vendors we are aware of:
>     - TAPCO, Inc. (completed by Danielle)
>     - Texas Concrete Enterprise Ready Mix, Inc
>     - Concrete Pros Ready Mix, Inc
>     - Sunbelt Rentals
>     - Montgomery Heavy Equipment
>     - LEFTAMO Construction (completed by Danielle)
>     - CRC & Associates
> - Submit a request via B2Gnow to remove any vendors. The requests must be accompanied by written justification and supporting documentation.
> - Submit a revised Contractor Utilization Plan (CUP).
> - Submit subcontract agreements for all new subcontractors that are being added.
> - Payment of all past-due invoices.
> - Report payment activity in B2Gnow per their audit period.
> - Post subcontractor invoice information in B2Gnow, per all invoices submitted to METRO.
>
>
> Feel free to contact me or Danielle if you have any questions or need any further assistance.
>
>
> Regards,
>
> Otis Johnson, Director

<div style="border:1px solid black; display:inline-block; padding:10px; text-align:center;">

**EXHIBIT**

**B**

</div>

5/10/23, 4:40 PM          Premier Group Mail - 56 BOOST Project Shut Down - April 29,...

Case 4:24-cv-00796   Document 1-1   Filed on 06/10/24 in TXSD   Page 115 of 127

Office of Economic Business Opportunity (OEBO)

713-615-6112



---

**From:** Jacob Varghese <jacob@premiergrouptx.com>
**Sent:** Friday, April 28, 2023 11:23 AM
**To:** Shri Reddy <Shri.Reddy@ridemetro.org>; Lehman, Gary <Gary.Lehman@arcadis.com>; Bilal Salahuddin <Bilal.Salahuddin@ridemetro.org>
**Cc:** Cecil Boone <Cecil.Boone@ridemetro.org>; Abdul Dawood <abdul@premiergrouptx.com>; Otis Johnson <Otis.Johnson@ridemetro.org>; Michael Diettel <Michael.Diettel@ridemetro.org>; Michael Kyme <Michael.Kyme@ridemetro.org>; mukadas kurban <dansi@premiergrouptx.com>
**Subject:** 56 BOOST Project Shut Down - April 29, 2023

---

**CAUTION:** This email originated from outside METRO's network. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hi Shri and Bilal,

After careful and painful consideration - and finding out that our invoices are being held by METRO SBE due to administrative issues with a B2G system that is having software issues (not due to actual construction performance and not PRC's fault). Due to invoicing being held, PRC can no longer maintain crews, subs, and vendor payments. We did not receive any notice after submitting our March Pay App that it was being withheld either.

We are pouring today and tomorrow April 29, 2023 - we will need to clean up, remove traffic control, and shut down the site - as it has become financially untenable for us to continue.

We will submit April Pay App by Monday, May 1, 2023. We can only continue and restart site work once both March and April Pay Apps have been received and materials escalation has been approved.

Thank you,

Jacob

--

// Jacob Varghese //  COO //

// Direct: +1.832.278.3780 //

// Email: jacob@premiergrouptx.com //

// Web: http://premiergrouptx.com //

// Address: 3411 Richmond Ave. Ste. 610 - Houston, TX 77046 //

At PRC+HOU we aim to bring the finest in retail construction capabilities to our clients. We are proud to be Woman Owned (WBENC Certified) as well as HUB, SBE, DBE, HCDD (Section 3), Metro, Port of Houston and City of Houston Certified.

Disclaimer // Please consider the environment before printing this e-mail.
This message may contain information that is confidential or privileged.
If you are not the intended recipient, please advise the sender immediately and delete this message and any attachments without retaining a copy.

--
// Jacob Varghese //  COO //

// Direct: +1.832.278.3780 //
// Email: jacob@premiergrouptx.com //
// Web: http://premiergrouptx.com //
// Address: 3411 Richmond Ave. Ste. 610 - Houston, TX 77046 //

At PRC+HOU we aim to bring the finest in retail construction capabilities to our clients. We are proud to be Woman Owned (WBENC Certified) as well as HUB, SBE, DBE, HCDD (Section 3), Metro, Port of Houston and City of Houston Certified.

Disclaimer // Please consider the environment before printing this e-mail.
This message may contain information that is confidential or privileged.
If you are not the intended recipient, please advise the sender immediately and delete this message and any attachments without retaining a copy.



**Jacob Varghese <jacob@premiergrouptx.com>**

## Details - Re: B2G Entered - Re: -- Re: 56 BOOST Project Shut Down - April 29, 2023
2 messages

**Jacob Varghese** <jacob@premiergrouptx.com>                     Mon, May 1, 2023 at 2:04 PM
To: Danielle Smith <Danielle.Smith@ridemetro.org>
Cc: "Lehman, Gary" <gary.lehman@arcadis.com>, Bilal Salahuddin <Bilal.Salahuddin@ridemetro.org>, Cecil Boone
<Cecil.Boone@ridemetro.org>, Abdul Dawood <abdul@premiergrouptx.com>, Michael Diettel
<Michael.Diettel@ridemetro.org>, Otis Johnson <Otis.Johnson@ridemetro.org>, mukadas kurban
<dansi@premiergrouptx.com>, "Bagga, Ashish" <Ashish.Bagga@arcadis.com>, Karen Hudson
<Karen.Hudson@ridemetro.org>

Danielle,

Yes - please find an explanation that is from a business perspective -

1) Sunbelt is not an SBE - and we have not used them since last year - but more importantly - we are dealing with their
invoice department to correct these past errors and have asked respectfully for METRO to not be involved with our
business affairs. Our attorneys are handling this as well. So for legal reasons, we are not going to place them in the CUP.

2) CRC & Associates is not an SBE - and we had briefly engaged them for a couple of weeks to test - but failed as they
also have misrepresented their invoices and our attorneys have advised us to not directly engage - as it is now going
through a legal process. We respectfully again ask METRO to be not invoiced in our business affairs of subs due to legal
reasons as well as not being an SBE.

3) Montgomery -- as you can see in B2G -- they are listed as Onnea DBA Montogomery Heavy Equipment. They go by
Montgomery Heavy Equipment and checks are made out to that entity.

Thank you,

Jacob

On Mon, May 1, 2023 at 1:55 PM Danielle Smith <Danielle.Smith@ridemetro.org> wrote:

> Jacob,
>
>
> Thank you for submitting these for my review. However, upon reviewing them, I noticed that a few subs/suppliers were
> not listed on the CUP, and I did not receive any requests for them to be added via B2Gnow. Per the assessment below,
> please update B2Gnow and submit a revised CUP. Otherwise, I will need an explanation/justification for the discrepancy
> for our review.
>
>
> Missing from the CUP
>
> - Sunbelt
> - CRC & Associates
> - Onnea Equipment (brought to attention by Jacob via B2Gnow)
>
>
> Missing from B2Gnow
>
> - Sunbelt
> - Montgomery Heavy Equipment
> - CRC & Associates

<div style="border:1px solid black; display:inline-block; padding:10px; text-align:center;">

**EXHIBIT
C**

</div>

Thank you,

Danielle Smith

---

**From:** Jacob Varghese <jacob@premiergrouptx.com>
**Sent:** Monday, May 1, 2023 12:16 PM
**To:** Danielle Smith <Danielle.Smith@ridemetro.org>; Lehman, Gary <gary.lehman@arcadis.com>
**Cc:** Bilal Salahuddin <Bilal.Salahuddin@ridemetro.org>; Cecil Boone <Cecil.Boone@ridemetro.org>; Abdul Dawood <abdul@premiergrouptx.com>; Michael Diettel <Michael.Diettel@ridemetro.org>; Otis Johnson <Otis.Johnson@ridemetro.org>; mukadas kurban <dansi@premiergrouptx.com>; Bagga, Ashish <Ashish.Bagga@arcadis.com>
**Subject:** B2G Entered - Re: -- Re: 56 BOOST Project Shut Down - April 29, 2023

> **CAUTION:** This email originated from outside METRO's network. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Update to all -

Despite issues with B2G (i.e. multiple vendor contacts, error references, etc..) subs have been entered in B2G by possible workaround solutions -

Danielle - please approve on your end. Attached is the CUP. Gary - appreciate your help as well.

We sincerely request the release of our check as soon as possible.

Thank you,

Jacob

On Sun, Apr 30, 2023 at 8:21 PM Jacob Varghese <jacob@premiergrouptx.com> wrote:

> Hi Otis,
>
> I'm the one that entered those two vendors into B2G - not Danielle - once I entered them, it is pushed to her for her approval. So, it seems you may not be aware of how B2G works and the issues it has.
>
> I will review your email and see what we can do.
>
> Jacob

On Fri, Apr 28, 2023 at 3:59 PM Otis Johnson <Otis.Johnson@ridemetro.org> wrote:

Jacob,

In lieu of your recent email correspondences, I want to make it clear there are no software "circular reference errors" or "glitches" with B2Gnow. And to prove this point, within seconds Danielle was able to add the two vendors you claimed could not be entered, due to software issues with B2Gnow. Despite numerous emails, the Office of Economic Business Opportunity (OEBO) has been waiting for several weeks for PRC+HOU to address the open non-compliance issues. During the contract, OEBO discovered several subcontractors and suppliers were being used without our knowledge. The contract clearly states the CUP must contain all subcontractors and suppliers the Prime will use to execute the scope of work. And that the addition or removal of any vendors must first be approved by OEBO. To make matters worse, several vendors have notified METRO of non-payment issues. While the construction nature of the contract is important, the Small Business compliance requirements are no less important. Your outstanding invoices will be released once the following compliance items have been resolved:

- Add all missing subcontractors and suppliers to B2Gnow. The list below represents vendors we are aware of:

  - TAPCO, Inc. (completed by Danielle)
  - Texas Concrete Enterprise Ready Mix, Inc
  - Concrete Pros Ready Mix, Inc
  - Sunbelt Rentals
  - Montgomery Heavy Equipment
  - LEFTAMO Construction (completed by Danielle)
  - CRC & Associates

- Submit a request via B2Gnow to remove any vendors. The requests must be accompanied by written justification and supporting documentation.
- Submit a revised Contractor Utilization Plan (CUP).
- Submit subcontract agreements for all new subcontractors that are being added.
- Payment of all past-due invoices.
- Report payment activity in B2Gnow per their audit period.
- Post subcontractor invoice information in B2Gnow, per all invoices submitted to METRO.

Feel free to contact me or Danielle if you have any questions or need any further assistance.

Regards,

Otis Johnson, Director

Office of Economic Business Opportunity (OEBO)

713-615-6112



---

**From:** Jacob Varghese <jacob@premiergrouptx.com>
**Sent:** Friday, April 28, 2023 11:23 AM
**To:** Shri Reddy <Shri.Reddy@ridemetro.org>; Lehman, Gary <Gary.Lehman@arcadis.com>; Bilal Salahuddin <Bilal.Salahuddin@ridemetro.org>
**Cc:** Cecil Boone <Cecil.Boone@ridemetro.org>; Abdul Dawood <abdul@premiergrouptx.com>; Otis Johnson <Otis.Johnson@ridemetro.org>; Michael Diettel <Michael.Diettel@ridemetro.org>; Michael Kyme <Michael.Kyme@ridemetro.org>; mukadas kurban <dansi@premiergrouptx.com>
**Subject:** 56 BOOST Project Shut Down - April 29, 2023

5/10/23, 4:37 PM
Case 4:24-cv-00796 Document 14-1 Filed on 06/10/24 in TXSD Page 120 of 127
Premier Group Retail Ltd - Re: Fall down on Post 00 S TX Sac Shir Page 120 of 127

**CAUTION:** This email originated from outside METRO's network. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Shri and Bilal,

After careful and painful consideration - and finding out that our invoices are being held by METRO SBE due to administrative issues with a B2G system that is having software issues (not due to actual construction performance and not PRC's fault). Due to invoicing being held, PRC can no longer maintain crews, subs, and vendor payments. We did not receive any notice after submitting our March Pay App that it was being withheld either.

We are pouring today and tomorrow April 29, 2023 - we will need to clean up, remove traffic control, and shut down the site - as it has become financially untenable for us to continue.

We will submit April Pay App by Monday, May 1, 2023. We can only continue and restart site work once both March and April Pay Apps have been received and materials escalation has been approved.

Thank you,

Jacob

--

// Jacob Varghese //  COO //

// Direct: +1.832.278.3780 //

// Email: jacob@premiergrouptx.com //

// Web: http://premiergrouptx.com //

// Address: 3411 Richmond Ave. Ste. 610 - Houston, TX 77046 //

At PRC+HOU we aim to bring the finest in retail construction capabilities to our clients. We are proud to be Woman Owned (WBENC Certified) as well as HUB, SBE, DBE, HCDD (Section 3), Metro, Port of Houston and City of Houston Certified.

Disclaimer // Please consider the environment before printing this e-mail.
This message may contain information that is confidential or privileged.
If you are not the intended recipient, please advise the sender immediately
and delete this message and any attachments without retaining a copy.

--

| | /

--
// Jacob Varghese  //  COO //

// Direct: +1.832.278.3780 //
// Email: jacob@premiergrouptx.com //
// Web: http://premiergrouptx.com //
// Address: 3411 Richmond Ave. Ste. 610 - Houston, TX 77046 //

At PRC+HOU we aim to bring the finest in retail construction capabilities to our clients. We are proud to be Woman Owned (WBENC Certified) as well as HUB, SBE, DBE, HCDD (Section 3), Metro, Port of Houston and City of Houston Certified.

Disclaimer // Please consider the environment before printing this e-mail.
This message may contain information that is confidential or privileged.
If you are not the intended recipient, please advise the sender immediately
and delete this message and any attachments without retaining a copy.

---

**Charles Holmes** <Charles.Holmes@ridemetro.org>                    Mon, May 1, 2023 at 2:57 PM
To: Jacob Varghese <jacob@premiergrouptx.com>

FYI

## Charles Holmes

## Supervisor, Contracts Specialist

Metropolitan Transit Authority

### *1900 Main Street*

### *Houston, TX 77002*

☎713-615-6258

Charles.Holmes@ridemetro.org



---

**From:** Charles Holmes
**Sent:** Monday, May 1, 2023 2:55 PM
**To:** jacob@premiergrouptx.co
**Subject:** FW: Details - Re: B2G Entered - Re: -- Re: 56 BOOST Project Shut Down - April 29, 2023

Hello Jacob,

Please include me on all communications regarding the 56 Boost project.

Thank you so much.

**Charles Holmes**

**Supervisor, Contracts Specialist**

Metropolitan Transit Authority

*1900 Main Street*

*Houston, TX 77002*

☏713-615-6258

Charles.Holmes@ridemetro.org



---

**From:** Michael Diettel <Michael.Diettel@ridemetro.org>
**Sent:** Monday, May 1, 2023 2:51 PM
**To:** Charles Holmes <Charles.Holmes@ridemetro.org>
**Subject:** FW: Details - Re: B2G Entered - Re: -- Re: 56 BOOST Project Shut Down - April 29, 2023

FYI

**Regards,**

**Michael L. Diettel**
**Sr. Contracts Administrator**
**Procurement & Materials Department**
**Metropolitan Transit Authority**
**1900 Main Street**
**Houston, TX. 77002**

Michael.Diettel@ridemetro.org
**(713) 652-8018**


[Quoted text hidden]



EXHIBIT D



**Vendor Registration: Start**                                                                                                                CLOSE WINDOW ⊠

> **ridemetro.sbdbe.com says**
>
> The email/username is in use on another active account. Please contact Customer Support for assistance or enter another email/username.
>
> **OK**

* required entry

**Business Information**

| | |
|---|---|
| BUSINESS NAME * | Ba... |
| DBA NAME | |
| TAX ID NUMBER * | 060254490 |
| | (9 digit Federal Tax ID; firms are strongly encouraged not to use SSN as the tax ID. Tax ID Numbers can be easily obtained from the IRS at no charge.) |
| UNIQUE ENTITY IDENTIFIER | (More information about Unique Entity Identifiers) |
| DUNS NUMBER | (Look up a Dun & Bradstreet number) |
| COMPANY TYPE | None selected |
| COMPANY OWNERSHIP ETHNICITY | None selected |
| COMPANY OWNERSHIP GENDER | None selected |

**Business Contact Information**

| | |
|---|---|
| MAIN COMPANY EMAIL * | JKeefe@Bartlett.com |
| MAIN PHONE * | 713  692-6371 |
| MAIN FAX | |
| MAIN COMPANY WEBSITE | |
| COMPANY ADDRESS * | 6113 Gardendale Dr |
| CITY * | Houston |
| STATE/PROVINCE * | U.S. States/Provinces   Canadian Provinces |
| | TX |
| ZIP CODE/POSTAL CODE * | U.S. Zip Code   Canadian Postal Code |
| | 77092 |
| COUNTRY * | United States |

**Company Contact Person**

| | |
|---|---|
| NAME * | First name: Joe   Last name: Keefe |
| TITLE | |
| EMAIL (USERNAME) * | (Copy from above) JKeefe@Bartlett.com |
| PHONE NUMBER | (Copy from above) 713  692-6371  Ext. |
| MOBILE NUMBER | |
| FAX NUMBER | (Copy from above) |
| TIME ZONE * | US/Central |

Review   Cancel

Logged on as:
Jacob Varghese
PRCHOU LLC

Home
View »
Search »
  Vendors
  Certified Vendors
  Contracts
  Bid Solicitations
  Concessions
  Outreach
  Users
  Search Results »
Message »
Settings »
Help & Support »
Logoff
Show All   Hide All

# Exhibit 5

## June 29, 2023:

**PRC sent another formal Letter to Michael Diettal, including an Email to Michael Diettal and Charles Holmes at METRO requesting an Appeal.**

**To this day, PRC still has not received a response from METRO regarding the Appeals it submitted on May 8, May 15, June 16 and June 29, 2023.**



**MUNSCH HARDT**
DALLAS / HOUSTON / AUSTIN

Hartland Plaza
1717 W. 6th Street, Suite 250
Austin, Texas 78703
Main 512.391.6100
Fax 512.391.6149
munsch.com

**CONNOR BEST**
Direct Dial 512.391.6141
Direct Fax 512.391.6149
cbest@munsch.com

June 29, 2023

*Via Certified Mail/RRR 9314769904300109537664*
 *and Email (Michael.Diettel@ridemetro.org)*

**METRO Contract Disputes Appeals Committee**
c/o Michael Diettel
Contracting Officer
1900 Main Street
Houston, Texas 77002

<div align="center">

Re:    PRCHOU, LLC's Appeal pursuant to Section IX(9) of METRO'S Termination of Contract No. 7022000111 BOOST 54 AIRLINE/MONTROSE

</div>

Dear Mr. Diettel:

      I am writing this letter in accordance with my previous letter, dated June 16, 2023, to which I have not received any response. Per my previous letter, PRC disputes METRO's termination of the Contract, and submitted two responses appealing METRO's termination of the Contract and requesting a hearing to contest the termination on May 8, 2023 and May 15, 2023. In its appeal to the METRO Contract Disputes Appeals Committee on May 15, 2023. PRC disputed METRO's stated grounds for termination, provided evidence in support thereof, and requested an evidentiary hearing to present its case in accordance with Section IX, Paragraph 9 of the Contract.

      PRC still has not received any response from METRO regarding the appeals it submitted in May, nor its June 16, 2023 letter requesting METRO comply with its Contract. METRO's failure to provide an appeal is a breach of the Contract and waives ay requirement of PRC to submit to the evidentiary hearing. Furthermore, METRO's wrongful demands of performance to PRC's surety without providing PRC the required appeal may cause damages to PRC for which METRO will be liable and constitutes a failure to mitigate damages by METRO. Please confirm in writing that METRO will be providing an evidentiary hearing, as required by the Contract, by **July 5, 2023**.

      By the copy below, I am providing a copy of this correspondence to the performance bond surety on the project at issue, Travelers Casualty and Surety Company of America.

      PRC reserves all rights and remedies granted to it pursuant to the Contract, at law and equity, and the requests contained in this letter shall not be construed as a waiver of any of PRC's rights and/or remedies. In addition, METRO's wrongful termination and breach of the Contract has caused PRC to incur damages and attorney's fees, which are recoverable pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

4859-7292-2989v.1 017053.00001

June 29, 2023
Page 2

**Furthermore, PRC requests METRO preserve and retain all documents, electronically stored information (ESI), and physical evidence related to the Contract, in accordance with Texas and Federal law.**

I look forward to hearing from you.

Regards,

Connor Best

Attorney at Law

cc: Charles Holmes
Supervisor, Contracts Specialist
Metropolitan Transit Authority of Harris County
1900 Main Street
Houston, TX 77002
Charles.Holmes@ridemetro.org

Travelers Casualty and Surety Company of America
c/o Elizabeth Roman
EJROMAN@travelers.com